# EXHIBIT C

Exhibit C Page 32

# PRODUCT SUPPLY AGREEMENT

This AGREEMENT is made effective as of [    ], 2004 ("Effective Date") by and between **V, Inc.**, a California corporation, having its principal place of business at 320A Kalmus Drive, Costa Mesa, CA, USA ("Buyer") and AMTRAN TECHNOLOGY CO., LTD., having its principal place of business at 17F, No. 268 Lien Chen Road, Chung-Ho City, Taipei County 235, R.O.C (hereinafter referred to as "Supplier"):

## Recitals

Supplier desires to supply to Buyer, and Buyer desires to acquire from Supplier, under the terms and conditions set forth in this Agreement, computer monitors and such other products as may be supplied by Supplier to Buyer during the term of this Agreement ("Products", as specified in Schedule A) for distribution and/or resale by Buyer and/or for incorporation into products to be manufactured and sold by Buyer, upon Buyer's instructions.

In consideration of their mutual promises, the parties agree as follows:

1. **Purchase of Products by Buyer.**

    A. **Scope of Agreement**. The terms and conditions contained herein shall govern all orders for Products placed by Buyer and shall supersede any terms and conditions of any order, confirmation, acknowledgment, acceptance or other such document related to the supply of Products by Supplier to Buyer.

    B. **Purchase Orders; Forecasts**. To purchase Products hereunder, Buyer shall submit to Supplier purchase orders for quantities of Products desired by Buyer from time to time, in accordance with the provisions set forth herein. Supplier agrees to sell Products to Buyer in such quantities as Buyer may require during the term hereof. During the term hereof Buyer shall provide rolling consumption forecasts for rolling ninety-day periods ("Forecasts"), by the first day of each month during the term hereof. The parties agree that Buyer shall not be obligated in any way to purchase any quantity of Product set forth in any Forecasts and that such Forecasts are solely guidelines to facilitate the ordering process.

    C. **Acceptance.** Any modification or rejection of purchase order shall be sent to Buyer via written notice within three (3) working days after receipt of Buyer's purchase order. Positive acknowledgement within three (3) working days after Supplier receives Buyer's purchase order shall be deemed acceptance of the purchase order by Supplier, however, any delay of the response by Supplier shall not be deemed to the acceptance by Supplier.

    D. **Delivery to Buyer; Drop Shipment.** Supplier will store certain number of the Products for sales, pursuant to the Purchase Orders furnished by Buyer and the inventory to be agreed between Supplier and Buyer, in the Hub/ warehouse agreed between Supplier and Buyer. Buyer shall use the Shipping Order (SO) to pull the Products from the Hub/ warehouse of Supplier's. Risk of loss or damage to the Products shall pass to Buyer when the Products are pull out from the Hub/ warehouse as well as the title to the Products. Notwithstanding the forgoing, Buyer shall be responsible for the Purchase Orders issued and be liable for all the Products shipped and stored over thirty (30) days to the Hub as the applicable Purchase Orders. Storage fee over thirty (30) days will also be charged.

Exhibit C Page 33

Outside Attorneys' Eyes Only

V0000046722

E. **Shipping Terms:**

a. Consignee on Bill of Lading
   1. Consignee will be V, Inc. c/o AseV

b. Importer and custom broker
   1. Importer will be: V, Inc. c/o AseV
   2. Custom broker: will be AmTran custom broker;
   3. However, V will issue a power of attorney to AmTran's custom broker enabling AmTran's custom broker to clear cargo for V, Inc.

c. Cargo Insurance:
   1. AmTran will be responsible for insurance during transportation until product ex AmTran Hub.
   2. V, Inc. will not cover cargo insurance from port to AmTran hub. However, V, Inc. will cover cargo insurance for local transportation, i.e., from AmTran hub to the customers of V, Inc.

d. Trade Term:
   While the name of V, Inc. appears in the Bill of Lading, the trade term between AmTran and V, Inc. continues to be Ex-Hub term. This means AmTran will cover all the costs before products "ex" AmTran hub.

e. Ownership of Inventory and timing of title transfer
   1. Since the trade term between AmTran and V, Inc. continues to be Ex-Hub, the ownership of the inventory will belong to AmTran until products "ex" AmTran hub.
   2. Therefore, the title of the inventories will be transferred to V, Inc. at the time V, Inc. receives products from AmTran hub. V, Inc.'s liability will occur from the point of product "ex" AmTran hub.

f. Billing
   1. AmTran or AseV will bill V, Inc. at the time products "ex" AmTran Hub

F. **Flexibility and cancellation requirement.** Products furnished by Supplier shall follow the shipping instructions and delivery schedule specified in each purchase order.
BUYER can increase, decrease, cancel or reschedule scheduled deliveries to Supplier only within mutual agreed. Notwithstanding the foregoing, any confirmed shipment cannot be canceled by Buyer without cancellation charges, including, but not limited to, all costs of inventory, finished Products, Products in-transit, work-in-process, raw materials, unique parts, labor costs, production costs and other losses and costs incurred by Supplier. Any confirmed shipment/ Purchase order shall be rescheduled with mutual agreement.

G. **Late and Expedited Deliveries.** Supplier agrees, with its best efforts, to figure the solution in any event of the delay default. In any event of such delivery delays over fifteen (15) days, both parties shall re-negotiate the alternate delivery method to the relevant Purchase Order(s). Any cost and expenses of the additional transportation requested resulted from the alternative shipping method shall be further discussed and born after mutually agreed.

H. **Product Packaging Specification.** Unless otherwise requested in the Buyer's purchase order,

Outside Attorneys' Eyes Only

V0000046723

Supplier shall provide Products on pallets stacked in accordance with international and commercially reasonable standards and shall be suitably packaged to comply with any specifications set forth in this Agreement and in accordance with any other written instructions received from Buyer before two (2) weeks of each scheduled delivery date. The exposed ends of the Product packaging shall display a bar code identifying the Products' serial numbers and other identifying information.

1. **Prices and Payment**. The prices for Products sold hereunder shall be mutually agreed by both parties in writing. All prices shall be quoted in United States Dollars. Supplier shall issue and send to Buyer the invoice stating the total amount and quantities of the Products delivered to Buyer. And Buyer shall pay to Supplier the total amount stated on the invoice in United States Dollars, by telegraphic transmitting the same to the bank account designated by the Supplier, within forty-five (45) days from the Ex-Hub/warehouse date of the Product.

2. **Product Quality Inspection**

   A. **Factory Inspections**. In addition to any of its other inspection rights hereunder, during the term of this Agreement, Buyer retains the right to conduct inspections of finished Products at Supplier's facility(ies) in order to ensure compliance with Buyer's inspection quality standards as set forth in the PPS for such Product ("Inspection Quality Standards").

   B. **Inspection of Shipped Products**. Incoming Product shipped to Buyer may be inspected by Buyer at Buyer's facility, Buyer's customer's facility or at the new product hub, depending upon the shipment destination set forth in Buyer's purchase order therefore.

   C. **Failure of Inspection**. In the event Buyer inspects with evidence there is any nonconformity with any of the Inspection Quality Standards, Buyer may ask Seller to repair or replacement the Products in accordance with Section 3.

3. **Warranties/Spare Parts/Product Documentation.**

   A. **Warranty**. Supplier warrants that the Products delivered to Buyer shall be free from defects in material (except for material designated, provided or consigned by Buyer) and workmanship for 15 months after ex-hub shipping date of the Products (the "Warranty Period") and shall perform in accordance with the Product specifications provided by Buyer or mutually agreed by both parties. Warrant term attached hereto as Schedule C.

   B. **Exclusion of Supplier's liability.** Supplier shall have no liability or obligation to Buyer with respect to any defect caused by abuse, misuse, neglect, improper installation, operation, use, testing, or storage, or improper maintenance, repair, alteration, modification, tampering, accident or unusual deterioration or degradation of the Products or parts thereof due to physical environment beyond the requirements of Product specifications. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH ABOVE IN THIS SECTION, SUPPLIER IS MAKING NO OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO PRODUCTS, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. However, Supplier's service center needs to provide the receiving status information:

   - Provide Daily receiving log record information to Buyer Call Center

Outside Attorneys' Eyes Only

V0000046724

- Receiving inspection:
  - Check for complete accessories ( Speakers, Stand, Accessories box ( manual, remote, cables )
  - Check if Bezel, Cover, filter surface, Stand & Speaker is scratched or damaged.
  - Condition of the shipment if broken.
  - All the inspection detail with Discrepancies

  (missing, scratches, or damaged ) will follow the discrepancy process.

**Discrepancy process:
For shipment with discrepancy or damaged:
- Take picture and keep the shipment intact
- Pictures are taken from all 4 angles of the problem (Front, Top, sides and back)
- Put the shipment aside and provide and forward pictures, description of the damaged, all receiving paperwork as freight bills and reports to Buyer Call Center within 48 hours.

C. **Supplier's Aggregate Liability.** Supplier's aggregate liability arising out of this Agreement and/or sales of the products shall be limited to the amount received from Buyer for the Products. In no event Supplier shall be liable to Buyer or any other entity for any special, consequential, incidental, indirect or punitive damages however caused, on any theory of liability, and notwithstanding any failure of essential purpose of any limited remedy. Such excluded damages shall include, but not limited to, loss of goodwill, loss of profits, loss of use or data, interruption of business or other economic loss.

D. **Quality level Guarantee**.

AFR (Annualize Failure Rate)

Supplier should provide good quality product. The quality of the product for the AFR (Annualize Failure Rate) On the actual defect shall not exceed 2.0% during the consecutive 12 months from manufacture date.

AFR shall exclude Customer dissatisfaction returns, no trouble found (no defect found), customer abuse/ damage (including but not limited to scrap, spill, drop, mismatch), user software operation, installation, application issues or buyer waived problems, single unit with simultaneous multiple parts replacement is counted as one incident.

Supplier will review the actual AFR data on monthly basis. If the actual AFR of a specific product model turned out to be 2 times for a 3 consecutive months of the agreed percentage. Supplier needs to provide improvement plan.

Epidemic failure

1. Definition of "Epidemic Failure" should be one specific single factor cause quality failure per agreed specification.

2. The epidemic failure rate shall not exceed 5% during the consecutive period of 12

Outside Attorneys' Eyes Only

V0000046725

months. In the event of an epidemic failure, Supplier shall provide analysis report and feasible recovery plan to Buyer after Supplier's receipt of Buyer's written notice or Supplier's discovery of such epidemic failure. The remedy to an epidemic defect may involve Supplier & Buyer regional Hub rework, field site rework for actual failure units. Supplier and Buyer will under good faith to discuss for solution associated with resolving an epidemic defect. In any case if epidemic failure happens, which problem both parties had confirmed. Prior to any action taken supplier will provide the solution to Buyer for confirmation. Supplier will take action for actual failure units and implement solution to fully support Buyer to resolve the problem. For cost associated with resolving an epidemic defect should be discussed between both parties.

E. **Supplier Insurance.**

(a) <u>Personal Injury and Property Damage Insurance</u>. Supplier shall maintain liability insurance with a minimum limit of $1,000,000 per occurrence with such insurers and which will protect Supplier and Buyer from and against any and all liabilities arising from claims for damages because of bodily injury or death or property damage arising from or in any way related to the, manufacture, sale or use of Products supplied by Supplier pursuant to this Agreement. Supplier agrees to notify Buyer upon receipt of 30-day prior written notice for cancellation or change of the policy from Supplier's insurance carrier. Supplier shall also have no liability or obligation to Buyer under this section with respect to any claims caused by any Buyer's, end user's or any third party's abuse, misuse, neglect, improper installation, operation, testing, maintenance or repair, any alteration, unusual deterioration or degradation of the Product or parts thereof due to physical environment beyond the requirements of Product specifications, or Force Majeure event.

(b) <u>Evidence of Insurance Coverage</u>. Supplier shall, upon execution of this Agreement, provide Buyer with certificates evidencing such insurance.

4. **Trademarks**.

Supplier shall affix to each Product manufactured by it for sale to Buyer in accordance with this Agreement and the packaging thereof, such trademarks or tradenames in such form and style as may be specified by Buyer (the "Buyer Marks"). Supplier shall have no right to use or apply the Buyer Marks or to sell or otherwise dispose of any Products bearing the Buyer Marks except in connection with Products sold to Buyer pursuant to this Agreement. Nothing contained herein shall be construed as conferring upon Supplier any rights to use, ownership rights or interest in the Buyer Marks except as expressly authorized under this Agreement. Supplier shall immediately discontinue its use of the Buyer Marks upon Buyer's request, and in any event, upon termination of this Agreement. Buyer shall defend, indemnify, and hold Supplier harmless from and against any and all liabilities, claims, fines, losses, damages, costs and expenses (including attorney's fee) incurred by Supplier arising from any claim against Supplier for the infringement of any trademark or tradename resulting from Supplier's labeling/ affixing the trademark or tradename on a Product in accordance with Buyer's instructions.

Outside Attorneys' Eyes Only

V0000046726

5. **Patent Infringement.**

Supplier agrees to defend, indemnify and hold harmless Buyer and Buyer's representatives and employees from and against all liability, loss and damage resulting from valid and enforceable patent infringement with regard to Products purchased hereunder, or any claims thereof or litigation based thereon, except if such infringement arises out of (i) Buyer's modification of a Product, (ii) the combination, operation or use of a Product with any product, data or apparatus, (iii) anything Buyer provides to incorporate into a Product, (iv) Supplier's manufacture or modification of a Product in compliance with Buyer's design, tooling, specification, advice, approval, direction, indication, instruction, and/or using any of Buyer's designated or consigned material, component or part, or (v) Supplier's use of the Buyer Marks in accordance with this Agreement. In case the use or sale of any Products supplied hereunder is enjoined Supplier agrees to endeavor to procure for Buyer and purchasers of Products, at a mutually agreed election and at Supplier's expense, the right to continue using and selling said Products or to replace said Products with noninfringing Products acceptable to Buyer or to remove the same, or to refund a mutually agreed prices. For any claim or litigation for which Supplier has no obligation to defend, indemnify and hold harmless Buyer from and against hereunder, Buyer shall defend, indemnify and hold Supplier harmless from any and all liability, loss and damage, costs and expenses, including reasonable attorney's fees, as a result any claim or litigation brought by a third party claiming that the manufacture, sale or use of a Products constitutes an infringement of such third party's intellectual property right(s).

6. **Term and Termination**

   A. **Term**. This Agreement shall become effective as of the Effective Date, and unless earlier terminated as provided herein, shall continue for an initial term of one (1) year and, thereafter, shall automatically be renewed for additional terms of one year each, unless three (3) months before the end of the initial term or any additional term, either party shall give the other written notice of non-renewal of this Agreement, which notice may be issued with or without cause.

   B. **Termination for Cause.** If either party to this Agreement defaults in the performance of any material provision hereof, the non-defaulting party may give written notice to the defaulting party stating that, if the default is not cured within thirty (30) days from the receipt of such notice, the Agreement will be terminated. If the non-defaulting party gives such notice and the default is not cured during the thirty (30)-day notice period, then both parties shall promptly meet to resolve such defaulting problem.

   C. **Termination immediately for Cause.** If either party shall become insolvent, or make any assignment for the benefit of creditors, or admit in writing its inability to pay debts when due, or make or suffer to be made any transfer to any person, trustee, receiver, or referee for the benefit of creditors, or file a voluntary petition in bankruptcy, or suffer an involuntary petition in bankruptcy to be filed against it which is not stayed within sixty (60) days of filing, or file any petition in any reorganization, arrangement, composition, readjustment, liquidation, or dissolution or similar relief for itself, or becomes unable to pay its debts generally as they become due, the other party shall have the immediate right upon providing notice to terminate this Agreement.

   D. **Absolute Right**. The aforesaid rights of termination are absolute. Neither party shall be liable to the other party for any loss (including, but not limited to any claims for loss of profits or relating to any expenditures, investments, capital improvements, leases or other commitments made by either party in

Outside Attorneys' Eyes Only

V0000046727

connection with its business or reliance upon this Agreement), special, consequential, incidental, or indirect damage or indemnity, however caused, on any theory of liability, by reason of the expiration of this Agreement or the exercise by such party of any of the aforesaid termination rights.

E. **Rights and Duties After Termination**. Upon termination of this Agreement, all orders received and confirmed but not shipped by Supplier prior to the effective date of termination, shall still be shipped by Supplier except otherwise agreed separately by both parties then and/ or determined by one party when the cause of such termination is caused by the breaching party's.

F. **Effect of Transactions After Termination or Expiration**. Neither the processing by Supplier of orders from Buyer nor the continuation of acceptance of deliveries of Products by Buyer nor any other act of Supplier or Buyer after termination or expiration of this Agreement shall be construed as a waiver of the termination or expiration, or as a renewal, extension or a continuation of this Agreement.

7. **Confidentiality**. Each party agrees to receive and to hold in confidence any and all Confidential Information which it may from time to time receive from the other party during the term hereof, and to utilize the same solely for the purpose of manufacturing the Products under this Agreement and for no other purpose. As used in this Agreement, the term "Confidential Information" shall mean any information disclosed by the disclosing party to the receiving party which is in written, graphic, machine-readable or other tangible form and is marked as "Confidential," "Proprietary" or in some other manner to indicate its confidential nature. Confidential Information also includes oral information disclosed by the disclosing party to the receiving party, provided that such information is designated as confidential or proprietary at the time of disclosure and is further identified as confidential or proprietary in writing to be delivered to the receiving party within fifteen (15) days of the oral disclosure. However, the "Confidential Information" shall not include information that: (i) is or becomes generally known or available to the general public through no fault of the receiving party; (ii) is known and has been reduced to tangible form by either parties at the time of disclosure and is not subject to restriction; (iii) is disclosed with the prior written approval of the disclosing party; (iv) is independently developed by the receiving party without any use of the Confidential Information, as demonstrated by files created at the time of such independent development; (v) became known to the receiving party, without restriction, from a source other than the disclosing party or any of its employees, without breach of this Agreement by the receiving party and otherwise in a manner not in violation of the disclosing party's rights; or (vi) is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that the receiving party shall use all reasonable efforts to provide prompt, written, and sufficient advance notice thereof to the disclosing party to enable the disclosing party to seek a protective order or otherwise prevent or restrict such disclosure.

The receiving party shall not disclose Confidential Information of the disclosing party to any other person or organization without the prior written consent of the disclosing party. The receiving party shall protect Confidential Information of the disclosing party against unauthorized disclosure with at least the same degree of care as the receiving party exercises to protect its own information of like character and importance, but in no event less than reasonable care.

Outside Attorneys' Eyes Only

V0000046728

8. **Miscellaneous Provisions**.

   A. **Applicable Law**. This Agreement shall be governed and construed in accordance with the laws of the State of California, USA. The United Nations Convention on Contracts for the International Sale of Goods shall not be applicable to this Agreement.

   B. **Jurisdiction**. All disputes, controversies or differences which may arise between the parties, out of or in relation to or in connection with this Agreement, or for the interpretation or breach thereof shall be finally judged by the jurisdiction of the courts of the State of California, the United States of America.

   C. **Force Majeure**. Neither party shall be liable for any failure or delay in its performance under this Agreement due to causes, including, but not limited to, acts of God, acts of civil or military authority, fires, epidemics, floods, earthquakes, riots, wars, sabotages, labor shortages or disputes, and governmental actions, which are beyond its reasonable control; provided that the delayed party: (a) gives the other party written notice of such cause promptly, and in any event within five (5) days of discovery thereof; and (b) uses its best efforts to correct such failure or delay in its performance.

   D. **U.S. Export Controls**. Buyer refers to the U.S. Export Administration Regulations ("EAR") and the Commerce Control List set forth therein. Supplier agrees that it will not re-export any technical data or software programs received from Buyer or any direct products thereof without first obtaining the permission of the U.S. Department of Commerce or State, either in writing or as provided by an applicable regulation. Supplier agrees that it shall not use or transfer without U.S. Government permission U.S. Origin products, technology, or software of any type if Supplier knows that the products, technology, or software will be used in the design, development, production, or use of missiles, chemical or biological weapons, or sensitive nuclear and uses in certain specific countries of concern designated from time to time by the Commerce Department in Part 778 of the U.S. Export Administration Regulations, as amended from time to time.

   E. **Severability**. If any provision is prohibited by or under the laws of any jurisdiction in which this Agreement may be used or to which it may be applicable, said provision shall be, as to said jurisdiction, ineffective to the extent of such prohibition, without invalidating thereby any of the remaining provisions of this Agreement.

   F. **Entire Agreement**. This Agreement evidences the entire agreement of the parties, and supersedes and cancels all prior discussions, agreements and understandings with respect to the subject matter hereof between the parties, written, oral or implied.

   G. **Assignment**. This Agreement may not be assigned by either party except with the other party's prior written consent. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

   H. **Notices**. Any notice required or contemplated by this Agreement shall be in writing, delivered in person, by facsimile or by registered or certified mail, postage prepaid, with return receipt requested addressed to each party at its address set forth on the first page of this Agreement, or at such other addresses as may from time to time be substituted therefore by notice in writing sent by the party changing its address.

Outside Attorneys' Eyes Only

V0000046729

I. **Non-Waiver and Amendment**. Failure by either party to enforce or take advantage of any provision of this Agreement shall not constitute a waiver of the right subsequently to enforce or take advantage of such provision. Except as otherwise expressly provided herein, this Agreement or any of the terms and provisions thereof may not be changed or amended or waived, in any way whatsoever, except by written agreement executed by the parties which refers specifically to this Agreement.

J. **Relationships**. It is understood that neither party is constituted an agent, employee or servant of the other for any purpose whatsoever. Supplier and Buyer each shall conduct its business in its own name and each shall be solely responsible for its acts, conduct and expenses and the acts, conduct and expenses of its employees and agents.

K. **Survivability**. The provisions of this Agreement set forth in Sections 1.H, 3.A.B.D, 4, 5, 6, 7, 8.A and 8.B shall survive the expiration or termination of this Agreement.

**IN WITNESS WHEREOF**, the parties have caused their respective duly authorized representatives to execute this Agreement effective as of the Effective Date.

BUYER  
V, INC.(VINC)

BY_____

Name:_____

Title:_____

SUPPLIER  
AMTRAN TECHNOLOGY CO., LTD.,

BY_____

Name:_____

Title:_____

Outside Attorneys' Eyes Only

V0000046730

# PRODUCT WARRANTY AND RMA SERVICE TERMS

**Objective:** to establish a reasonable RMA repair and return policy for Products sold by SUPPLIER, to V, INC., ., (VINC.) in order to help both companies sustain a long-term mutually beneficial relationship.

V,Inc(Vinc.).purchases PDP TV/LCD TV from AmTRAN, Vinc. and AmTRAN have reached an agreement concerning as follows:

1. AmTRAN should provide the On-site service for End-user within 12 months from the date of End-user purchase based on the original purchase receipt or 15 months from manufacturing date.

2. Costco piece, return for Credit Warranty period is 15 months from manufacturing date.

3. In case COSTCO request packing material for RMA return units. AmTRAN should provide the packing material FOC. Vinc and AmTRAN will share the transportation cost 50% each.

4. AmTRAN should provide a RMA repair report summary every month from the ASP (Authorized Service Provider).

5. Vinc. will be responsible for its own Call Center fee and Vendor will provide the part and labor under the warranty period.

6. AmTRAN's ASP receive units from Costco and update to Vinc's receiving log with the POD ( proof of delivery) daily.
   AmTRAN's ASP must commit to provide this receiving report daily.

7. AmTRAN's ASP needs to provide the sorting report for the RMA return units within 2 working days after receiving the RMA units for max 100 pcs per lot. AmTRAN's ASP will apply AmTRAN's RMA number weekly based on the exact quantity and S/N received, and will copy to Vinc. If the unit is found to be " no defect", but with end user abuse & transportation damages or out of warranty should be responsible by Vinc. and AmTRAN can reject to repair the units.

8. IF the return quantity over max 100 pcs per lot with additional 15 units AmTRAN's ASP will allow additional day. The maximum TAT must no exceed 25 days.

9. If the return units is found to be " defected with function problem", it's AmTRAN's responsibility to accept and to repair the return unit. AmTRAN will send back those repaired RMA units after AmTRAN 's authorized service provide finished the repairing.

9-1. If the returned unit is found to be " no defect", but with end user abuse & transportation damages, it should be responsible by Vinc. The definition for [" no defect ", but with end user abuse & transportation damages] means " panel broken or scratched to be beyond economic repairing."

   a. It is the responsibility of AmTRAN's ASP to verify of the returned unit is found to be "no defect", but with end user abuse & transportation damages. AmTRAN's ASP should:

Outside Attorneys' Eyes Only

61098

V0000046731

      i. Take pictures with detailed report (content of report will be defined by Vinc. and AmTRAN's ASP);

      ii. Send the pictures and report to Vinc. within 48 hours;

      iii. Separate the damaged units from good units or defected units.

      iv. AmTRAN will be liable if AmTRAN's ASP classifies the returned unit improperly.

  b. Vinc. will notify AmTRAN's ASP how to take care of the returned unit is found to be " no defect", but with end user abuse & transportation damages within 2 working days after receiving the report from AmTRAN's ASP.

  c. If Vinc. doesn't give any feedback on time, it will be assumed that Vinc. agrees AmTRAN's ASP to return the rejection units to Vinc. directly.

10. All returns from Costco are subject to Return For Credit- " RFC" with the exception of Item 9-1.

10. The definition of " RFC":
Vinc. will issue Credit Memo to AmTRAN for the confirmed returned units.

11. Dead On Arrival (DOA) /within return for Credit 15 months period.

12-1: DOA/Credit unit will be with "RFC" term.

12-2: The DOA/Credit period is setting as 15 months after manufacturing date.

12-3: Reason for DOA should not be due to end-user's abuse.

12-4: The manufacturing date in 13-2 is determined by the unit's serial number.

-For example: Need to revise from Vinc. by Vendor code.

AHLAASAF100001

AH→ Vendor code: AmTRAN –Taiwan HuKou factory

L→ LCD panel

AA→ CPT 640×480 panel with Techwell scaler

S → Silver case

A → First production release

F→ 2005

10→ Week of Mar 1
0001→ First unit of week 10

11    61098

Exhibit C Page 43

Outside Attorneys' Eyes Only    V0000046732

12-5 Credit Unit price in invoice for DOA/Credit unit should be based on the most current PO's FOB unit price.

13. Buyback from Credit returns within the TAT.

13-1: After finishing the repair and refurbish for the credit units, the unit AmTRAN's ASP has is needed to pass Vinc's QA on-site inspection before buy back, then AmTRAN / AmTRAN's ASP will notify Vinc. of the units available for buying back. Within 2 working days Vinc should inform AmTRAN / AmTRAN's ASP inspection schedule after been notify the units are ready. Vinc should arrange inspection for goods within 2 working days after informed by AmTRAN / AmTRAN's ASP.

13-2: Upon receiving the detailed notice from AmTRAN / AmTRAN's ASP, Vinc. will issue a buyback PO to AmTRAN (If within the 14 days TAT time, based on original P.O to buyback. If not should need negotiation, it depends on the product price depreciation). For all repaired credit units within 5 working days. If the RFC(Return Of Credit) units over 14 days TAT time to return it, V shall using the current price instead of original price buy back from AmTRAN

13-3: The unit price for buyback PO will be the same price credit (12-5) for A grade units, or 80% of credited for B grade units.

14. Cost responsibility

14-1. Vinc. will be responsible for costs of call center.

14-2. All freight and logistics cost to receive and to deliver the goods from AmTRAN's authorized service provider to Vinc.'s warehouse (one way).

15. Turn Around Time

15-1: AmTRAN's service provider needs to repaired and refurbished the products within a 14 working days Turn Around Time, if over the TAT time then Vinc. has a right to negotiate the price base on the product.

15-2: AmTRAN's ASP service provider needs to provide the defective Top 5 analysis report and manufacture needs based on this report to find the root cause and send the corrections to QA/QC department by weekly.

16. End OF Life (EOL)

16-1: The definition for EOL is 3 months after the last on boarding date.
The cutting point for Return For Credit and the cut point are 6 months after the last Shipment of EOL model, and return for repairs for 15 months.

16-2: AmTRAN offers Vinc. "Return For Repairing" terms for EOL Model within15 months warranty period. (TAT for Return For Repairing will be 10 days after the returned units are received by AmTRAN 's authorized repairing center.)

61098

Exhibit C Page 44

Outside Attorneys' Eyes Only

V0000046733

16-3: Return For Repairing should follow AmTRAN's standard RMA policy with the exception of item 9-1.

17 Out of Warranty

17-1: Out of warranty means products are out of Item 1 range.

17-2: Vinc. should be responsible for all costs for products are out of warranty.

17-3: AmTRAN's authorized repairing center is to be responsible for identifying if the products are within or out of warranty.

17-4: AmTRAN's authorized repairing center is to be responsible for separating out of warranty products and to notify Vinc. in its daily receiving report.

17-5: For out of warranty repair V-Inc is responsible for stock the parts for repair use. If any of parts are going to be EOL, AmTRAN will notify V-INC 2 months prior to EOL. V-INC shall issue a last buy order to supplier within 30 days. The cost for spare parts will be determined at time of order. Minimum order quantity is required for EOL parts. AmTRAN will try to provide the repair history to V-Inc as reference.

17-6: AmTRAN shall provide Vinc Service Manual within one month after mass production.

18. Warranty terms for Sam's club

18-1: Warranty period is 15 months from manufacturing date.

18-2: For SAM's club return for credit warranty period is 3 months from manufacturing date. Any units after 3 months period will base on return for repair service.

18-3: For defect units will be return to AmTRAN/AmTRAN ASP will provide with service for same repair and return. AmTRAN should provide the repair service within 7 working days after unit received.

18-4: For RMA or Credit return units NDF rate shall fewer than 30% of total returns for SAM's CLUB. Or AmTRAN has the right to charge for handling for NDF units. The charge cost attached hereto as Schedule A.

19 AmTRAN needs to provide the names, telephone numbers, and e-mail address for person's related warranty and service to Vinc.

20: This agreement will be effective from March _____, 2005.

61098

Exhibit C Page 45

Outside Attorneys' Eyes Only

V0000046734

# Schedule A

Handling charge for NDF and refurbish units charge table

| Size | NDF | Parts |
|---|---|---|
| 19"/21" | $ 15.00 | Actual cost |
| 23" | $ 15.00 | Actual cost |
| 30"~ 35" | $ 17.00 | Actual cost |
| 37"~42" | $ 17.00 | Actual cost |
| 43"~50" | $ 20.00 | Actual cost |

Out of AmTRAN warranty coverage repair charge table

| Size | Repair | Parts |
|---|---|---|
| 19"/21" | $ 55.00 | Attached file |
| 23" | $ 75.00 | Attached file |
| 30"~ 35" | $ 85.00 | Actual cost |
| 37"~42" | $ 100.00 | Actual cost |
| 43"~50" | $ 120.00 | Actual cost |

1. All cost is for labor only.
2. NPF cost will be covered labor cost (Receiving, IQC, Burn/In, OQC and packing)
3. Transportation cost will pay by customer
4. Material cost will charge as actual (Any material within USD 5 will absorb by ASP)
5. Packing material use original
6. Limited warranty 90 days


BUYER                                          SUPPLIER
V, INC.(VINC)                                  AMTRAN TECHNOLOGY CO., LTD.,

BY_____                  BY_____

Name:_____                 Name:_____

Title:_____                Title:_____

Outside Attorneys' Eyes Only                                              V0000046735