# EXHIBIT E

July 13, 2009

**VIA E-MAIL**

Ryan McCrum, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190

Re:     Sony Corporation v. Vizio, Inc.

Dear Ryan,

Pursuant to Local Rule 37, I write to request a meet-and-confer regarding various deficiencies in Vizio's responses to Sony's discovery requests regarding the accused Vizio televisions.

Sony's Interrogatory No. 3 requires Vizio to set forth the bases for its First Affirmative Defense that Vizio does not infringe any claim of the patents-in-suit. Vizio's response is deficient because it contains no facts regarding any of the accused televisions. Indeed, Vizio's response does not refer to even a single feature of any Vizio television. Rather, the response is merely a word-for-word recitation of claim elements. Vizio's response makes it impossible for Sony to determine why Vizio contends its products do not infringe the asserted claims.

Vizio's inadequate response to Interrogatory No. 3 is particularly troubling because it omits critical facts regarding infringement that Vizio has raised elsewhere. For example, in your May 20, 2009 letter, you represented that one of Vizio's televisions does not infringe the '182 patent because the television "analyzes the entire frame to generate a histogram distribution that accumulates luminance data into 32 bins." Because Vizio omitted that critical information from

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90017 | TEL (213) 443-3000 FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, 107-0052 | TEL +81 3 5561-1711 FAX +81 3 5561-1712
LONDON | 16 Old Bailey, London United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100

its response to Interrogatory No. 3, I requested in my June 16 and June 18 letters to you that Vizio supplement its response to include that information. Vizio failed to do so.

In addition to failing to properly respond to Sony's Interrogatory No. 3, Vizio has also withheld critical documents from Sony regarding infringement. For example, despite your assertions regarding the "histogram distribution" described above, Sony has been unable to locate in Vizio's production even a single document discussing how Vizio's televisions analyze the frame, let alone showing that such analysis involves accumulating luminance data into a histogram of 32 bins. Such documents are responsive not only to Interrogatory No. 3, but also to Sony's Requests for Production, including at least Request for Production Nos. 22 and 115. It is unclear to Sony whether such documents were sent to Vizio's counsel by Vizio or by a third party. In either case, however, the documents must be produced.

Vizio is also withholding critical communications it has had with third parties regarding infringement. For instance, in its April 22, 2009 response to Sony's Interrogatory No. 16, Vizio stated that "it has instructed its original equipment manufacturers (OEMs) to not incorporate transparency features with respect to on screen displays." Nevertheless, Vizio has failed to produce any such correspondence between Vizio and any of its original equipment manufacturers. Such correspondence is plainly responsive not only to Interrogatory No. 16, but also to Sony's Requests for Production, including at least Request for Production Nos. 3, 17, 67, 83, 84, 85, and 91.

Similarly, it appears that Vizio is also withholding technical documents it has received from its original equipment manufacturers. For example, although Vizio has produced some engineering specification documents, such as the document at V0000043780-818, Vizio has not produced such documents for each of the accused televisions. These documents are responsive to at least Sony's Request for Production Nos. 17-24, 27, and 114-123.

Further, Vizio has produced virtually no documents regarding the structure and operation of the scalars or microprocessors Vizio identified in response to Sony's Interrogatory No. 13. These documents are plainly responsive to at least Sony's Request for Production Nos. 17-24, 27, and 114-123 and it is inconceivable that Vizio does not have documentation for these scalars or microprocessors in its possession, custody, or control.

Finally, Vizio has not produced source code including, for example, software code, firmware, Register Transfer Language (RTL), and Hardware Design Language (HDL) code, for any of its accused products. The production of such source code is required by Sony's Request for Production No. 68, which requires production of "[a]ll Source Code that relates to any of the Vizio Products or the Related Vizio Products." Production of source code is also required by at least Sony's Request for Production Nos. 69-81. During the parties' June 22, 2009 meet-and-confer, Vizio represented that it does not have any source code. Vizio, however, subsequently produced a number of documents confirming that it does possess source code, and that its employees have specifically requested the delivery of such source code from third parties. One such document was produced by Vizio at V0000041098-99.

We are available to meet and confer regarding the above issues in our Los Angeles offices this Friday, July 17 at 1:00 P.M. PDT. Please let us know as soon as possible whether Vizio is available at that time.

Best regards,

Todd Kennedy
02347.51451/3008517.1

# EXHIBIT F

Direct Number: (216) 586-7291
rbmccrum@jonesday.com

July 17, 2009

<u>VIA EMAIL</u>

Todd M. Kennedy, Esq.
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
50 California Street
22nd Floor
San Francisco, CA 94111

   Re:   <u>*Sony Corporation v. Vizio Inc.*</u>

Dear Todd:

      This letter responds to your letter of July 13, 2009 regarding Sony's request for a meet and confer.

      Your claims that Vizio's response to Interrogatory No. 3 is inadequate are without merit. Sony's Interrogatory No. 3 asks Vizio to set forth in "claim chart form the bases for Vizio's First Affirmative Defense that it does not infringe . . . the patents-in-suit."  In response, Vizio provided claim charts for each of the more than 100 asserted patent claims setting forth each limitation that it currently contends is not present in Vizio's products or that Sony has not shown by a preponderance of the evidence to be present in Vizio's products.

      To the extent Sony is not satisfied with this response, it is alone to blame for its refusal to agree to exchange proposed claim constructions.  As you know, claim construction is the first step of any infringement analysis, and for good reason.  Once the parties exchange proposed claim constructions, it will become much more apparent why each party is claiming that certain limitations are or are not present in Vizio's accused products.  For example, once Vizio sets forth its construction for "gamma correction means," including the structure that is necessary to satisfy that limitation, Sony will better understand why Vizio is claiming that limitation is missing.  Similarly, Vizio will better understand why Sony is claiming that limitation is present in the accused products.  Accordingly, Vizio's response to Sony's Interrogatory No. 3 adequately provides the current bases for Vizio's claims that it does not infringe the patents-in-suit.  Many of Sony's concerns will be alleviated if it agrees to the perform the first step of the infringement analysis, which is to propose claim constructions.  Vizio is willing to supplement its response to Interrogatory No. 3 after the parties have exchanged proposed claim constructions and had an opportunity to consult with experts.

      As for your claims that Vizio has withheld "critical documents," "critical communications," "technical documents," "source code," and "documents regarding the

structure and operation of the scalars or microprocessors" used in the Vizio products, we have repeatedly told you that is not the case. Vizio has, and will continue to produce all relevant, responsive documents within its possession, custody and control, and is not withholding any documents regarding the issues raised in your letter. Vizio will continue to search for non-privileged, responsive documents in its possession, custody and control, including the types mentioned in your letter, and to the extent it finds additional such documents, Vizio will produce them to Sony.

In view of the foregoing, Vizio does not believe that an in-person meet and confer is necessary.

Very truly yours,

/s/ *Ryan B. McCrum*

Ryan B. McCrum

# EXHIBIT G

July 21, 2009

**VIA E-MAIL**

Ryan McCrum, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190

Re:    Sony Corporation v. Vizio, Inc.

Dear Ryan,

After having reviewed your July 17, 2009 letter, Sony has determined that a meet-and-confer is still necessary.  Sony is available on July 23 between noon and 4 p.m. PDT .  Please let us know when Vizio is available.

Your letter did not contain any specific response to Sony's request that Vizio produce the documents supporting Vizio's May 20, 2009 assertion that a Vizio Television "analyzes the entire frame to generate a histogram distribution that accumulates luminance data into 32 bins."  Vizio cannot continue to ignore Sony's repeated requests for these critical documents.  So that the parties can have a productive meet-and-confer, please either produce those documents by the close of business tomorrow, or explain why Vizio is refusing to do so.  If you believe Vizio has produced those documents, please provide the production numbers.

Your letter also did not contain any specific response to Sony's concern that Vizio appears to be withholding technical documents it has received from its original equipment manufacturers ("OEMs") like AmTRAN Technology Co., LTD.  Although Vizio has produced some documents that appear to have been authored by AmTRAN Tech., it is entirely unclear whether Vizio has actually contacted AmTRAN Tech. in order to collect from that company all

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, CA  90017 | TEL (213) 443-3000 FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY  10010 | TEL (212) 849-7000 FAX (212) 849-7100
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA  94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku,  107-0052 | TEL +81 3 5561-1711 FAX +81 3 5561-1712
LONDON | 16 Old Bailey, London United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100

documents responsive to Sony's document requests. By the close of business tomorrow, please tell us whether Vizio has, in fact, asked AmTRAN Tech. to provide documents to Vizio for production to Sony. If Vizio has not done so, please explain why not.

Best regards,

Todd Kennedy
02347.51451/3015770.1

# EXHIBIT H

July 21, 2009

<u>VIA E-MAIL</u>

Ryan McCrum, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190


Re:    <u>Sony Corporation v. Vizio, Inc.</u>

Dear Ryan:

I write in response to your letter of July 17, 2009 regarding Vizio's reasons for failing to produce e-mail communications, in particular communications with AmTRAN regarding this lawsuit or the patents-in-suit.

You stated that Vizio is refusing to produce e-mails because "the parties have agreed not to produce email correspondence in this litigation." This comes as quite a surprise to us and is a gross overstatement of what we understood the parties' agreement to be. The parties agreed that given the nature of this case and the patents-in-suit, the parties would not be obligated to carry out burdensome electronic searches of e-mail records when more targeted documents requests and corresponding searches would likely result in a more efficient discovery process for both sides. Sony did not agree to withhold relevant documents simply because they are in e-mail form, particularly where the only relevant documents are emails. Communications between Vizio and AmTRAN, for example, are likely to be in email form and are specifically called for by Sony's document requests. Similarly, Sony did not agree that e-mails *already collected and in the possession* of a party's counsel would be immune from discovery.

quinn emanuel urquhart oliver & hedges, llp

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90017 | TEL (213) 443-3000 FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, 107-0052 | TEL +81 3 5561-1711 FAX +81 3 5561-1712
LONDON | 16 Old Bailey, London United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100

As you are likely aware, my statement during the June 19, 2009 meet and confer regarding e-mails was not to support the untenable proposition that the parties could withhold already located e-mails unless they were in printed out form (which is a meaningless distinction), but that Sony would not withhold responsive, non-privileged e-mails that were located as a result of other document searches.

As demonstrated by their document productions, both parties have already been producing e-mails in the manner understood by Sony. For example, Sony has produced hundreds of e-mails regarding the licensing of the patents-in-suit. Similarly, Vizio has produced a number of e-mails between it and its suppliers, including AmTRAN. (*See, e.g.,* V0000041130, V0000041131-32, V0000118953-991). For Vizio to now contend that the parties have agreed to not produce any e-mails to each other is not only incorrect, but it does not match Vizio's own practice so far in this litigation. As you are of course aware, for Vizio to unilaterally stop producing e-mails in the middle of discovery simply because it does not want to produce a particular subset of e-mails is not how discovery is supposed to proceed under the Federal Rules. Please confirm that Vizio has produced all e-mails that it has located during its document searches and is not withholding any such e-mails.

You also state in your letter that "Vizio objects to producing correspondence generated after the date of the Complaint." As has been the pattern throughout this litigation, Vizio is creating disputes where none exist. Sony is not asking for any correspondence, nor a log, that consists of Vizio's post-Complaint communications with its counsel, whether Jones Day or internal counsel. Sony has not asked for such communications. Rather, Sony has requested that Vizio produce its communications regarding this lawsuit and the patents-in-suit with third parties, including AmTRAN. In your own letter of July 8, 2009, you requested that Sony produce its communications with third parties, and Sony has not resisted doing so, even if such communications are generated after the lawsuit. For Vizio to resist doing so after it requested Sony do so is improper.

Therefore, Sony reiterates its request of July 13, 2009 that Vizio produce immediately all communications with AmTRAN regarding this lawsuit or the patents-in-suit, whether or not they are generated before or after the complaint. If the communications consist of e-mail correspondence, Vizio is obligated to produce it to the extent it is located in conjunction with other document searches or is already in the possession of counsel for Vizio (such as communications between Jones Day and AmTRAN or between Jones Day and AmTRAN's counsel Sidley Austin). Vizio has set forth no reasons why such communications would be privileged; therefore, Vizio must produce the actual communications and not a log.

The ten day period under Local Rule 37 to meet and confer on this request expires on Thursday, July 23, 2009. Unless Vizio can immediately agree in writing to produce the above described documents in their entirety, please let us know your availability to meet and confer by the end of the day on Thursday. As mentioned in Todd Kennedy's letter to you earlier today, Sony is available to meet and confer between noon and 4 pm PDT on Thursday.

Very truly yours,

/s/

Peter Klivans

02347.51451/3015013.2

# EXHIBIT I

July 23, 2009

<u>VIA E-MAIL</u>

Ryan McCrum, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190

Re:     Sony Corporation v. Vizio, Inc.

Dear Ryan:

I write to follow-up the parties' meet and confer today with respect to the issue of Vizio's obligation to search for technical documents in its control but in the physical possession of AmTRAN Technology, Co. Ltd. Sony offered to provide case law relating to this topic. Cases include the following:

*Super Film of America, Inc. v. UCB Films, Inc.*, 219 F.R.D. 649 (D. Kan. 2004).

*Afros S.P.A. v. Krauss-Maffei Corporation*, 113 F.R.D. 127 (D. Del. 1986).

*Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997).

*Hitachi, Ltd. v. AmTRAN Technology Co. Ltd.*, 2006 WL 2038248 (N.D. Cal. 2006).

*Synopsys, Inc. v. Ricoh Co. Ltd.*, 2006 WL 1867529 (N.D. Cal. 2006).

*Duran v. Cisco Systems, Inc.*, ---F. Supp. 2d ---, 2009 WL 2043516 (C.D. Cal. July 1, 2009).

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90017 | TEL (213) 443-3000 FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, 107-0052 | TEL +81 3 5561-1711 FAX +81 3 5561-1712
LONDON | 16 Old Bailey, London United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100

*Kamatani v. BenQ Corp.*, No. 2:03-CV-437, 2005 WL 2455825 (E.D. Tex. 2006).

In today's meet and confer, contingent on your review of the above case law, you offered to search for documents at AmTRAN that were technical in nature. Although Sony reserves the right to request in the future that Vizio search for other non-technical documents at AmTRAN, Sony agrees that Vizio is not required to carry out wide-ranging searches at AmTRAN to locate documents responsive to all of Sony's document requests. Rather, at this time, Sony agrees that Vizio need only look for technical documents. Should Sony believe that additional categories of documents need to be searched for in the future, Sony will work with Vizio to narrowly tailor any such document searches.

With respect to technical documents, you mentioned today certain types of technical documents that Vizio would endeavor to locate at AmTRAN. Sony generally agrees with the document categories discussed at the meet and confer, but states that at a minimum, Vizio would need to endeavor to locate at AmTRAN the following documents, for each accused product:

- User manuals and service manuals, if not already produced
- IC data sheets, specifications, and schematics of the type generally in the possession of a television manufacturer
- Source code including: software code, firmware, Register Transfer Language (RTL), and Hardware Design Language (HDL) code
- Product design documents
- Product specification sheets
- Any other technical documents responsive to Sony's requests that are located while the above documents are being searched for

Of course, Sony requests the above documents only for accused products that were manufactured by AmTRAN.

Based on your comments at today's meet and confer, it is Sony's understanding that contingent upon your review of the above case law, Vizio will make a good faith effort to locate the above documents and produce them to Sony. Please let us know by tomorrow, July 24, 2009, whether Vizio will be requesting the above-described documents of AmTRAN. If Vizio does agree to produce such documents, Sony requests that Vizio produce them no later than August 10, 2009. Please note that if Vizio does not agree to search for these documents, then Sony considers the parties to be at an impasse on this issue.


Very truly yours,

/s/

Peter Klivans

# EXHIBIT J

Direct Number: (216) 586-7291
rbmccrum@jonesday.com

July 29, 2009

<u>VIA EMAIL</u>

Peter Klivans, Esq.
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
50 California Street
22nd Floor
San Francisco, CA 94111

   Re:    <u>*Sony Corporation v. Vizio Inc.*</u>

Dear Peter:

        I write in response to your letter dated July 23, 2009 (which I received July 24, 2009).

        We have reviewed the cases cited in that letter, and are not convinced that Vizio is obligated to produce documents from a third-party, Taiwanese company that is not a party to this lawsuit. You only cited one case from the Central District of California, and none from the 9th Circuit.

        The case that you cited from the Central District of California was not about producing third-party documents; it was about relevancy objections. *Duran v. Cisco Systems, Inc.,* ---F. Supp. 2d ---, No. CV 08-3337-CAS(RCx), 2009 WL 2043516, at *3 (C.D. Cal. July 1, 2009) ("[D]efendant discusses only one objection in the Joint Stipulation, *i.e.,* relevancy. Thus, the Court finds defendant has waived those objections not addressed in the Joint Stipulation.") None of the other cases you cited are controlling or even support the argument that Vizio must obtain documents from AmTRAN Technologies in Taiwan, as they involved different fact patterns and different relationships between the named party and third party. In fact, in some cases, the party from whom documents were being sought was not even a third party.

        There are a number of other cases with fact patterns closer to those present here that support Vizio's position that it is not obligated to seek and produce documents from a third-party, Taiwanese company. For example, Vizio directs Sony to the following cases:

- *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989) (union did not control records of local union branch since union constitution did not give it right to obtain records on demand)

JONES DAY

- *In re Citric Acid Litig*., 191 F.3d 1090, 1107-08 (9th Cir. 1999) (domestic subsidiary did not have legal authority to obtain foreign parent's documents and district court properly denied motion to compel on that basis)

- *Tessera, Inc. v. Micron Tech., Inc., No*. C06-80024MISC-JW(PVT., 2006 WL 733498, at *6 (N.D. Cal. Mar. 22, 2006) (denying motion to compel domestic subsidiary to produce documents of foreign parent to the extent it sought information not already in domestic subsidiary's possession)

- *Micron Tech., Inc. v. Tessera, Inc.,* No. C06-80096 MISC.JW (HRL), 2006 WL 1646133, at *2 (N.D. Cal. June. 14, 2006) (denying motion to compel production where companies were closely related companies with some management in common, where requesting party failed to prove producing party had legal right to demand documents from non-party)

- *Miniace v. Pacific Maritime Ass'n*, No. C 04-3506-SI, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006) (denying motion to compel production of documents in possession of former directors of party, where party seeking production failed to establish the degree of control exercised by party over former directors)

We ask that you review these cases and let us know if you still believe that Vizio is obligated to produce documents from AmTRAN Technologies.

Very truly yours,

/s/ *Ryan B. McCrum*

Ryan B. McCrum

# EXHIBIT K

**REDACTED**

# EXHIBIT L

**REDACTED**

# EXHIBIT M

**REDACTED**

# EXHIBIT N

**REDACTED**

# EXHIBIT O

**REDACTED**

# EXHIBIT P

**REDACTED**

# EXHIBIT Q

**REDACTED**

# EXHIBIT R

REDACTED

# EXHIBIT S

**REDACTED**

# EXHIBIT T

**REDACTED**

# EXHIBIT U

**REDACTED**

# EXHIBIT V

**REDACTED**

# EXHIBIT W

# JONES DAY

NORTH POINT • 901 LAKESIDE AVENUE • CLEVELAND, OHIO 44114-1190

TELEPHONE: (216) 586-3939 • FACSIMILE: (216) 579-0212

Direct Number: (216) 586-7291
rbmccrum@jonesday.com

May 20, 2009

VIA EMAIL

Todd M. Kennedy, Esq.
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
50 California Street
22nd Floor
San Francisco, CA 94111

Re: *Sony Corporation v. Vizio Inc.*

Dear Todd:

As we discussed during our meet and confer on May 18, 2009, Vizio has serious concerns that Sony had no Rule 11 basis for asserting that Vizio infringes some of the patents-in-suit. Rule 11 of the Federal Rules of Civil Procedure requires a patentee to conduct a pre-suit investigation and interpret the pertinent claims of the asserted patents before filing a complaint alleging patent infringement. It appears that Sony did not conduct an adequate investigation regarding Vizio's accused products. It also appears that Sony has made no attempt to construe the claims, or that Sony's interpretation of at least some of the asserted claims is so clearly unsupportable as to be in violation of Rule 11.

The claims of U.S. Patent No. 5,434,626 require a "display means for controlling display characteristics . . . by modifying a common menu display signal to generate said menu display signal." In response to Vizio's Interrogatory No. 1 seeking the bases for Sony's contentions that Vizio's accused products satisfy this claim limitation, Sony provided a claim chart that does not even remotely suggest that this limitation is satisfied. Rather, Sony simply regurgitated the claim language, and then pasted a portion of Vizio's user manual into the chart that has nothing to do with "modifying a common display signal." This limitation is critical, because it was added by Sony to overcome the art applied by the Examiner during prosecution:

> Applicants hereinabove have amended independent claims 1 and 4 to recite a menu <u>display</u> signal and a common menu <u>display</u> signal to emphasize: (1) that the common menu display signal is generated from common menu data; and (2) that the common menu <u>display</u> signal is modified to generate the menu display signal. Thus, the common menu display signal is a <u>display signal</u> which, if left unmodified by the display control means, displays all items in the menu as available. In contrast, both Marouka and

> Myers fail to teach or suggest the generation of a common menu
> <u>display</u> signal.

('626 Patent Prosecution History, Nov. 25, 1994 Amendment, p. 5) (emphasis in original).

Despite the importance of this limitation, the addition of which was used by the applicant to convince the Examiner to allow the claims, Sony has made no attempt whatsoever to establish that it is satisfied by any Vizio accused product. Moreover, during our May 18, 2009 meet and confer, Sony was unable to identify any evidence or facts demonstrating that it had a good faith basis for alleging that this limitation was satisfied by any accused Vizio product.

This is particularly troubling given the fact that during meetings between Sony and Vizio well before this litigation commenced, Vizio advised Sony that what Sony was accusing of infringement does not generate a common menu display signal, but instead generates a distinct menu display signal for each menu programmed into the television, and does so on the fly. This is precisely the type of device that Sony represented during prosecution is not covered by the claims of the '626 patent.

As we discussed during our May 18, 2009 meet and confer, Vizio is also concerned that Sony did not have any good-faith basis for asserting the '182 patent against Vizio. The claims of the '182 patent require a gamma correction means changing the gamma correction curve responsive to the average luminance level. As an initial matter, Sony has not provided any evidence or facts that would support a Rule 11 basis for claiming that the accused Vizio products have a gamma correction means. Rather, Sony provided a claim chart that simply cut and pasted large portions of Vizio's User Manual into the chart without any attempt to specify what corresponded to the gamma correction means. In fact, the portion of the User Manual that Sony relied on was the exact same portion of the User Manual that Sony relied on for *every* single other limitation of the asserted claims of the '182 patent. Sony is contending that the claimed gamma correction means, measuring means, display means and every other limitation are one in the same in Vizio's products. This falls far short of establishing a good faith basis that the gamma correction means limitation (or any of the other limitations for that matter) is satisfied by the accused Vizio products.

Moreover, Vizio advised Sony well before this litigation commenced that what it was accusing of infringement does not change a gamma correction curve responsive to the average luminance level. Rather, it analyzes the entire frame to generate a histogram distribution that accumulates luminance data into 32 bins. The luminance level is enhanced for the histogram bins with high concentrations of data. The average luminance is not considered. The absence of this limitation is critical, because it was the addition of this limitation that the applicant argued distinguished the claims during prosecution over the prior art:

      Therefore, unlike Applicant's claim 22, Watanabe fails to disclose
or suggest changing a gamma correction curve responsive to an
average luminance signal.

('182 Patent Prosecution History, Jan. 13, 2004 Amendment B, p. 5).

      Given the importance of the limitation regarding average luminance level, Vizio's representations regarding how its products operate, and Sony's failure to provide any reasonable basis or facts supporting Sony's claims that the '182 patent is infringed, Vizio does not believe Sony had a Rule 11 basis for asserting the '182 patent against Vizio.

      In view of the foregoing, Vizio requests that Sony either withdraw all of its claims relating to the '626 and '182 patents, or provide within seven (7) calendar days factual support it relied upon for asserting infringement of '626 and '182 patents.

Very truly yours,

Ryan B. McCrum

# EXHIBIT X



30d0040a-8d33-4f4f-aad0-468593b039ce

1         UNITED STATES DISTRICT COURT
2      CENTRAL DISTRICT OF CALIFORNIA
3          WESTERN DIVISION
4
5  SONY CORPORATION, a Japanese   )
   corporation,               )
6                     )
       Plaintiff,     )
7                     )
    vs.        ) No. 8:08-cv-01135-
8            )   RGK-FMO
  VIZIO, INC., a California    )
9  corporation,            )
                    )
10      Defendant.    )
  _____)
11
12
13
14
15     Transcript of proceedings, taken at 865 South
16  Figueroa Street, 10th Floor, Los Angeles,
17  California, commencing at 12:09 p.m. Monday,
18  May 11, 2009, before BETH FELIX, Certified
19  Shorthand Reporter No. 12766.
20
21
22
23
24
25

1          I N D E X
2
3  EXHIBITS FOR IDENTIFICATION
4  1  Vizio's response to Sony's first set of
    requests for production; 99 pages
5
6  2  Vizio's response to Sony's first set of
    interrogatories; 38 pages
7  3  Letter to James Wamsley, dated April 29,
    2009; 10 pages
8
    4  Letter to Todd Kennedy, dated May 6, 2009;
9    5 pages
10  5  Letter to Ryan McCrum, dated May 7, 2009;
    3 pages
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  APPEARANCES:
2
3  For Plaintiff:
4   QUINN EMANUEL URQUHART OLIVER & HEDGES
    BY:  RORY S. MILLER
5   Attorney at Law
    865 South Figueroa Street, 10th Floor
6   Los Angeles, California  90017
    (213) 443-3000
7
  QUINN EMANUEL URQUHART OLIVER & HEDGES
8   BY:  TODD KENNEDY
    BY:  PETER KLIVANS
9   Attorneys at Law
    50 California Street, 22nd Floor
10  San Francisco, California  94111
    (Telephonic appearance.)
11
  QUINN EMANUEL URQUHART OLIVER & HEDGES
12  BY:  THOMAS PEASE
    Attorney at Law
13  51 Madison Avenue, 22nd Floor
    New York, New York  10010
14  (Telephonic appearance.)
15  For Defendant:
16  JONES DAY
    BY:  STEVEN J. CORR
17  Attorney at Law
    555 South Flower Street, 15th Floor
18  Los Angeles, California  90071
    (213) 243-2327
19
  JONES DAY
20  BY:  RYAN MC CRUM
    Attorney at Law
21  901 Lakeside Avenue
    Cleveland, Ohio  44114
22  (Telephonic appearance.)
23
24
25

1    Los Angeles, California, Monday, May 11, 2009
2         12:09 p.m. - 1:09 p.m.
3
4     MR. MILLER:  So let's go on the record now.
5  So from Quinn Emanuel representing Sony, Rory Miller.
6     MR. CORR:  And from Jones Day representing
7  Vizio, Steve Corr.
8     MR. MILLER:  Everyone else.
9     MR. MC CRUM:  Ryan McCrum from Jones Day
10  representing Vizio.
11     MR. PEASE:  Tom Pease from Quinn Emanuel
12  representing Sony.
13     MR. KLIVANS:  Peter Klivans from Quinn Emanuel
14  representing Sony.
15     MR. KENNEDY:  And Todd Kennedy from Quinn
16  Emanuel representing Sony.
17     MR. MILLER:  Okay.  So we can go ahead and
18  launch into this.  Tom, do you know where you'd like to
19  begin?
20     MR. PEASE:  I think Todd is going to take the
21  lead going forward.
22     MR. KENNEDY:  Okay.  Why don't we start with
23  Vizio's refusal to produce third-party documents
24  containing confidential information.  As an initial
25  matter, I was curious what Vizio considers to be

30d0040a-8d33-4f4f-aad0-468593b039ce

1 confidential information.
2     MR. MC CRUM: Obviously, our gathering of
3 information is ongoing. We can't predict the full
4 extent of what information is going to contain
5 third-party information at this point, but we had, at
6 least, identified some initial documents that contained
7 third-party confidential information.
8     As I'm sure it's no secret here, a lot of the
9 technology in the products that have been accused is in
10 the chips that are used in these products, and Vizio
11 does not manufacture these chips. They don't design
12 and develop these chips. They're made by third
13 parties. As our interrogatory responses reflect, a
14 large number of these chips are made by a company known
15 as Media Tech, so we have documents with Media Tech
16 confidential information in them as one example.
17     MR. KENNEDY: I don't think that answers the
18 question, which is how do you define confidential
19 information. I understand you have information that
20 Vizio considers to be confidential. I want to know
21 going forward what kinds of documents are you going to
22 be withholding? Does it require a contract with the
23 third party or some kind of oral agreement that the
24 documents will be confidential?
25     MR. MC CRUM: Well, I don't know the answer to

1 that question. Maybe since Sony has raised the same
2 concern, we ought to talk about each party's position
3 on what confidential information is. I think we are
4 here to talk about Sony's concerns about our discovery.
5 I think they go hand in hand.
6     To the extent you folks have indicated quite
7 clearly you are withholding documents based on
8 confidential information of third parties, I'm happy to
9 discuss what we collectively think is the correct
10 definition of confidential information and what we're
11 withholding, but I think that any information that we
12 have a reason to believe is proprietary and that we
13 have a reason to believe should not be disclosed
14 without the consent of a third party is, at least, at
15 first go confidential information in our view.
16     MR. KENNEDY: Am I correct to say that Vizio
17 intends to withhold documents that it has decided alone
18 are confidential even though those are not the subject
19 of a formal confidentiality contract?
20     MR. MC CRUM: We're not in a position to say
21 that. We have documents we know that contain
22 confidential information because we've been told that.
23 As I'm sitting here right now, I'm not aware of a
24 decision that we made -- a unilateral decision that we
25 made to withhold documents because we think they might

1 be confidential. If there is a question about a third
2 party's documents, we are going to respect that and we
3 are going to seek out that company's consent to produce
4 those documents.
5     MR. KLIVANS: This is Peter Klivans. You are
6 seeking permission from those parties where necessary
7 to produce them?
8     MR. MC CRUM: I think that's what we said in
9 our letter, and, yes, we are taking steps to secure
10 that consent.
11     MR. KENNEDY: What kinds of steps are you
12 taking?
13     MR. MC CRUM: We are preparing letters and
14 sending those out.
15     MR. KENNEDY: Will you provide those letters
16 to Sony?
17     MR. MC CRUM: I will be happy to give you
18 copies.
19     MR. KENNEDY: When will Vizio do that?
20     MR. MC CRUM: At this point, I don't know. I
21 know we are in the process of doing that now.
22     MR. KENNEDY: One concern that we have in
23 particular is that AmTRAM, which is a third party,
24 technically, to this case produces, according to Vizio,
25 most of Vizio's products, and I'm curious if Vizio

1 intends to withhold documents generated by AmTRAM.
2     MR. MC CRUM: We haven't made a determination
3 on that yet. We are in talks with all third parties
4 that we think have confidential information, and quite
5 frankly, we haven't gotten that far with AmTRAM yet.
6     MR. KENNEDY: Have you reviewed any AmTRAM
7 documents that you currently consider to be
8 confidential?
9     MR. MC CRUM: I don't think we need to talk
10 about that. I think we're on the fringe of work
11 product here, guys. Sufficed to say, we are going to
12 take the steps to secure the third-party consent that
13 we need to. If we have trouble doing that, we will
14 certainly let you know.
15     MR. KENNEDY: At this point, I still don't
16 have any idea what you consider to be confidential
17 information.
18     MR. MC CRUM: If we are going to withhold
19 documents because we're unable to secure third-party
20 consent, we will let you know, and you will know the
21 nature of the documents.
22     MR. KENNEDY: Is Vizio willing to provide Sony
23 a written definition of confidential information so the
24 parties have an understanding?
25     MR. MC CRUM: Why don't you propose your

3 (Pages 6 to 9)

30d0040a-8d33-4f4f-aad0-468593b039ce

1 understanding. We'll let you know if it's different.
2 The term "confidential information" can be construed in
3 a number of different ways. I don't know what you are
4 looking for. What are you looking for?
5     MR. KENNEDY: What we're looking for is
6 identified in our interrogatory request and our
7 document request. Your objection is that you will
8 provide information that is responsive unless it's
9 considered by Vizio confidential information, which
10 brings us to the question. You asked me to provide you
11 with a definition. I think the burden is on Vizio to
12 provide a definition. It's initially your objection.
13 We're talking about Vizio's responses during this
14 telephone call.
15     MR. MC CRUM: I can't decide what's
16 confidential to these third parties. If we feel that
17 there is information in our documents that could be the
18 subject of a confidentiality claim, then we're going to
19 seek permission from those third parties to produce it.
20 Whether it is confidential or not, I don't know.
21     MR. KENNEDY: When can Sony expect to hear
22 from Vizio about which parties it has propounded on --
23 excuse me. When can Sony expect to hear from Vizio
24 about which parties it is asking to produce
25 confidential information?

1     MR. MC CRUM: As we obtain those documents
2 that are subject to potential third-party
3 confidentiality restrictions, we'll let you know. I've
4 already told you one. That's Media Tech.
5     MR. KENNEDY: You asked Sony to provide you
6 with a definition of confidential information. I think
7 we can discuss that. As an initial starting point, why
8 don't I suggest confidential information is only that
9 information that is subject to a formal contract of
10 confidentiality between a party and a third party.
11 Does that sound reasonable to you?
12     MR. MC CRUM: I would have to talk to our
13 client about that because I'm not sure that information
14 that may have a claim of confidentiality is subject to
15 a formal written agreement. I have to check with my
16 client to see if that's acceptable.
17     MR. KENNEDY: That sounds reasonable to us.
18 Can you, please, talk with your client and get back to
19 us on Friday about whether that's a reasonable
20 definition going forward?
21     MR. MC CRUM: We'll try to get back to you on
22 Friday, if we can get in touch with you.
23     MR. KENNEDY: Does anyone else have anything
24 on --
25     MR. KLIVANS: We have an agreement by letter

1 now to produce stuff outside counsel's eyes prior to
2 entry of the protective order. We'll be going forward
3 with that. That falls under that category. I just
4 want to check with you. We got the first disk you
5 produced this morning. It was user manuals and a
6 couple servers' manuals. Can we expect to be receiving
7 outside counsel's eyes only stuff too soon?
8     MR. MC CRUM: Yeah. I think we reached an
9 agreement on production of confidential information
10 outside attorney's eyes only, and we are, also,
11 preparing to move forward with that understanding as
12 well.
13     MR. KLIVANS: I know how these things take
14 time and effort to get these out the door. Do you have
15 a rough guess?
16     MR. MC CRUM: I don't. I don't know when our
17 next production is going to be.
18     MR. PEASE: Can we assume we'll have it within
19 30 days?
20     MR. MC CRUM: That's, probably, a fair
21 assumption. I don't want to commit to anything. I
22 don't see anything that would prevent us from giving it
23 to you in 30 days.
24     MR. PEASE: This is Tom again. Putting aside
25 the definition what's third-party confidential, other

1 than the Media Tech that you identified so far, are
2 there any other documents that you know of that you are
3 withholding based on a third-party confidentiality
4 concern?
5     MR. MC CRUM: I haven't reviewed documents
6 myself. I can't speak to that. I'm not personally
7 aware. That doesn't mean there are not others. The
8 only ones I'm personally aware of are Media Tech
9 documents. It's quite possible that our reviewers have
10 identified others.
11     MR. PEASE: For the Media Tech docs, are those
12 schematics and spec sheets and the like, or is it a
13 broader category than that?
14     MR. MC CRUM: I think right now what I've been
15 referring to is those types of technical documents.
16     MR. PEASE: Okay.
17     MR. KLIVANS: What about server manuals? Will
18 more of those be coming soon?
19     MR. MC CRUM: Steve Corr, the server manuals,
20 do you know whether we've been able to find any
21 additional ones? I don't know if we have them all.
22 We're searching for as many as we can find.
23     MR. CORR: This is an ongoing project right
24 now. We would expect to include those in future
25 productions that we expect to get out in the next 30

1  days. There are just some challenges in identifying
2  each one relative to the various models. Sufficed to
3  say, that's included in our efforts to move our
4  production forward.
5       MR. MILLER: One follow-up to the third-party
6  things you stated that you're aware of Media Tech being
7  aware one of the third parties have you notified Media
8  Tech of the request for production yet.
9       MR. MC CRUM: I don't know the answer to that.
10  I can tell you that I have seen a letter that we
11  prepared. It's been over a week ago now. Whether
12  we've, actually, sent it out yet I can't say for sure,
13  so I hope that we contacted them. But if we haven't,
14  it will be imminent.
15       MR. CORR: My answer is the same.
16       MR. MILLER: I figured, if it was different,
17  you would have jumped in.
18       MR. KENNEDY: Okay. Anything else on
19  confidential third-party information?
20       MR. MC CRUM: Not from me.
21       MR. KENNEDY: Why don't we move on to Sony's
22  Request for Production Number 1, which requests an
23  inspection of the accused product. We appreciate Vizio
24  has agreed to allow Sony to inspect all of the accused
25  products in its inventory. We should talk about when

1  that inspection can take place.
2       MR. MC CRUM: Well, you folks offered doing
3  that within -- or proposed doing it within 60 days. I
4  can tell you that we have already broached the topic
5  with our client, and we are taking steps to try to get
6  moving on that front. But we need to talk to them
7  about the logistics, what they have, a practical place
8  for this to take this place. I think we shouldn't
9  haven't a problem complying with your request to get
10  this done within 60 days.
11       MR. KENNEDY: Does Vizio accept Sony's
12  proposal that Sony will be able to take its experts as
13  well as a photographer and a videographer to the
14  inspection?
15       MR. CORR: Ryan, can I jump in on that one
16  issue, Todd? It's going to have to be broached before
17  we move forward. We're going to have to hammer out the
18  protective order so that experts are properly disclosed
19  and signed up to it, and so at this point, I'm not sure
20  why we would need to agree or not agree to that. Once
21  we have a protective order in place, we'll know the
22  disclosure of your experts. We can respond at that
23  time.
24       MR. KENNEDY: I was just curious if Vizio
25  right now has any particular objection to the idea of

1  Sony bringing an expert as well as a photographer and
2  videographer to the inspection. I want to identify any
3  disputes we may have right now.
4       MR. CORR: To refer to my earlier answer, I
5  don't think that Vizio could generate any concern
6  without any disclosure of the experts. Regarding your
7  other abilities to take discovery, I think as long as
8  we comply with the rules related to inspection, I don't
9  foresee any issues.
10       MR. KENNEDY: Okay.
11       MR. PEASE: This is Tom. Other than the
12  specific objection to the specific experts Sony will,
13  eventually, identify under the protective order, Vizio
14  doesn't have an objection to the inspection or to the
15  concept of Sony bringing experts to the inspection;
16  correct?
17       MR. CORR: We haven't delved into this topic
18  with the client specifically. Until we get the
19  logistics of the inspection worked out and the
20  protective order, I'm not committing there wouldn't be
21  a future dispute. We haven't broached the subject to
22  the client until we get into the details of the
23  examination.
24       MR. PEASE: Well, we did raise the topic in
25  our letter. We thought you would have broached it, to

1  the extent that you could, with your client. You have
2  60 days from the letter, so that takes us to the end of
3  June. So, hopefully, we'll have a protective order in
4  place long before that.
5       MR. MC CRUM: Further to Steve's point, the
6  answer is going to depend on the logistics of the
7  inspection and the finalization of the protective order
8  where this takes place. If it's at Vizio's facilities
9  or elsewhere, it's going to bear on whether or not we
10  allow video cameras into our facilities or whether we
11  do it somewhere else. We've got to hammer out the
12  logistics, figure out where we're going to have the
13  inspection before we can talk about whether video
14  cameras and unknown unidentified personnel are going to
15  be able to attend. We're open to the idea. We just
16  need to nail down the logistics of it at this point.
17       MR. PEASE: I think, from our standpoint, the
18  logistics are going to include photography and
19  videotaping. If you're saying you're not going to
20  allow that, that's something we ought to be discussing
21  because we're going to need that. That's something we
22  ought to tee up with the Court independent of who the
23  experts are and whether you have objections or not.
24       MR. CORR: Yeah. Why don't -- Tom, this is
25  Steve. Why don't we endeavor to work out those two

1  subtle points by the end of this week, and then as long
2  as -- I mean, I agree with Ryan's point that some of
3  this is premature.  If you're asking if the client
4  fundamentally has an opposition to the use of
5  videographers and photographers, that may guide our
6  conversations of where we're going to have this
7  inspection.
8         MR. PEASE:  We'll agree to reach a resolution
9  or try to by the end of this week.  How about that?
10        MR. CORR:  That's fine.
11        MR. KENNEDY:  Why don't we move on to Sony's
12  Interrogatory Number 2, which requests information
13  about how, when and by whom Vizio products were
14  manufactured, sold and distributed.  Sony has a couple
15  of issues with Vizio's response.  The response does not
16  mention the company AmTRAM Logistics, Inc.
17        MR. MC CRUM:  We raised this in our responsive
18  letter.  Did you guys look at the chart we refer to?
19        MR. KENNEDY:  I have it in front of me right
20  now.
21        MR. MC CRUM:  There's a column for vendor.
22  AmTRAM is listed literally a dozen times.
23        MR. KENNEDY:  Does that refer to AmTRAM
24  Logistics, Inc.?
25        MR. MC CRUM:  Yes.  It does as far as I know.

1         MR. KENNEDY:  AmTRAM Logistics, Inc., is
2  incorporated in the state of California.  Am I
3  understanding there's another AmTRAM entity that
4  operates under the laws of Taiwan?  By looking at your
5  reference to AmTRAM, it's unclear to me which of those
6  entities you're referring to.
7         MR. MC CRUM:  Okay.  That confusion wasn't
8  clear from your letter.  We can certainly go back and
9  figure out the precise name of the vendor, and we can
10  put who that is in this chart.  Would that be
11  sufficient?
12        MR. KENNEDY:  I think that would be a starting
13  point.  I don't know if just by simply listing, you
14  know, one vendor or the other that that's responsive,
15  and it may be that the entities are involved in the
16  manufacturing and distribution of the products in
17  different ways.  And, I mean, just the column that says
18  vendor does not describe in any way or identify in any
19  way how that company is involved.  It could be
20  manufacturer or distribution or both.
21        MR. MC CRUM:  Well, if they were involved in
22  any of the information -- if they're involved in any of
23  those tasks, we would be including it in our response
24  just for, you know -- as I mentioned earlier, you know,
25  Vizio itself does not manufacture anything.  They get

1  products from their vendors.  How their vendors make,
2  design and develop the products -- that's information
3  in their possession, custody and control.  AmTRAM is
4  one of our vendors, and I will be happy to supplement
5  our chart to give the full and complete name of the
6  company for whom we purchase our TVs from.
7         MR. KENNEDY:  Will Vizio agree to identify
8  each company that manufactures each of its accused
9  products as well as each company that distributes each
10  of its accused products?
11        MR. MC CRUM:  I don't know.  What do you mean?
12  Let me get the interrogatory in front of me before I
13  answer that question.  Okay.  So you want to know -- I
14  mean, what we are providing in the vendor column is who
15  we get the products from.
16        MR. KENNEDY:  That's not really responsive to
17  the interrogatory, which requires Vizio to, actually,
18  describe how, when and by whom the product was
19  manufactured, sold, offered for sale, distributed in or
20  imported into the United States.  Simply having a
21  column that lists companies is not responsive.
22        MR. MC CRUM:  Well, I mean, we're all still
23  going to be relying on documents as providing
24  responsive information as well.  What more are you
25  looking for?

1         MR. KENNEDY:  I think what we're, actually,
2  looking for is for each product a description what
3  companies are involved in the distribution, manufacture
4  and sale.
5         MR. MC CRUM:  It's a lot more simpler than you
6  think.  We purchase the products from our vendors, and
7  Vizio sells them.
8         MR. KENNEDY:  When can we expect a supplement
9  to your response?
10        MR. MC CRUM:  I think we'll be in a position
11  to do that within 30 days of your letter.
12        MR. KENNEDY:  We know that Vizio purchases,
13  for example, products made by AmTRAM Technology Co.,
14  Ltd. -- I think is the formal name of the company in
15  Taiwan, but how those products get from that company to
16  Vizio is what we're concerned with.  And we think there
17  may be other companies, like AmTRAM Logistics, which we
18  identified, that were involved as intermediaries in
19  some way.  That's the kind of information we're looking
20  for through this interrogatory response.
21        MR. MC CRUM:  Okay.
22        MR. KENNEDY:  Anything else on that one?
23  Let's move on to Sony's Interrogatory Number 3, which
24  requests Vizio's contentions in plain short form.
25  Vizio, basically, said it would not answer that

1 interrogatory until Sony identified the asserted claims
2 and accused products. Sony did that on April 29th in
3 my letter to Vizio, and now, Vizio is refusing to
4 answer because it views this as requiring legal
5 contentions. I think Sony's position -- as an initial
6 matter, we're really more interested in the factual
7 contentions. For example, if Vizio contends a
8 particular television does not have a particular
9 feature required by its claims, Vizio would be required
10 to say so in response to the interrogatory.
11       MR. MC CRUM: Well, I think that any time
12 you're applying the terms of a claim to a product it's
13 going to involve legal contentions. We've all been
14 around and done this enough that that involves issues
15 in claim construction. That is the first step of any
16 type of infringement analysis. I don't think you can
17 separate one from the other that easily, but, you know,
18 more to the point here is the fact that, as plaintiff,
19 our position is that -- well, let me step back a
20 minute.
21       We had tried to propose an orderly exchange of
22 this type of information, and that offer was rejected
23 by Sony. And I really believe that the best way to
24 deal with these types of issues is to work together,
25 per Judge Klausner's instructions, as professionals and

1 come to some type of an agreement by which we can
2 exchange these types of contentions.
3       MR. KENNEDY: I think the information that
4 you're referring to, at least, from Sony's end has
5 already been exchanged. Sony has provided Vizio with
6 extremely detailed infringement claim charts. Really,
7 this meet and confer is about Interrogatory Number 3
8 and Vizio's failure to --
9       MR. MC CRUM: I understand that, and with all
10 due respect -- was that Rory that made that statement
11 about your infringement contentions?
12       MR. MILLER: I believe that's Todd.
13       MR. MC CRUM: Todd, those infringement
14 contentions were just wholly deficient. I don't know
15 if you personally prepared them, but they were almost
16 useless in many regards.
17       MR. KENNEDY: I think that the parties are
18 going to have a meet and confer about that.
19       MR. MILLER: Guys, I hate to jump in here and
20 play moderator, but we do have a court reporter who is
21 trying valiantly to keep all of this straight. So if
22 we could remember to identify ourselves before we begin
23 speaking for her benefit, that would be helpful.
24       MR. MC CRUM: I know that we're here to talk
25 about Vizio's responses today. We did ask a few times

1 to talk about both today, but you folks didn't want to
2 do that. Our response to these interrogatories depends
3 largely on what claims you, as plaintiff, are making in
4 your infringement contentions. To date, we don't have
5 complete and comprehensive infringement contentions
6 from Sony. There are -- there are a number of
7 deficiencies in them. For Sony to insist that we now
8 provide noninfringement contentions based on what you
9 provided in your interrogatory responses is just -- it
10 just can't happen. I mean, we need complete and
11 comprehensive infringement contentions before we can
12 answer your demands to provide our legal contentions.
13       MR. KENNEDY: This is Todd Kennedy. Sony
14 disagrees with Vizio's view that its infringement
15 contentions are deficient. It's certainly no excuse
16 for Vizio to not provide the information it has
17 currently responsive to this interrogatory. Vizio has
18 provided no information about why it thinks its
19 products do not infringe these claims.
20       MR. MC CRUM: I think our correspondence
21 speaks for itself. Our position is that there's
22 nothing that we have been ordered to provide in terms
23 of legal contentions during fact discovery. We think
24 it's severely premature to be insisting on this stuff
25 right now. This is fact discovery. It's early in fact

1 discovery. What you're seeking relates to legal
2 issues.
3       With that said, we are willing to talk about a
4 schedule by which we can have an orderly exchange of
5 this information and remove all of the future disputes
6 about this. We don't have to get on the phone with the
7 court reporter and argue about this. We can have
8 deadlines by which these contentions on these issues
9 are due.
10       Short of that, there's nothing in any local
11 rule or court order that mandates that we provide these
12 legal contentions this early in fact discovery
13 especially given the charts provided by Sony in
14 response to our interrogatories.
15       MR. PEASE: I think we kind of crystallized
16 the dispute here then. You asked Sony to produce claim
17 charts and infringement contentions, and you didn't
18 seem to have a problem with those calling for legal
19 conclusions when you propounded those interrogatories.
20 You're not willing to do the same in response to our
21 interrogatories.
22       MR. MC CRUM: That's, actually, not right
23 because we don't dispute that you're entitled to our
24 legal contentions at some point. In fact, the order
25 that was issued by the judge indicates that detailed

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

30d0040a-8d33-4f4f-aad0-468593b039ce

1  legal positions have to be provide, at least, 21 days
2  before the final conference. We're willing to comply
3  with that for sure. You're entitled to that.
4      Our mission is that right now on this record
5  you're not entitled to that stuff right now, but we are
6  willing to agree to something where parties exchange
7  this stuff before that 21-day deadline that I referred
8  to, and I think that makes an abundance of sense.
9      MR. KENNEDY: I understand that Vizio would
10  like to exchange this information in a different
11  manner, but I don't see how that desire somehow excuses
12  Vizio from answering the interrogatories that's already
13  been propounded.
14      MR. MC CRUM: We're not asking to be excused
15  from answering. We just don't think that legal
16  contentions and that type of information is the proper
17  subject of fact discovery, particularly, this early in
18  fact discovery and, particularly, given the contentions
19  that you folks have provided to date.
20      MR. PEASE: Well, I think we've got a dispute.
21  I think that's an issue we can raise with the Court at
22  this point. We've given you hundreds, if not
23  thousands, of pages of claim charts. In your view,
24  they're not sufficient. We think we did a very
25  thorough job setting forth our contentions, and we need

1  to know Vizio's response to those contentions.
2      MR. MC CRUM: Just so the record is clear, I'm
3  not trying to take unfair jabs here. The reference to
4  hundreds of pages of claim charts I would encourage you
5  all who haven't looked at them to look closely at them.
6  It is a cut-and-paste for every single limitation of,
7  like, five to six pages of the same cut and paste over
8  and over again. Most of which is irrelevant to the
9  claim limitations. I want the record to be clear on
10  that. The fact that there's hundreds of pages of claim
11  charts does not mean there was a substantive analysis
12  done. That's an important point I want to make sure is
13  clear on the record.
14      MR. KENNEDY: Sony absolutely disputes that.
15  Sony took great care in preparing those claim charts.
16  It is far from a cut-and-paste job. Every single
17  element was addressed specifically, but this meet and
18  confer is not about Sony's responses. It's about
19  Vizio's.
20      Unless anyone else has something to say about
21  number 3, why don't we move to Interrogatory Number 8,
22  which requires Vizio to produce sales information, and
23  Vizio, it appears, is relying on 33(d). I would just
24  like Vizio to confirm when it will produce those
25  documents.

1      MR. MC CRUM: I can't give you a date by which
2  we'll have those. Those are one of our top priorities
3  for gathering information. We recognize and we put on
4  the top of our list information that is responsive to
5  interrogatories. So we do -- we do have some of this
6  stuff that we are gathering right now, and we are
7  working very hard to get the rest of it. I should have
8  an answer for you by Friday. I should be able to give
9  you some sense of when those documents are going to be
10  produced.
11      MR. KLIVANS: Our understanding is that the
12  parties will do rolling productions as they gather and
13  review stuff. You mentioned you already have some
14  stuff that is responsive to this interrogatory. Is
15  there any reason why that wouldn't be produced in the
16  near future?
17      MR. MC CRUM: I said we're in the process of
18  gathering stuff. If I led you to believe otherwise, I
19  apologize.
20      MR. KLIVANS: If I misunderstood, sorry.
21      MR. MC CRUM: That's okay. So, yes, we are
22  trying to gather the interrogatory responsive documents
23  as quickly as we can. For this one, I will give you a
24  report on Friday as to where we stand on that.
25      MR. KENNEDY: Let's move on to Interrogatory

1  Number 10, which requires Vizio to provide information
2  about when and how it became aware of each of the
3  patents in suit. I understand Vizio says that it will
4  supplement it's response to include the 373472 and 468
5  patents. Can we expect Vizio to do that within 30 days
6  of the date of my letter?
7      MR. MC CRUM: Yes.
8      MR. KENNEDY: Interrogatory Number 11 requires
9  Vizio to identify for each Vizio product which of the
10  11 features it incorporates. As I'm sure Vizio is
11  aware, Sony propounded an almost identical
12  interrogatory in the Westinghouse case. Judge Olguin
13  found the interrogatory is proper. What is Vizio's
14  position?
15      MR. MC CRUM: Our position is we provided you
16  an answer. We have not taken the position we're not
17  going to answer. We've answered the interrogatory.
18      MR. KENNEDY: From Sony's perspective, the
19  answer is deficient. It does not list any feature for
20  any product.
21      MR. MC CRUM: That's because we relied on
22  33(d).
23      MR. KENNEDY: Can you explain how documents
24  produced under 33(d) will be sufficient to answer that
25  interrogatory?

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

30d0040a-8d33-4f4f-aad0-468593b039ce

1    MR. MC CRUM: Gosh, that's a loaded question.
2  I guess my -- the only way I can answer that -- you'll
3  see our documents.  If you have a problem and don't
4  think they're satisfactory, you can let us know then.
5  We think they're responsive and have responsive
6  information.
7    MR. KENNEDY: I don't see how documents could
8  possibly answer this interrogatory under 33(d).  It
9  seems to me the interrogatory is quite simple and
10 straightforward and just requires Vizio to list for
11 each product which of 11 features --
12   MR. MC CRUM: Let me ask you this: You
13 provided claim charts; right?  Those claim charts were
14 filled with pictures from user manuals purportedly
15 showing certain features.  If our documents can't
16 possibly establish these features, by your own
17 admission, your claim charts are equally deficient.
18   Our position is that there are documents that
19 do show these features, and I think that's evidenced by
20 the fact that you're relying on this type of thing in
21 your claim charts.  We disagree with you about that.
22 We think there are documents out there that can show
23 the existence or nonexistence of these things.  Look
24 for them yourself when you receive them.
25   MR. MILLER: When can we expect to receive all

1  of the documents necessary to, in your opinion, respond
2  to this interrogatory under 33(d)?
3    MR. MC CRUM: I don't know.  Again, I'll get
4  back to you on Friday and see where we are on gathering
5  and producing those documents.
6    MR. KENNEDY: I think the fundamental issue is
7  that these are Vizio's own products, and Sony is not --
8  has not asked Vizio to perform some kind of
9  complicated, super technical analysis of these
10 products.  It's to provide 11 simple features, and it
11 asks Vizio to identify which of those products
12 incorporate those features.  I don't see how the burden
13 can be equal between the parties of identifying those
14 features under 33(d).
15   MR. MC CRUM: Well, I don't know what else to
16 say.  I disagree with you that these -- you're asking
17 us to do an analysis of our products that can just as
18 easily be done by Sony.  Essentially, asking us to do
19 Sony's work for it.  We're going to give you the
20 information that we have that would allow you to obtain
21 this information, and it's -- our position is going to
22 be no harder for Sony to get that information from the
23 documents we'll produce.
24   MR. KENNEDY: What kinds of documents are we
25 talking about?  Vizio produced user manuals and I

1  believe two server manuals.  Are you talking about
2  documents duplicative of those manuals?
3    MR. MC CRUM: The manuals will be some of the
4  documents we'll refer to in response to this.  Is it
5  going to be all of them?  I don't know yet.
6    MR. KENNEDY: I'm trying to imagine what kinds
7  of documents would possibly answer this interrogatory.
8    MR. MC CRUM: The user manuals are, at least,
9  one example of documents that will have responsive
10 information.
11   MR. KENNEDY: Will it have that information
12 for all of the products in Interrogatory Number 1?
13 That's what this interrogatory seeks.  You mentioned
14 that we provided information in our claim charts, but
15 this interrogatory isn't directed to claim limitations.
16 It's directed to high-level product features;
17 therefore, what we put in our interrogatory response
18 relating to infringement, you know, isn't necessarily
19 implicated directly by this interrogatory.  It's
20 different.
21   MR. MC CRUM: Well, it's seeking the same type
22 of things and same type of information -- menu displays
23 capable of displaying more than one color, more than
24 one brightness.  You folks relied on things from our
25 user manuals, pictures of TVs and the menus and all of

1  these types of things.  Some of these things, if not
2  all, are readily available from our user manual
3  documents.
4    MR. KENNEDY: Why don't I give you an example
5  of one of the features that I don't think is going to
6  be disclosed in the documents for each product, and
7  that is letter B, which is, "Menu displays capable of
8  displaying in more than one level of transparency."
9  Certainly, in some of the user manuals, that is
10 apparent by looking at the manual.  There are screen
11 shots that show transparency.  For the vast majority of
12 Vizio products, there is no such screen shot.  It's
13 impossible to tell by just looking at the user manual
14 whether or not there are transparency features
15 incorporated in those products.  Unless you have
16 documents in mind that, actually, show the transparency
17 features, I don't possibly see how Rule 33(d) can get
18 you out of responding to this interrogatory in a
19 written format.
20   MR. CORR: You focused on B there.  What other
21 ones don't you think can't be answered from user-type
22 materials?
23   MR. KENNEDY: I would have to look at these
24 and spend a few minutes with them.  I don't know if I'm
25 able to answer that sitting right here.

30d0040a-8d33-4f4f-aad0-468593b039ce

1    MR. CORR: I'm trying to get some insight into
2 the nature of this dispute here.
3    MR. PEASE: We want to know, for the sake of
4 completeness, that we've identified all products that
5 fall within each of these categories. The fact that we
6 identified some products from which you think we can
7 derive this information isn't sufficient. We want to
8 make sure that we identify all of the products that
9 Vizio makes that have Feature A, Feature B, Feature C.
10 We propounded the same interrogatory to Westinghouse,
11 and they fought us on it. And we moved to compel, and
12 they were ordered to produce this information. We'll
13 take a look at the documents you produce, but if it's a
14 matter of your engineers being able to identify these
15 products versus us having to sit down with our experts
16 and comb through your documents, that's not the same
17 burden on us as it would be on you. If it's easier for
18 you to do it and your engineers to do it, then we're
19 going to go back to the Court and insist that you
20 provide this information in a substantive interrogatory
21 response and not be permitted to just rely on Rule
22 33(d).
23    You guys relied on 33(d), but you didn't
24 produce documents to support the 33(d) response. It's
25 hard for us to say what this interrogatory response is,

1 ultimately, going to look at because we haven't seen
2 the documents. Hopefully, you'll get them to us soon,
3 and we'll be able to move forward on this.
4    MR. MC CRUM: Why don't we do that. If
5 there's still an issue, then you can raise it with us
6 then. I don't see any reason to keep going around in
7 circles on this one. We're relying on documents.
8 We'll produce those as quickly as we can and go from
9 there.
10    MR. KENNEDY: I'm just curious. Again, with
11 respect to B -- letter B, does Vizio know of any
12 documents -- any type of documents that could list that
13 feature or show that that feature is incorporated into
14 each of Vizio's products?
15    MR. MC CRUM: Well, like I said, I know there
16 are user manuals that have -- that bear on this issue.
17 To the extent that they don't, we will be relying on
18 other documents that do.
19    MR. KENNEDY: What kinds of documents is my
20 question?
21    MR. MC CRUM: I don't know. We're still in
22 the process of gathering our documents. I do know we
23 have identified documents that have responsive
24 information including user manuals, the service
25 engineering documents as well. We will be identifying

1 those.
2    MR. KENNEDY: Okay. Why don't we move on to
3 Interrogatory Number 14, which requests Vizio to
4 identify the digital television standards that its
5 products incorporate. The interrogatory specifically
6 gives as examples the closed captioning standards and
7 the standards for HDCP. It seems like a similar
8 dispute as with Interrogatory Number 11. Vizio is
9 relying on Rule 33(d). Again, we don't understand how
10 Vizio can possibly respond to this interrogatory just
11 by producing documents, and we'd like to have some kind
12 of idea of what kinds of documents Vizio thinks will be
13 responsive.
14    MR. MC CRUM: Well, again, I think that you
15 know our position. Obviously, we served these
16 responses, and we felt like this was an interrogatory
17 that we had documents on that were responsive. I did
18 not specifically prepare the response to this myself,
19 but we represented we had documents that are
20 responsive. Again, I'm beating a dead horse here, but
21 we will produce those as quickly as we can. If you
22 folks have an issue with it then, we can revisit it.
23 Before the documents, it's premature to be arguing
24 about this. I understand you want the documents now,
25 and I'm telling you the best we can do is we will get

1 them to you as quickly as possible. The documents that
2 have responsive information are the ones that we are
3 endeavoring to get out to you first.
4    MR. MILLER: Can we expect a time certain on
5 the production of documents that you believe are
6 responsive to this interrogatory on Friday along with
7 the other days?
8    MR. MC CRUM: I'm not going to commit to
9 giving you a time certain. I hope we have a date by
10 which we can do that. I'm not going to commit to
11 something that I'm not in a position to commit to right
12 now.
13    MR. MILLER: Will we, at least, receive an
14 estimated time frame on Friday with the other documents
15 you're promising?
16    MR. MC CRUM: I don't know. I'll let you know
17 on Friday. I don't know what else to tell you.
18    MR. KENNEDY: I don't understand how Rule
19 33(d) is appropriate for this kind of interrogatory
20 because the interrogatory merely requests Vizio to list
21 the standards with which it complies. I assume there
22 is some employee at Vizio who is responsible for
23 ensuring that its products comply with these particular
24 standards. Why is it a burden for Vizio to simply have
25 conversations with that employee and provide that

30d0040a-8d33-4f4f-aad0-468593b039ce

1 information in a written format?
2 　　MR. MC CRUM: I think you're making
3 assumptions about our client and the way they operate
4 and how they're structured that may not be entirely
5 accurate. I told you we've got documents that are
6 responsive to this interrogatory, and we're going to
7 identify those. I know it's hard for you to imagine
8 that there might be documents that are responsive.
9 What I'm telling you is they do exist, and we will
10 identify them.
11 　　MR. KENNEDY: Does Vizio employ anyone who is
12 responsible for ensuring that its products comply with
13 closed captioning standards or any other digital
14 television standards?
15 　　MR. MC CRUM: I feel like I'm in a deposition.
16 I don't know.
17 　　MR. KENNEDY: You've just represented you are
18 confident that there are documents responsive to the
19 interrogatory. I'm curious. What kinds of documents
20 are these?
21 　　MR. CORR: I think we're having the same
22 discussion on the earlier interrogatory. We'll get you
23 the materials. To the extent you don't think the
24 information is there, you can let us know. This is the
25 same question. I hate to object under asked and

1 answered.
2 　　MR. KENNEDY: I understand that. I would like
3 to go down each interrogatory in order so the disputes
4 are clear on the record.
5 　　Why don't we move on to Interrogatory Number
6 18, which I think is an interrogatory over which we
7 have a similar dispute. That requires Vizio to
8 identify the industry and standard organizations that
9 it participates in.
10 　　Once again, Vizio is relying on 33(d). Sony's
11 position is that Rule 33(d) is an inappropriate
12 response to this interrogatory, which is a simple and
13 straightforward request that Vizio just identify the
14 organizations it participates in. I was hoping Vizio
15 could explain why Rule 33(d) is appropriate here.
16 　　MR. MC CRUM: Well, we think it's appropriate
17 because we have -- we have documents that provide
18 responsive information.
19 　　MR. MILLER: But that's only one half of the
20 33(d) equation. It, also, has to be equally burdensome
21 to Vizio, which, clearly, it isn't, if Vizio is
22 participating in these organizations, rather than
23 forcing us to comb through all of the documents and
24 assemble a complete list.
25 　　MR. MC CRUM: I will take this under

1 advisement and talk to our client and whether we'll
2 provide a narrative answer to anything. I'm not going
3 to promise anything, but I'll get back to you on Friday
4 on this one.
5 　　MR. KENNEDY: Thank you.
6 　　MR. MC CRUM: You're welcome. Peter, did you
7 have any disputes you wanted to discuss?
8 　　MR. KLIVANS: To follow up on some of the
9 requests for production, you objected, in part, that
10 some responsive documents would be privileged or
11 otherwise protected, such as, Request for Production
12 55, 6 and 7, also, 82. So can we expect a privilege
13 log for those documents at a certain point in time?
14 　　MR. MC CRUM: Of course, any documents that we
15 feel too are responsive that are privileged we will
16 provide on a privilege log.
17 　　MR. MILLER: Have any such documents been
18 identified as of today?
19 　　MR. MC CRUM: I don't know.
20 　　MR. KLIVANS: Do you have any time frame on
21 when we will get a privilege log? Would it be around
22 30 days by the time we get your next production?
23 　　MR. CORR: This is Steve. Ryan, if you don't
24 mind, I'm going to jump in. As we collect documents
25 and pull them together, we'll give you a timely

1 privilege log, but at this point, we're chasing a lot
2 of documents. So I don't know we'd have any more
3 ascertainment of when we're going to give you a
4 privilege log as we would the other documents. As we
5 uncover those documents, we'll give you a timely
6 privilege log. I don't know that we can commit at this
7 point until we identify those documents that we believe
8 are privileged.
9 　　MR. KENNEDY: I'm sorry to go back to the
10 third-party confidential information, but I don't
11 believe we asked you whether or not Vizio is logging
12 all of those third-party documents that it considers to
13 contain confidential information.
14 　　MR. CORR: I'm sorry. I'm not following you.
15 We were just talking about privilege.
16 　　MR. KENNEDY: I'm kind of going back to the
17 discussion about third-party documents that Vizio
18 believes contain confidential information. Vizio has
19 stated that it is going to withhold those documents
20 unless it gets permission from the third parties. My
21 question is whether or not Vizio is going to be
22 providing a log of documents from third parties that
23 may or may not be privileged that Vizio is withholding.
24 　　MR. MC CRUM: Under what theory are you
25 claiming that you're entitled to that?

Page 42

1    MR. KENNEDY: I don't have a case to cite to
2  you right now. The idea is that, if Vizio is
3  withholding documents that are responsive to Sony's
4  interrogatories -- I mean, Sony's position is that
5  Vizio is required to produce the documents. At the
6  very least, Sony would be entitled to see some kind of
7  list of documents that are being withheld; otherwise,
8  Sony wouldn't have any idea of what documents you're
9  not producing.
10    MR. MC CRUM: We can tell you the party's
11  information that we think may have a claim of
12  confidentiality. Until I see something convincing
13  otherwise that would require me to log that information
14  like a privilege log, I have no plans to provide that
15  at this time. Is that something you folks are planning
16  to do? Maybe we can talk about mutually how we're
17  going to deal with third-party information. Obviously,
18  it would be a reciprocal thing. We ought to talk about
19  some agreed-upon approach for handling that issue.
20    MR. KENNEDY: Well, again, I think we're going
21  to be discussing Sony's production and objections to
22  Vizio's request later on this week. We can certainly
23  talk about that then.
24    MR. MC CRUM: That's fine. We'll table it
25  until then.

Page 43

1    MR. KENNEDY: Does anyone else have anything
2  to discuss? Is everybody available Wednesday or
3  Thursday?
4    MR. MC CRUM: I think we're still checking on
5  that. We'll just try to get back with you, hopefully,
6  sometime today.
7    MR. KENNEDY: Okay. We are --
8    MR. MC CRUM: I'm, basically, wide open on
9  Wednesday and Thursday. I've kept my schedule clear.
10  The only potential conflict I have is 1:00 p.m. eastern
11  time on Wednesday; otherwise, we've kept our calendar
12  clear. Since we made the offer for the meeting, if you
13  can, let us know. I would appreciate it.
14    MR. KENNEDY: No problem. Okay. I think that
15  is the end of the meet and confer.
16    MR. MC CRUM: All right. Thank you all very
17  much, and I look forward to doing this again.
18    (Whereupon the proceedings
19    concluded at 1:09 p.m.)
20        - ooo -
21
22
23
24
25

Page 44

1    Deposition Officer's Certificate
2
3
4    I, BETH FELIX, hereby certify:
5    I am a duly qualified certified shorthand reporter
6  in the state of California, holder of Certificate
7  Number CSR 12766 issued by the Court Reporters Board of
8  California and which is in full force and effect. [FED.
9  R. DIV. P. 28(A)].
10    I am authorized to administer oaths or
11  affirmations pursuant to California Code of Civil
12  Procedure, Section 2093(B) and prior to being examined,
13  the deponent was first duly sworn by me. [FED. R. CIV.
14  P. 28(A), 30(F)(1)].
15    I am not a relative or employee or attorney or
16  counsel of any of the parties, nor am I a relative or
17  employee of such attorney or counsel, nor am I
18  financially interested in this action. [FED. R. CIV. P.
19  28].
20    I am the deposition officer that stenographically
21  recorded the testimony in the foregoing deposition and
22  the foregoing transcript that is a true record of the
23  testimony given by the deponent. [FED. R. CIV. P.
24  30(F)(1)].
25    Before completion of the deposition, review of the

Page 45

1  transcript [ ] was [ ] was not requested. If
2  requested, any changes made by the deponent (and
3  provided to the reporter) during the period allowed are
4  appended hereto. [FED. R. CIV. P. 30(E)].
5
6
7    Dated:_____,_____, 2009.
8
9
10
11
12    _____
13
14
15
16
17
18
19
20
21
22
23
24
25

12 (Pages 42 to 45)

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

30d0040a-8d33-4f4f-aad0-468593b039ce

# EXHIBIT Y





Consumer Electronics

# Good Omen For Vizio

Russell Flannery, 05.21.09, 7:30 PM ET

TAIPEI, TAIWAN -- The biggest supplier to No. 1 U.S. flat-screen TV brand Vizio expects its business to bulge in 2009, suggesting the market leader will stay on a roll this year. Amtran Technology of Taiwan, which supplies as much as 80% of Vizio's products and owns 24% of the firm, may ship as many as 5 million LCD TVs this year, compared with 3.2 million last year, Chairman Alpha Wu said in an interview with Forbes. "It's very possible."

Vizio, the Irvine, Calif., company, trounced bigger rivals Samsung and Sony in the first three months of this year, by winning 18.9% of the North American LCD TV market, according to market research firm DisplaySearch. Vizio's first-quarter share climbed from only 12.9% for the quarter ended in December. By contrast, Samsung had 17.4% of the market in the first quarter, and Sony had 14.5%. Wu's ties to Vizio run deeper than outsourced manufacturing: Amtran also helps design its products. Vizio doesn't do any of its own manufacturing.

Sales of flat-panel TVs have been booming in part because they are healthier than radiation-emitting, traditional cathode-ray models, and because the U.S. is switching over to all-digital broadcasting. Prices at the end of last year were more affordable than ever, too, with standard 32-inch models going for as low as $399 this Christmas season, versus $599 a year earlier. One reason for cheaper prices: LCD panel prices had been falling, tough for their producers but a boon to TV makers and consumers.

This year, prices have recovered 5% to 10% from last year's lows amid tight part supplies and growing demand for China. Yet Wu says they aren't likely to go any higher and may decline in time for the all-important Christmas season as component bottlenecks ease. Rather than relying on electronics chains, low-cost Vizio has worked with mass retail stores like Wal-Mart, Costco and Sears.

Vizio has also benefited in 2009 because of a good call on inventory levels. While rivals were clearing out their inventories at the end of last year amid worries about the U.S. economy, Amtran modestly built up stocks in anticipation of healthy first-quarter growth. When that happened, Vizio was ready to meet consumer demand.

Another reason for Vizio's first-quarter burst: Successful advertising. Vizio purchased advertising time during the U.S. Super Bowl, one of the year's most-watched TV shows, in a year when advertising rates were soft. It paid off, Wu says.

Vizio and Amtran are poised to continue to gain from growth in flat-TV demand because Amtran has expanded capacity at its main production site in Suzhou. It shares space there in a 49-51 joint venture with South Korea's LG Display formed last year.

In the first three months of 2009 alone, Amtran shipped 980,000 TVs, about a quarter more than a year earlier. That rise in volume and lower costs from integrated production in Suzhou are benefiting Amtran's profits. Net income increased by 80% in the first quarter to $13 million. Wu expects net profit for all of 2009 will climb by a third as much as $56 million.

One dark cloud on the horizon: Funai Electric of Japan, which sells the Sylvania and Emerson brands in the U.S., has accused Amtran and other companies of patent infringement Wu says: "We strong believe that we haven't infringed." There's been no impact on Amtran's business "until now," either, he says. Vizio on May 20 fired back at Funai, filing a lawsuit against Funai for infringing on its patents.

The stock market doesn't seem concerned: Taipei-traded shares of Amtran have nearly doubled this year, compared with a 40% rise in Taiwan's main stock index.

**Related Stories:**

Greater China's Renaissance

Streaming Internet Movies At Home

America's Largest Private Companies: No. 247 Vizio

# EXHIBIT Z

REDACTED