# EXHIBIT 1

QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
Kevin P.B. Johnson (Bar No. 177129)
  kevinjohnson@quinnemanuel.com
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Edward J. DeFranco (Bar No. 165596)
  eddefranco@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile:   (212) 849-7100

Steven M. Anderson (Bar No. 144014)
  steveneanderson@quinnemanuel.com
865 S. Figueroa St. 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Plaintiff Sony Corporation

Attorneys for Plaintiff Sony Corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SONY CORPORATION, A Japanese corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>VIZIO, Inc.,<br><br>    Defendant. | CASE NO. SA CV08-01135-RGK (FMOx)<br><br>**SONY'S FIRST SET OF INTERROGATORIES TO VIZIO** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Sony Corporation requests that Defendant Vizio, Inc. respond to the following interrogatories in writing, under oath, and in accordance with the following definitions and instructions, within thirty (30) days from the date of service thereof.

## DEFINITIONS AND INSTRUCTIONS

Each request in Sony's First Set of Interrogatories is subject to and incorporates the following definitions and instructions as used herein:

1.    "Vizio Product" means any product manufactured, sold, offered for sale, or distributed in, and/or imported into, the United States by Vizio since October 10, 2002 that by itself or in combination with any other product, device, or instrumentality is capable of displaying digital video signals, data or information. The term shall include, but shall not be limited to, the following products:  GV42L, GV42L FHDTV10A, GV42L HDTV, GV42L10A, GV42LF, GV46L FHDTV20A, GV46L HDTV, GV47L FHDTV, GV47L FHDTV20A, GV52L FHDTV10A, HDX 20L, JV50P HDTV10A, L15, L20, L30, L30e, L30WGEe, L30WGU, L32 HDTV, L37, L37HDTV, L42, L42 HDTV, L6, P4, P42, P42 ED, P42 HD, P42 HDTV, P46, P50 HDM, P50 HDTV20A, SV420XVT, SV420XVT 1A, SV470XVT, SV470XVT1A, V022L, VA19L HDTV10T, VA22LF HDTV10T, VA26L HDTV10T, VECO320L, VF550XVT, VF550XVT 1A, VM60P, VM60P HDTV, VO22L FHDTV10A, VO22LF, VO32L, VO32L HDTV10A, VO37L, VO37L HDTV10A, VO42L, VO42L FHDTV10A, VO47L FHDTV10A, VOJ320F, VOJ320F1A, VOJ370, VOJ370F, VOJ370F, VP322, VP322 HDTV10A, VP42, VP42 HDTV, VP422, VP422 HDTV10A, VP423 HDTV10A, VP50 10A, VP50 20A, VP50 HDTV20A, VP503 HDTV10A, VP504 FHDTV10A, VP505XVT1A, VS370, VS420LF, VS420LF1A, VS42L 10A, VS42L FHDTV10A, VS42LF,

VU32L, VU32L HDTV10A, VU37L HDTV10A, VU42L 10A, VU42L
FHDTV10A, VU42LF, VW22L HDTV10T, VW26L, VW26L HDTV10F, VW32L
10A, VW32L 30A, VW32L HDTV10A, VW32L HDTV30A, VW37L 10A,
VW37L 20A, VW37L 30A, VW37L 40A, VW37L HDTV10A, VW37L
HDTV30A, VW37L HDTV40A, VW42L, VW42L 10A, VW42L FHDTV10A,
VW42L HDTV10A, VW42LF, VW46L FHDTV10A, VW46L20A, VW46LF,
VW47L 10A, VW47L FHDTV10A, VW47LF, VX20L, VX20L 20A, VX32L,
VX32L 20A, VX32L HDTV , VX32L HDTV20A, VX37L, VX37L 10A, VX37L
20A, VX37L HDTV, VX37L HDTV10A, VX37L HDTV20A, VX42L, VX42L
10A, VX42L HDTV10A, VX52L 10A, VX52L FHDTV10A, VX52LF, VXW20L,
VXW20L 10A, VMM26, and VMM26 F201 LCD.  In the event that any of Vizio's
products have any versions, each version shall be considered a separate Vizio
Product.

2.    "Related Vizio Products" means any device manufactured, sold,
offered for sale, or distributed in, and/or imported into, the United States by Vizio
that is capable of being connected to or used with any of Vizio Product. "Related
Vizio Products" shall include, but shall not be limited to, the following products:
Bravo D1, Bravo D2, Bravo HD1, VR1, VR2, VR3, VUR2, VUR5, VUR6, and
VUR8.

3.    "'626 patent" means U.S. Patent No. 5,434,626, entitled "Display
Apparatus Displaying Operation Menu."

4.    "'577 patent" means U.S. Patent No. 5,583,577, entitled "Caption Data
Coding/Decoding Systems And Methods That Includes Key Data Indicating
Intermediate Levels Of Attenuation In The Vicinity Of The Caption."

5.    "'542 patent" means U.S. Patent No. 5,684,542, entitled "Video
Subtitle Processing System."

6.    "'847 patent" means U.S. Patent No. 5,731,847, entitled "Subtitle
Encoding/Decoding Method and Apparatus."

7.     "'373 patent" means U.S. Patent No. 5,751,373, entitled "Television function selection method, television receiver and remote commander for television receiver."

8.     "'614 patent" means U.S. Patent No. 6,111,614, entitled "Method And Apparatus For Displaying An Electronic Menu Having Components With Differing Levels Of Transparency."

9.     "'055 patent" means U.S. Patent No. RE 38,055, entitled "Video Data Bus Communication System and Method."

10.    "'468 patent" means U.S. Patent No. RE 40,468, entitled "Video Data Bus Communication System and Method."

11.    "'182 patent" means U.S. Patent No. 6,778,182, entitled "Display Device."

12.    "'472 patent" means U.S. Patent No. 6,661,472, entitled "Channel selection in digital television."

13.    "Patents-in-suit" means the '626 patent, the '577 patent, the '542 patent, the '847 patent, the '373 patent, the '614 patent, the '055 patent, the '468 patent, the '182 patent, the '472 patent, and any other patent that Sony may later assert in this action that Vizio infringes.

14.    "Affirmative Defense" shall refer to each defense asserted by Vizio relating to Sony's claims against Vizio, including, without limitation, any defenses enumerated in Vizio's Answer, filed January 26, 2009, or any amendments or supplements thereto.

15.    "Communication" or "Communications" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to electronic communications and electronic mail.

1     16.   "Document" or "Documents" shall have the broadest meaning ascribed
2 to it by Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1001. The
3 term shall include within its meaning, by way of example and not limitation, any
4 and all accounts, analyses, books, CDs, calendars, commercial paper,
5 communications, correspondence, DVDs, e-mail, films, financial statements, floppy
6 disks, hard disks, inter-office memoranda, invoices, ledgers, letters, licenses, logs,
7 memoranda, microfilms, minutes, notes, notes of conversations, notes of meetings,
8 notes of telephone calls, office communications, photographs, printouts, recordings
9 of conversations (whether written or electronic), reports, schedules, storage tape,
10 task lists, telegrams, telephone bills, videotapes or other video recordings, and any
11 differing versions of the foregoing whether denominated formal, informal or
12 otherwise, as well as copies of the foregoing which differ from the original in any
13 way, including handwritten notations or other written or printed matter. The
14 foregoing specifically includes information stored electronically, whether in a
15 computer database or otherwise, regardless of whether such documents are presently
16 in documentary form or not. A draft or non-identical copy of a Document is a
17 separate Document within the meaning of this term.

18     17.   "Identify" when used in reference to:

19     (1)   An individual, means to state his or her full name, present or last
20 known residential and business addresses, present or last known position and
21 business affiliation, and if applicable, history of employment of that individual;

22     (2)   A firm, partnership, corporation, proprietorship, joint venture,
23 association, or other organization or entity, means to state its full name, present or
24 last known address and place of incorporation or formation and to identify each
25 agent that acted for it with respect to the matters relating to the request or answer;

26     (3)   A document, means to state the date, title, if any, subject matter, each
27 author, each addressee or recipient if practicable, and otherwise a general
28 description of the persons to whom the writing was distributed, the production

1  number, and the type of document, *i.e.*, publication, letter, memorandum, book,
2  telegram, chart etc., or some other means of identifying the document, and its
3  present location and custodian;

4      (4)   A communication, means to state its date and place, the person(s) who
5  participated in it or who were present during any part of it or who have knowledge
6  about it;

7      (5)   A date, means to state the date and set forth the basis for your
8  contention that the date is responsive to the request; and

9      (6)   A product, service, or intellectual property, means to state all names
10  and numbers related to the product, service, or intellectual property, and the owner,
11  manufacturer, distributor, licensor, or dealer of the product, service, or intellectual
12  property during the relevant time period and currently. For a product, provide all
13  designations for the product, from the most specific to the most general, including
14  any model numbers or designations, version numbers or designations, and internal
15  numbers or designations.

16     18.   The terms "Vizio," "you," "defendant," or "your" shall refer to Vizio,
17  Inc., and includes any entities constituting parents, predecessors, subsidiaries,
18  affiliates, divisions, associated organizations, joint ventures, as well as present and
19  former officers, directors, trustees, employees, staff members, agents, or other
20  representatives, including counsel and patent agents, in any country.

21     19.   The term "plaintiff" or "Sony" means Sony Corporation.

22     20.   The term "AmTRAN" shall refer to AmTRAN Technology Co., Ltd.,
23  and includes any entities constituting parents, predecessors, subsidiaries, affiliates,
24  divisions, associated organizations, joint ventures, as well as present and former
25  officers, directors, trustees, employees, staff members, agents, or other
26  representatives, including counsel and patent agents, in any country. The term shall
27  include, but shall not be limited to, AmTRAN Logistics, Inc., AseV Display Labs,
28  and AmTRAN Technology Inc.

1     21.    The term "person" or "persons" refers to any individual, corporation,
2  proprietorship, association, joint venture, company, partnership or other business or
3  legal entity, including governmental bodies and agencies. The masculine includes
4  the feminine and vice versa; the singular includes the plural and vice versa.

5     22.    The terms "any," "all" and "each" shall each mean and include the
6  other.

7     23.    The terms "and" and "or" shall be construed either disjunctively or
8  conjunctively as necessary to bring within the scope of the discovery request all
9  responses that might otherwise be construed to be outside of its scope.

10     24.    The use of the singular form of any word includes the plural and vice
11  versa.

12     25.    "Thing" refers to any physical specimen or tangible item in your
13  possession, custody or control, including research and development samples,
14  prototypes, productions samples and the like.

15     26.    "Referring to," "relating to," "concerning" or "regarding" means
16  containing, describing, discussing, embodying, commenting upon, identifying,
17  incorporating, summarizing, constituting, comprising or are otherwise pertinent to the
18  matter or any aspect thereof.

19     27.    The term "this action" means the above-captioned action, <u>Sony Corp. v.
20  Vizio, Inc.</u>, case number SA CV08-01135-RGK (FMOx).

21     28.  The term "license" means any agreement, contract, or arrangement relating
22  to one or more patents.

23     29.  The term "superimposed" means displayed over at least one other image
24  such that both the superimposed image (*e.g.*, a caption, a subtitle, a menu, etc.) and the
25  underlying image(s) are seen, at least in part, at once.

26     30.  "Level of transparency" means the extent to which a superimposed image
27  blocks out or leaves visible an underlying image or background.

28

1      31. The term "Video Processor" means an integrated circuit that can perform
2  analysis, manipulation, storage, or display of graphical images, graphical signals, or
3  graphical data.

4      32. The term "Graphics Processor" means an integrated circuit that can generate
5  and/or display graphical images such as lines and filled areas, or that can cause or
6  facilitate the generation and/or display of graphical images.

7      33. The term "Dynamic Contrast" means automatically adjusting the contrast
8  based on the picture brightness or luminance and/or dynamically enhancing the black
9  and white levels.

10      34. The term "Source Code" means any software, programming code, or
11  microprocessor instructions. The terms includes but is not limited to all software code,
12  middleware, millicode, firmware, bytecode, compiled executable files, and makefiles.

13      35. The use of a verb in any tense shall be construed as the use of the verb in all
14  other tenses.

15      36. In answering the following Interrogatories, furnish all available information,
16  including information in the possession, custody, or control of any of your attorneys,
17  directors, officers, agents, employees, representatives, associates, investigators or
18  division affiliates, partnerships, parents or subsidiaries, and persons under your control,
19  who have the best knowledge, not merely information known to you based on your own
20  personal knowledge. If you cannot fully respond to the following Interrogatories after
21  exercising due diligence to secure the information requested thereby, so state, and
22  specify the portion of each Interrogatory that cannot be responded to fully and
23  completely. In the latter event, state what efforts were made to obtain the requested
24  information and the facts relied upon that support the contention that the Interrogatory
25  cannot be answered fully and completely; and state what knowledge, information or
26  belief you have concerning the unanswered portion of any such Interrogatory.

27      37. If you are producing Documents in connection with these Interrogatories,
28  electronic records and computerized information must be produced in an intelligible

format, together with a description of the system from which they were derived sufficient to permit rendering the records and information intelligible.

38. If you are producing Documents in connection with these Interrogatories, selection of Documents from the files and other sources and the numbering of such Documents shall be performed in such a manner as to ensure that the source of each Document may be determined, if necessary.

39. If you are producing Documents in connection with these Interrogatories, file folders with tabs or labels or directories of files identifying Documents must be produced intact with such Documents.

40. If you are producing Documents in connection with these Interrogatories, Documents attached to each other shall not be separated. All Documents that respond, in whole or in part, to any portion of any request shall be produced in their entirety, including all attachments and enclosures.

41. Separately with respect to each piece of information called for by these Interrogatories withheld under a claim of privilege or otherwise, provide an explanation of the claim being asserted and a description of the information withheld in accordance with Fed. R. Civ. P. 26(b)(5).

42. If your response to a particular Interrogatory is a statement that you lack the ability to comply with that Interrogatory, you must specify whether the inability to comply is because the particular item or category of information never existed, has been destroyed, has been lost, misplaced, or stolen, or has never been, or is no longer, in your possession, custody, or control, in which case the name and address of any person or entity known or believed by you to have possession, custody, or control of that information or category of information must be identified.

43. The obligation to provide the information sought by these Interrogatories is continuing within the requirement of Fed. R. Civ. P. 26(e).

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify each Vizio Product using all internal and external model numbers or designations and the product type and size (*e.g.*, 32" LCD television).

**INTERROGATORY NO. 2:**

For each Vizio Product identified in response to Interrogatory No. 1, describe how, when and by whom (including all entities involved) the Vizio Product was manufactured, sold, offered for sale, or distributed in, and/or imported into, the United States.

**INTERROGATORY NO. 3:**

Set forth in claim chart form the bases for Vizio's First Affirmative Defense that "it does not infringe, induce infringement of, or contributorily infringe any properly construed, valid claim of . . . the "patents-in-suit."

**INTERROGATORY NO. 4:**

Set forth the bases for Vizio's Second Affirmative Defense that "one or more of the claims of the patents-in-suit is invalid for failing to meet one or more of the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112."

**INTERROGATORY NO. 5:**

Set forth the bases for Vizio's Third Affirmative Defense that "Sony is barred form recovering damages for failure to provide adequate notice in accordance with 35 U.S.C. § 287."

**INTERROGATORY NO. 6:**

Set forth any bases for the additional affirmative defenses that Vizio reserves the right to assert in its Fifth Affirmative Defense.

**INTERROGATORY NO. 7:**

For each claim term of the patents-in-suit that Vizio contends or will contend requires construction by the Court, separately state Vizio's proposed construction of each such claim term and set forth all bases for that construction (including any

intrinsic or extrinsic evidence on which Vizio relies, or any bases for any contention by Vizio that Sony is estopped or otherwise barred from asserting a particular claim construction).

**INTERROGATORY NO. 8:**

For each yearly quarter dating back to October 10, 2002, state the total number of units sold, the gross revenue (in U.S. dollars), the net profits (in U.S. dollars), the profit margins (in U.S. dollars), and the costs (in U.S. dollars) associated with each Vizio Product and set forth all bases for your response.

**INTERROGATORY NO. 9:**

For each of the Patents-in-Suit, identify the reasonable royalty rate that Vizio contends Vizio and Sony would have agreed upon in a hypothetical negotiation and set forth the basis for that contention, including the date on which Vizio contends the hypothetical negotiation would have occurred and Vizio's analysis of any factors that it contends bear on the reasonable royalty rate

**INTERROGATORY NO. 10:**

Describe when and how (including all persons involved) Vizio first became aware of each of the patents-in-suit.

**INTERROGATORY NO. 11:**

For each Vizio Product identified in response to Interrogatory No. 1, identify which of the following product features it incorporates: menu displays capable of displaying in more than one color or more than one brightness; menu displays capable of displaying in more than one level of transparency; menu displays capable of displaying a submenu or subordinate menu; the capability to superimpose captions on another image or on a background; the capability to superimpose subtitles on another image or on a background; the capability to securely transfer video data between devices connected to a common bus; Dynamic Contrast; a Digital Visual Interface ("DVI") or a High Definition Multimedia Interface

("HDMI"); High-bandwidth Digital Content Protection ("HDCP") functionality; and the capability of selecting a major and minor channel number.

**INTERROGATORY NO. 12:**

Separately for each feature identified in Interrogatory No. 11, identify the five Vizio employees most knowledgeable about that feature.

**INTERROGATORY NO. 13:**

Separately for each Vizio Product identified in response to Interrogatory No. 1, identify each integrated circuit incorporated into that product that performs any part of the functions of a Video Processor and/or a Graphics Processor, including the time period during which that integrated circuit was incorporated in the Vizio Product.

**INTERROGATORY NO. 14:**

Separately for each Vizio Product, identify all digital television standards (*e.g.,* standards relating to Closed Captioning such as EIA-708-B, CEA-708-B, and CEA-708-C, or standards relating to HDCP, such as "High-Bandwidth Digital Content Protection System," revision 1.3, issued by the Digital Content Protection LLC) with which that product complies or has complied (including the relevant time periods) and describe the manner in which each such standard is or has been implemented.

**INTERROGATORY NO. 15:**

If Vizio contends that, even if it is found to infringe the asserted claims of the patents-in-suit, its infringement was not willful, set forth all bases for that contention.

**INTERROGATORY NO. 16:**

Identify all efforts Vizio has made to design around any of the patents-in-suit or to purchase or otherwise acquire any non-infringing alternative to any of the patents-in-suit.

1 **INTERROGATORY NO. 17:**

2      If Vizio contends that any conduct of Sony or another in relation to any

3 industry or standards organization has any effect on any claim asserted by Sony or

4 Sony's alleged damages, set forth all bases for that contention.

5 **INTERROGATORY NO. 18:**

6      Identify all industry or standards organizations in which Vizio has

7 participated and for each describe the nature and timing of Vizio's participation.

8

9 DATED: March 23, 2009      QUINN EMANUEL URQUHART OLIVER &
           HEDGES, LLP

10

11

12

13 By _____ /FOR

14      Kevin P.B. Johnson
      ATTORNEYS FOR PLAINTIFF

15      Sony Corporation

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

**PROOF OF SERVICE**

</div>

1

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Now Legal Service, 1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

On March 23, 2009, I served true copies of the following document(s) described as

**1) SONY'S FIRST SET OF INTERROGATORIES TO VIZIO**

**2) SONY'S FIRST SET OF REQUESTS FOR PRODUCTION TO VIZIO**

on the parties in this action as follows:

**Steven John Corr**
Jones Day
555 South Flower Street 50th Floor
Los Angeles , CA 90071
213-243-2327
Fax: 213-243-2539

**[X] BY PERSONAL SERVICE:** I delivered such envelope(s) by hand to the office of the person(s) being served.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 23, 2009, at Los Angeles, _CA_ .

_____
Dave Quintana

# EXHIBIT 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SONY CORPORATION, | ) | CASE NO. SA CV 08-01135-RGK (FMOx) |
| Plaintiff(s), | ) ) | **ORDER FOR JURY TRIAL:** |
| vs. | ) ) | **Pretrial Conference: January 10, 2010 at** |
| VIZIO, INC., | ) | **9:00 a.m.** |
| Defendant(s). | ) ) | **Trial Date: January 26, 2010 at 9:00 a.m.** |
| _____ | ) | |

**UNLESS OTHERWISE ORDERED BY THE COURT, THE FOLLOWING RULES**

**SHALL APPLY:**

## SCHEDULING

**1.**    **In General**

All motions to join other parties or to amend the pleadings shall be filed and served

within fifteen (15) days of the date of this order.

**2.**    **Motions for Summary Judgment or Partial Summary Judgment**

Motions for summary judgment or partial summary judgment shall be filed as soon as

practical, however, in no event later than the motion cut-off date.

3.    **<u>Discovery Cut-Off</u>**

The Court has established a cut-off date for discovery in this action. All discovery shall be complete by the discovery cut-off date specified in the Scheduling Order.  **This is <u>not</u> the date by which discovery requests must be served; it is the date by which all discovery is to be completed.**

In an effort to provide further guidance to the parties, the Court notes the following:

a.  <u>Depositions</u>

All depositions shall be scheduled to commence sufficiently in advance of the discovery cut-off date to permit their completion and to permit the deposing party enough time to bring any discovery motion concerning the deposition prior to the cut-off date.

b.  <u>Written Discovery</u>

All interrogatories, requests for production of documents, and requests for admission shall be served sufficiently in advance of the discovery cut-off date to permit the discovering party enough time to challenge (via motion practice) responses deemed to be deficient.

c.  <u>Discovery Motions</u>

Whenever possible, the Court expects the parties to resolve discovery problems among themselves in a courteous, reasonable and professional manner.  The Court expects that counsel will strictly adhere to the Civility and Professional Guidelines adopted by the United States District Court for the Central District of California in July, 1995.

Discovery matters are referred to a United States Magistrate Judge.  **Any motion challenging the adequacy of responses to discovery must be filed timely, and served and calendared sufficiently in advance of the discovery cut-off date to permit the responses to be obtained before that date, if the motion is granted.**

Consistent resort to the Court for guidance in discovery is unnecessary and will result in the appointment of a Special Master at the joint expense of the parties to resolve discovery disputes.

4.    **<u>Mandatory Settlement Conference</u>**

2

Pursuant to Local Rule 16-14, the parties in every case must select a settlement procedure. The final meeting with the parties' settlement officer must take place no later than 45 days before the Final Pretrial Conference.

### FINAL PRE-TRIAL CONFERENCE

This case has been placed on calendar for a Final Pre-Trial Conference pursuant to Fed.R.Civ.P. 16 and 26. Unless excused for good cause, each party appearing in this action shall be represented at the Final Pre-Trial Conference, and all pre-trial meetings of counsel, by the attorney who is to have charge of the conduct of the trial on behalf of such party.

<u>STRICT COMPLIANCE WITH THE REQUIREMENT OF FED.R.CIV.P. 26 AND LOCAL RULES ARE REQUIRED BY THE COURT</u>. Therefore, carefully prepared Memoranda of Contentions of Fact and Law, a Joint Witness List, and Joint Exhibit List shall be submitted to the Court. The Joint Witness List shall contain a brief statement of the testimony for each witness, **what makes the testimony unique** from any other witness testimony, and the time estimate for such testimony. The Joint Exhibit List shall contain any objections to authenticity and/or admissibility to the exhibit(s) and the reasons for the objections.

The Memoranda of Contentions of Fact and Law, Witness List and Exhibit List are due twenty-one (21) days before the Final Pre-Trial Conference.

If expert witnesses are to be called at trial, each party shall list and identify their respective expert witnesses. Failure of a party to list and identify an expert witness may preclude a party from calling an expert witness at trial. If expert witnesses are to be called at trial, the parties shall exchange at the Final Pre-Trial Conference short narrative statements of the qualifications of the expert and the testimony expected to be elicited at trial. If reports of experts to be called at trial have been prepared, they shall be exchanged at the Final Pre-Trial Conference but shall not substitute for the narrative statements required.

**TRIAL PREPARATION FOR JURY TRIAL**

**MOTIONS, INSTRUCTIONS AND EXHIBITS**

THE COURT ORDERS  that all counsel comply with the following in their preparation for trial:

1.     **MOTIONS IN LIMINE**

All motions in limine must be filed and served a minimum of forty-five (45) days prior to the scheduled trial date.  Each motion should be separately filed and numbered.  All opposition documents must be filed and served at least twenty-five (25) days prior to the scheduled trial date.  All reply documents must be filed and served at least ten (10) days prior to the scheduled trial date.

All motions in limine will be ruled upon on or before the scheduled trial date and should not be noticed for motion on any date other than the assigned trial date.

2.     **JURY INSTRUCTIONS/SPECIAL VERDICT FORMS**

Thirty-five (35) days before trial, plaintiff shall serve plaintiff's proposed jury instructions and special verdict forms on defendant.  Twenty-eight (28) days before trial, defendant shall serve on plaintiff defendant's objections to plaintiff's instructions together with any additional instructions defendant intends to offer.  Twenty-one (21) days before trial, plaintiff shall serve on defendant plaintiff's objections to defendant's instructions.  Twenty-one (21) days before trial, counsel are ordered to meet and confer to attempt to come to agreement on the proposed jury instructions.  The parties shall make every attempt to agree upon the jury instructions before submitting them to the Court.  It is expected that counsel will agree on the substantial majority of jury instructions, particularly where patent instructions are involved.

Sixteen (16) days before trial, counsel shall file with the Court a JOINT set of jury instructions on which there is agreement.  Defendant's counsel has the burden of preparing the joint set of jury instructions.  At the same time each party shall file its proposed jury instructions

1  which are objected to by any other party, accompanied by points and authorities in support of
2  those instructions.

3   When the parties disagree on an instruction, the party opposing the instruction must
4  attach a short statement (one to two paragraphs) supporting the objection, and the party
5  submitting the instruction must attach a short reply supporting the instruction.  Each statement
6  should be on a separate page and should follow directly after the disputed instruction.

7   The parties ultimately must submit one document, or if the parties disagree over any
8  proposed jury instructions, three documents.  The three documents shall consist of: (1) a set of
9  Joint Proposed Jury Instructions; (2) Plaintiff's Disputed Jury Instructions; and (3) Defendant's
10  Disputed Jury Instructions.  Any disputed Jury Instructions shall include the reasons supporting
11  and opposing each disputed instruction in the format set forth in the previous paragraph.

12   The Court directs counsel to use the instructions from the <u>Manual of Model Jury</u>
13  <u>Instructions for the Ninth Circuit</u> where applicable.  Where California law is to be applied and
14  the above instructions are not applicable, the Court prefers counsel to use the California Jury
15  Instructions in either BAJI or CACI.  If none of these sources is applicable, counsel are directed
16  to use the instructions in Devitt, Blackmar and Wolff, <u>Federal Jury Practice and Instructions</u>.

17   Modifications of instructions from the foregoing sources (or any other form instructions)
18  must specifically state the modification made to the original form instruction and the authority
19  supporting the modification.

20   Each requested instruction shall be set forth in full; be on a separate page; be numbered;
21  cover only one subject or principle of law; not repeat principles of law contained in any other
22  requested instructions; and cite the authority for a source of the requested instruction.  In
23  addition to the foregoing, each party shall file with the Courtroom Deputy on the first day of trial
24  a "clean set" of the aforesaid requested duplicate jury instructions in the following form:  Each
25  requested instruction shall be set forth in full; be on a separate page with the caption "COURT'S
26  INSTRUCTION NUMBER __"; cover only one subject or principle of law; and not repeat
27  principles of law contained in any other requested instruction.  The "clean set" shall <u>not</u> cite the

28  <div align="center">5</div>

authority for a source of the requested instruction.  Counsel shall also provide the Court with a CD in WordPerfect format containing the proposed jury instructions.

An index page shall accompany all jury instructions submitted to the Court.  The index page shall indicate the following:

- • the number of the instruction;
- • a brief title of the instruction;
- • the source of the instruction and any relevant case citation; and
- • the page number of the instruction.

*EXAMPLE:*

| NO. | TITLE | SOURCE | PAGE NO. |
|-----|-------|--------|----------|
| 5 | Evidence for Limited Purpose | 9th Cir. 1.5 | 9 |

During the trial and before argument, the Court will meet with counsel and settle the instructions.  Strict adherence to time requirements is necessary for the Court to examine the submissions in advance so that there will be no delay in starting the jury trial.  **Failure of counsel to strictly follow the provisions of this section may subject the non-complying party and/or its attorney to sanctions and SHALL CONSTITUTE A WAIVER OF JURY TRIAL in all civil cases.**

1          3.    **TRIAL EXHIBITS**

2          Counsel are to prepare their exhibits for presentation at the trial by placing them in

3    binders which are indexed by exhibit number with tabs or dividers on the right side.  Counsel

4    shall submit to the Court an original and one copy of the binders.  The exhibits shall be in a

5    three-ring binder labeled on the spine portion of the binder as to the volume number <u>and</u> contain

6    an index of each exhibit included in the volume.  Exhibits must be numbered in accordance with

7    Fed.R.Civ.P. 16, 26 and the Local Rules.

8          Exhibit list shall indicate which exhibits are objected to, the reason for the objection, and

9    the reason it is admissible.  Failure to object will result in a waiver of objection.

10          The Court requires that the following be submitted to the Courtroom Deputy Clerk on the

11    first day of trial:

12    •      The <u>original exhibits</u> with the Court's exhibit tags shall be stapled to the front of

13           the exhibit on the upper right-hand corner with the case number, case name, and

14           exhibit number placed on each tag.  Exhibit tags can be obtained from the Clerk's

15           Office, Room G-8, 312 North Spring Street, Los Angeles, CA 90012.

16    •      <u>One bench book</u> with a copy of each exhibit for use by the Court, tabbed with

17           numbers as described above.  (Court's exhibit tags not necessary.)

18    •      Three (3) copies of exhibit lists.

19    •      Three (3) copies of witness lists in the order in which the witness may be called to

20           testify.

21    •      Counsel are ordered to submit a short joint statement of the case seven (7) days

22           before trial that the Court may read to the prospective panel.

23    •      All counsel are to meet not later than ten (10) days before trial and to stipulate so

24           far as is possible as to foundation, waiver of the best evidence rule, and to those

25           exhibits which may be received into evidence at the start of trial.  The exhibits to

26           be so received will be noted on the copies of the exhibit lists.

27

28                                      7

- Counsel may, but need not, submit brief proposed voir dire questions for the jury seven (7) calendar days before the Pretrial Conference. The Court will conduct its own voir dire after considering any proposed voir dire submitted by counsel.
- Any items that have not been admitted into evidence and are left in the courtroom overnight <u>without prior approval</u>, will be discarded.

DATED: April 6, 2009

_____
R. Gary Klausner, Judge
UNITED STATES DISTRICT COURT

# EXHIBIT 3

April 29, 2009

**VIA E-MAIL, U.S. MAIL, AND FACSIMILE**

James L. Wamsley III, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
fax:  216-579-0212

Re:     Sony Corporation v. Vizio, Inc.

Dear Jim:

Pursuant to Local Rule 37-1, I write regarding various deficiencies in Vizio's discovery responses.

As an initial matter, Vizio failed to produce any documents along with its responses on the ground that a protective order has not been entered in this case.  This is improper.  At the very least, Vizio should have produced responsive non-confidential documents with its initial responses and produced its confidential documents on an Outside Attorneys' Eyes Only basis pending entry of a Protective Order.

In response to Sony's Request for Production Nos. 13, 14, 17-26, 43-46, 48-54, 67-81, 83-85, 91-92, 101-104, 110, 124, and 127-28, Vizio states that it will produce documents "only after . . . Vizio has received the consent of any third parties to produce any documents containing confidential information of said third parties."  Vizio is not entitled to withhold nonprivileged documents from production on the basis that a third party might regard those documents as confidential.  See In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir. 1995) (documents in possession of responding party are discoverable regardless of third-party ownership); 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2210 (2d ed. 2009) ("A party

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44-20-7653-2000 FAX +44-20-7653-2100

may be required to produce documents and things that it possesses even though they belong to a third person who is not a party to the action."). Rather, Vizio is required to produce all nonprivileged, responsive documents in its possession, custody, or control. See Fed. R. Civ. P. 36(a). Moreover, Vizio has not even attempted to describe why it believes the withheld information is "confidential," nor has Vizio provided Sony with a log of the withheld information. Vizio also fails to state whether it has requested permission from any third parties to produce the requested documents and things.

Sony's Request for Production No. 1 requires Vizio to provide a fully operational exemplar of each of the Vizio Products. Vizio neither objected to this request nor confirmed that it will make any of the accused Vizio Products available for Sony's inspection. Rather, Vizio responded that it "is willing to meet and confer with Plaintiff." Sony accepts Vizio's offer to meet and confer regarding this request. In particular, the parties need to confer regarding the dates, location, and logistical details of the inspection. Sony expects that this inspection will take place within the next 60 days, and that that Vizio will permit Sony to bring its experts, a photographer, and a videographer to the inspection.

With respect to Sony's Request for Production Nos. 55-57, 64, 82, 106, 125, and 126, Vizio has not confirmed that it will produce any documents or things. Rather, Vizio merely objects to these requests. Vizio is required to produce all nonprivileged, responsive documents and things in its possession, custody, or control. See Fed. R. Civ. Pro. 36(a). Therefore, Vizio's responses to these requests are deficient.

Interrogatory No. 1 requires Vizio to identify each of the Vizio Products. The list of products that Vizio provided in response to this interrogatory is incomplete. For example, the list does not contain Vizio's VO22L FHDTV10A, which appears to be one of Vizio's best-selling products. In addition, the list does not identify any of the following products: VX20L HDTV1A, L32 HDTV, L42 HDTV, P42 ED, P42 HDTV, VP42 HDTV, VP50 HDTV, and VM60P HDTV10A. Vizio should immediately supplement its response to this interrogatory to identify all Vizio Products including, without limitation, those listed above.

Vizio's response to Sony's Interrogatory No. 2 is also inadequate. The Interrogatory requires Vizio to describe for each Vizio Product "how, when and by whom (including all entities involved) the Vizio Product was manufactured, sold, offered for sale, or distributed in, and/or imported into, the United States." Vizio's response is inadequate because Vizio has not provided *any* information regarding when the products were manufactured or distributed. In addition, despite the fact that publicly available information shows that AmTRAN Logistics, Inc. is directly involved in the importation and distribution of Vizio Products, Vizio has not even mentioned that company in its response. Vizio's response is also inadequate because it improperly invokes Federal Rule of Civil Procedure 33(d). Given the nature of Interrogatory No. 2, it is simply unimaginable that "the burden of deriving or ascertaining the answer will be substantially the same for either party." Fed. R. Civ. P. 33(d); see also Ropak Corp. v. Plastican, Inc., No. 04 C 5322, 2006 WL 1005406, at *5 (N.D. Ill. April 17, 2006) (the responding party has the "obligation of show[ing] that the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served"). This is especially true because the interrogatory seeks information about Vizio's own products. See Laserdynamics, Inc. v. Asus Computer Int'l, No. 2:06-CV-348, 2009 WL 153161, at *3 (E.D. Tex. Jan. 21, 2009) ("It is implausible for the defendants to contend that the plaintiff stands on

2

equal footing when it comes to determining how the defendants' own products operate."). Moreover, even if it were appropriate to rely on Rule 33(d), Vizio failed to identify the production numbers of the documents it is relying on as required by Rule 33(d). See Cambridge Elecs. Corp. v. MGA Elecs., Inc., 227 F.R.D. 313, 322 (C.D. Cal. 2004) ("A party that elects to avail itself of [Rule 33(d)], however, must specify where in the records the answers [can] be found."). Indeed, as of today, Vizio has failed to produce a single document to Sony.

Sony's Interrogatory No. 3 requires Vizio to "set forth in claim chart form the bases for Vizio's First Affirmative Defense that 'it does not infringe, induce infringement of, or contributorily infringe any properly construed, valid claim of . . . the patents-in-suit.'" Vizio responded that it will not answer this interrogatory until Sony has identified "the asserted claims and the products accused of infringing each of those claims." That response is inadequate because Vizio alleged in its Answer that it does not infringe "any" of the patents-in-suit. Nevertheless, in order to facilitate a proper response to Interrogatory No. 3, and without waiving Sony's right to revise its contentions as discovery continues, Sony presently contends that each and every Vizio Product infringes at least the following claims of the patents-in-suit:

- '626 patent: claims 1, 3-4, 6-7, 9-10, 14, 17-24, and 29-33.
- '373 patent: claims 1-13.
- '614 patent: claims 1-4, and 6-7.
- '577 patent: claims 13, 15, 19, 20, 27, and 28.
- '542 patent: claims 6 and 11.
- '847 patent: claims 11, 12, 16, 27, 28, 33, 34, 35, and 37-41.
- '055 patent: claims 41-54 and 61-66.
- '468 patent: claims 41-45.
- '182 patent: claims 1-6.
- '472 patent: claims 1-18.

Now that Sony has provided Vizio with the requested information, Sony expects that Vizio will supplement its response within 30 days of the date of this letter.

Interrogatory No. 7 requires Vizio to set forth its proposed constructions of any claim term that Vizio contends requires construction by the Court. Vizio has objected that the interrogatory is "premature, overbroad, and unduly burdensome" because Sony has not yet identified its asserted claims and the products accused of infringement. Now that Sony has provided Vizio with that information, Sony expects that Vizio will supplement its response within 30 days of the date of this letter.

Vizio's response to Interrogatory No. 8, which requires Vizio to identify sales information for its products, is inadequate because it does not provide *any* responsive information. Vizio's reliance on Rule 33(d) is improper, especially because the interrogatory seeks information about Vizio's own products. See Laserdynamics 2009 WL 153161, at *3 ("It is implausible for the defendants to contend that the plaintiff stands on equal footing when it comes to determining how the defendants' own products operate."). In addition, Vizio has failed to identify the production numbers of the responsive records as required by Rule 33(d). See Cambridge Elecs., 227 F.R.D.

at 322 ("A party that elects to avail itself of this option, however, must specify where in the records the answers [can] be found.") Indeed, as of today, Vizio has not produced any documents to Sony.

Interrogatory No. 10 requires Vizio to "[d]escribe when and how (including all persons involved) Vizio first became aware of each of the patents-in-suit." Vizio's response with respect to the '373, '472, and '468 patents is deficient because Vizio has not provided any information regarding how it first became aware of the patents and who was involved.

Interrogatory No. 11 requires Vizio to identify for each Vizio Product which of eleven features it incorporates. Vizio has not identified even a single product, and instead invokes Rule 33(d). Once again, Rule 33(d) is an improper way of responding to this interrogatory, which requests information regarding Vizio's own products. See Laserdynamics 2009 WL 153161, at *3; Cambridge Elecs., 227 F.R.D. at 322. In Sony v. Westinghouse, 2:08-cv-03934-RGK-FMO (C.D. Cal.), Sony propounded the same Interrogatory No. 11 against Westinghouse. After Westinghouse provided the same kind of deficient answer that Vizio has provided, Sony moved to compel. On February 11, 2009, Magistrate Judge Olguin found that Westinghouse's response was deficient and ordered Westinghouse to supplement its response. For your convenience, a copy of Judge Olguin's order is attached to this letter.

Interrogatory No. 12 requires Vizio to identify, for each of eleven technological features, its five most knowledgeable employees. Vizio has objected that identifying five individuals is "overly burdensome," and instead has identified only three employees, asserting that they are the three most knowledgeable employees regarding each of the eleven features. Sony expects Vizio to identify two additional witnesses, as required by the interrogatory. If Vizio does not do so, Sony will seek to preclude any unidentified witness from testifying or submitting a declaration regarding any of the eleven identified features.

Interrogatory No. 13 requires Vizio to identify the Video Processors and Graphics Processors used in each Vizio Product. Vizio has failed to identify even a single processor in its response. Vizio instead invokes Rule 33(d) without identifying any documents, which is not an appropriate response to the interrogatory. See Laserdynamics 2009 WL 153161, at *3; Cambridge Elecs., 227 F.R.D. at 322.

Interrogatory No. 14 requires Vizio to identify separately for each Vizio Product "all digital television standards (e.g., standards relating to Closed Captioning such as EIA-708-B, CEA-708-B, and CEA-708-C, or standards relating to HDCP, such as 'High-Bandwidth Digital Content Protection System,' revision 1.3, issued by the Digital Content Protection LLC) with which that product complies or has complied (including the relevant time periods) and describe the manner in which each such standard is or has been implemented." Vizio's response is: "See Attachment A." Attachment A, however, does not provide the requested information. Among other things, Attachment A makes no mention of any of the relevant closed captioning or HDCP standards. In addition, there is no identification of the relevant time periods, nor any description of the manner in which any standard has been implemented. If Vizio's products do not comply with any digital television standards, then Vizio's response to this interrogatory should so state. Otherwise, Vizio should provide a substantive response to this interrogatory and identify the specific standards with which its products comply.

Interrogatory No. 18 requires Vizio to "[i]dentify all industry or standards organizations in which Vizio has participated and for each describe the nature and timing of Vizio's participation." Vizio has not identified any organizations, once again pointing to Rule 33(d) without identifying the production numbers of any documents. Again, Vizio's reliance on Rule 33(d) is improper. See Laserdynamics 2009 WL 153161, at *3; Cambridge Elecs., 227 F.R.D. at 322.

Pursuant to Local Rule 37, Sony requests an in-person meet and confer regarding the above issues in order to determine whether a motion to compel is necessary. We are available for the meet and confer in our Los Angeles offices on May 8. Please let us know whether Westinghouse is also available then.

Best regards,

Todd Kennedy

1
2
3
4
5
6          **UNITED STATES DISTRICT COURT**
7          **CENTRAL DISTRICT OF CALIFORNIA**
8

| | |
|---|---|
| 9  SONY CORPORATION, a Japanese corporation, | )  Case No. CV 08-3934 RGK (FMOx) |
| 10 | ) |
| Plaintiff, | ) |
| 11 | ) |
| v. | )  **ORDER Re: DISCOVERY MOTION** |
| 12 | ) |
| 13 WESTINGHOUSE DIGITAL ELECTRONICS, LLC, a California limited liability company, | ) |
| 14 | ) |
| Defendant. | ) |
| 15 | ) |

16          The court has reviewed and considered all the briefing filed with respect to the parties'

17   "Joint Stipulation Regarding Sony Corporation's Motion to Compel a Further Response to Sony

18   Interrogatory No. 11" ("Joint Stip." or "Motion"), and concludes that oral argument is not necessary

19   to resolve this Motion. <u>See</u> Fed. R. Civ. P. 78; Local Rule 7-15; <u>Willis v. Pac. Mar. Ass'n</u>, 244 F.3d

20   675, 684 n. 2 (9th Cir. 2001, <u>as amended</u> Mar. 27, 2001).

21                                      **<u>DISCUSSION</u>**

22   I.       STANDARD OF REVIEW.

23          A party can discover any nonprivileged information which is relevant to the claims or

24   defenses of any other party. Fed. R. Civ. P. 26(b)(1). Relevant information does not have to be

25   admissible so long as it appears calculated to lead to the discovery of admissible evidence. <u>Id.</u>

26   "Relevanc[e] is broadly construed, and a request for discovery should be considered relevant if

27   there is any possibility that the information sought may be relevant to the claim or defense of any

28   party. A request for discovery should be allowed unless it is clear that the information sought can

1   have no possible bearing on the claim or defense of a party." <u>McCormick v. City of Lawrence</u>,

2   2005 WL 1606595, at *5 (D. Kan. 2005) (citations omitted); <u>see also</u> <u>Surfvivor Media, Inc. v.</u>

3   <u>Survivor Prods.</u>, 406 F.3d 625, 635 (9th Cir. 2005) ("Litigants may obtain discovery regarding any

4   matter, not privileged, that is relevant to the claim or defense of any party.  Relevant information

5   for purposes of discovery is information reasonably calculated to lead to the discovery of

6   admissible evidence.") (internal quotation marks and citations omitted).  "The party who resists

7   discovery has the burden to show discovery should not be allowed, and has the burden of

8   clarifying, explaining, and supporting its objections." <u>Keith H. v. Long Beach Unified Sch. Dist.</u>,

9   228 F.R.D. 652, 655-56 (C.D. Cal. 2005) (citation omitted); <u>see also</u> <u>Blankenship v. Hearst Corp.</u>,

10  519 F.2d 418, 429 (9th Cir. 1975) ("Under the liberal discovery principles of the Federal Rules

11  defendants were required to carry a heavy burden of showing why discovery was denied.").

12  II.     INTERROGATORY NO. 11.

13          Interrogatory No. 11 requests defendant "to identify which of its products incorporate certain

14  specific high level features or capabilities . . . to allow [plaintiff] to make a complete list of

15  [defendant's] products that would need to be studied to determine whether they infringe one o[r]

16  more of the ten Sony patents-in-suit." (Joint Stip. at 1-2) (footnotes omitted).  Specifically,

17  Interrogatory No. 11 requests defendant to identify which of its products "incorporate one or more

18  of the following product features: menu displays capable of displaying in more than one color or

19  more than one brightness; menu displays capable of displaying in more than one level of

20  transparency; menu displays capable of displaying a submenu; the capability to superimpose

21  captions on another image; the capability to superimpose subtitles on another image; and the

22  capability to securely transfer video data between devices connected to a common bus." (<u>Id.</u> at

23  7-8).  Defendant responded to Interrogatory No. 11,[1] stating, <u>inter alia</u>, that "[a]s understood by

24  [defendant] and as alleged by [plaintiff], based on a reasonable investigation, no Westinghouse

25  ───────────────────

26      [1] Under the circumstances, it is a close question as to whether another meet and confer was
    required.  Given that the Motion involves only one interrogatory, the court will proceed to address
27  the merits of the Motion.  However, the parties are advised that the court will not consider any
    future discovery motions in this matter unless the parties have conducted a timely meet and confer
28  process.

1  product includes [the specific feature] as [plaintiff] contends this feature is relevant to any valid and

2  enforceable claim of the [relevant Sony] patent." (Id. at 11; see also id. at 12-13).

3        Plaintiff contends that defendant's supplemental response "is unreasonable and obstructs

4  [its] ability to litigate its claims[.]" (Joint Stip. at 14). Defendant counters that, "[a]lthough [plaintiff]

5  may disagree with [defendant's] understanding of the patents-in-suit and/or its interpretation of the

6  scope of the claims recited therein, [defendant] has provided a specific, substantive response to

7  Interrogatory No. 11." (Id. at 7). Defendant also contends that the "true issue presented by

8  Interrogatory No. 11 is whether [defendant's] product features infringe [plaintiff's] patents, i.e.,

9  whether [defendant's] product features reflect the claims of the patents-in-suit, which will ultimately

10  be decided by the trier of fact." (Id. at 25).

11        The court has reviewed defendant's responses to Interrogatory No. 11 and believes they

12  are deficient. It appears that defendant has deliberately misconstrued Interrogatory No. 11 by

13  giving it a highly technical and unfair reading. See Hunter v. Int'l Systems & Controls Corp., 51

14  F.R.D. 251, 257 (W.D. Mo. 1970) (answer insufficient when based on a deliberate misconstruction

15  of interrogatory); see also Tig Ins. Co. of Mich. v. Vision Service Plan, 2006 WL 192537, at *3

16  (E.D. Cal. 2006) (denying defendant's discovery motion after finding that defendant "appears to

17  be trying to confuse the expense and burden of having to sift through 30,000 to 50,000 pages of

18  documents responsive to a document request with the separate issue of checking only 70 pages

19  of documents clearly identified in its privilege log"). Contrary to defendant's assertion, (see Joint

20  Stip. at 25), the interrogatory does not request defendant to identify infringing products, a point

21  that plaintiff made clear during the meet and confer process. (See Declaration of Andrew J.

22  Bramhall in Support of Joint Stip., Exh. G at 21) ("We could have just said, identify all products that

23  infringe claim "X" of the "Y" patent. And you, of course, wouldn't have answered that."). Instead,

24  the Interrogatory merely requests that defendant identify the products which contain the features

25  listed in the Interrogatory; features which the parties agree are relevant to the patents-in-suit.

26  (See Joint Stip. at 6; Plaintiff's Supplemental Memorandum in Support of Joint Stipulation

27  Regarding Sony Corporation's Motion to Compel a Further Response to Sony Interrogatory No.

28  11 at 3 & n. 3).

1    Indeed, Interrogatory No. 11 is an entirely proper discovery request under the Federal

2  Rules of Civil Procedure. "[R]elevant discovery in a patent infringement suit includes discovery

3  relating to the technical operation of the accused products, as well as the identity of and technical

4  operation of any products reasonably similar to any accused product." Epicrealm, Licensing, LLC

5  v. Autoflex Leasing, Inc., 2007 WL 2580969, at *3 (E.D. Tex. 2007) (internal quotation marks and

6  citation omitted); see also Phillip M. Adams & Assocs., LLC v. Dell, Inc., 2008 WL 200340, at *1

7  (D. Utah 2008) ("Discovery in patent litigation must necessarily identify the products *potentially* at

8  issue before the products *actually* at issue are identified.") (italics in original). Thus, plaintiff is

9  entitled to seek the identity of all products that are reasonably similar to any accused product, not

10  just those products plaintiff has already identified.[2] See L.G. Philips LCD Co. v. Tatung Co., 2007

11  WL 869700, at *2 (E.D. Cal. 2007) (allowing plaintiff to seek "information about *all* potentially

12  infringing products, not just those that have so far been identified[]") (italics in original); Dr.

13  Systems, Inc. v. Fujifilm Medical Sys. USA, Inc., 2008 WL 1734241, at *3 (S.D. Cal. 2008)

14  (allowing discovery of "products that are reasonably similar to the accused products[]") (internal

15  quotation marks omitted).

16    In short, by requesting that defendant identify which of its products contain any of the

17  features set forth in Interrogatory No. 11, defendant is not being asked to admit whether the

18  products infringe one or more of the patents-in-suit. (See Joint Stip. at 6 (explaining that the

19  features described in Interrogatory No. 11 relate to one or more of the patents-in-suit) & 19-20

20  (explaining that the features described in Interrogatory No. 11 are not linked to the actual claim

21  language so as to explicitly avoid seeking any specific admissions of infringement)). Instead,

-------

23    [2] The cases cited by defendant are inapposite. In Tesseron, Ltd. v. R.R. Donnelley & Sons
24  Co., 2007 WL 2034286 (N.D. Ohio 2007), the plaintiff sought discovery "of all the systems that
  [defendant] is using and has previously used." Id. at *2. The Tesseron court found that while
25  discovery is not limited to the accused systems, the discovery request must be narrowed because
  it "includes many systems that cannot conceivably infringe on any of [plaintiff's] patents." Id. at
26  *5. Similarly, in Caliper Techs. Corp. v. Molecular Devices Corp., 213 F.R.D. 555 (N.D. Cal.
  2003), plaintiff sought discovery of "any invention, method, apparatus, or technology that does not
27  use antibodies or radioactive isotopes" without offering any explanation as to why this discovery
  was "relevant to any claim or defense of a party in this case." Id. at 558. Here, in contrast, the
28  interrogatory concerns the patents-in-suit.

1    defendant is being asked to identify the products that include any of the features set forth in the

2    Interrogatory.

3        **This Order is not intended for publication. Nor is it intended to be included or**

4    **submitted to any online service such as Westlaw or Lexis.**

5        Based on the foregoing, IT IS ORDERED THAT:

6        1.    Plaintiff's Motion to Compel a Further Response to Sony Interrogatory No. 11

7    **(Document No. 40) is granted**.

8        2.    Defendant shall provide a supplemental written response, under oath, to

9    Interrogatory No. 11 no later than **February 23, 2009**. Defendant shall identify by model number

10   all of its products that contain any of the features set forth in Interrogatory No. 11, irrespective of

11   whether defendant believes the product(s) is related to or infringes any of the patents-in-suit. If

12   none of defendant's products contain any of the features set forth in Interrogatory No. 11, then

13   defendant shall state so under oath. In addition, defendant's response shall indicate under oath

14   whether it considered and included all of its products in responding to the subject Interrogatory.

15   Finally, to the extent defendant claims that all responsive information has been provided or there

16   is a lack of information necessary to provide a complete response, it shall set forth in detail, under

17   oath: (1) the efforts defendant made to obtain the requested information; and (2) that no further

18   responsive information is available.

19       3.    The parties are reminded that they must strictly comply with the Local Rules and the

20   Court's Order of November 17, 2008.

21       4.    The failure of any party or attorney to comply with the requirements of this Order,

22   the Local Rules and Federal Rules of Civil Procedure may result in sanctions being imposed.

23   Dated this 11th day of February, 2009.

24

25                                        /s/

26                                   Fernando M. Olguin
                                United States Magistrate Judge

27

28

                                         5

# EXHIBIT 4

May 7, 2009

<u>VIA E-MAIL, U.S. MAIL, AND FACSIMILE</u>

Ryan McCrum, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
fax: 216-579-0212

Re:     Sony Corporation v. Vizio, Inc.

Dear Ryan:

I write in response to your May 6, 2009 letter to Todd Kennedy regarding Vizio's discovery responses.

As a preliminary matter, Sony reiterates its request for a meet and confer for the remaining areas of disagreement described below. As Mr. Kennedy pointed out in his letter of April 29, 2009, we were, and still are, available to meet and confer on May 8, 2009 in our Los Angeles offices. As an accommodation to you, we are willing to postpone the meeting until Monday May 11, 2009. Pursuant to Local Rule 37, the conference must take place by that date.

Sony accepts Vizio's offer that the parties produce confidential documents as "Outside Attorneys' Eyes Only" prior to the Court's entry of a protective order. We are preparing a separate response regarding your latest rounds of edits to the Protective Order. Although some of your proposed changes appear to be okay, others such as the changes to provisions regarding source code and the prosecution bar are unnecessarily complicated and overbroad.

We disagree with your characterization of Sony's first production of documents on April 30, 2009, particularly the statement that "Sony's first production consisted almost entirely of Vizio's

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100
CHICAGO | 250 South Wacker Drive, Suite 230, Chicago, Illinois 60606-6301 | TEL (312) 463-2961 FAX (312) 463-2962
LONDON | 16 Old Bailey, London EC4M 7EG ,United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052 ,Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712

own public documents and other public documents [], and Sony still has not produced documents from the Westinghouse litigation." In fact, Sony produced 22,968 pages of documents on April 20, 2009, over half of which were materials identified as "prior art"[1] by Westinghouse in the Westinghouse litigation, as indicated by the WDE production numbers that remain on these documents. Of the remainder, hundreds of pages consisted of documents relating to Vizio's Interrogatory No. 8, requesting information on nonobviousness. The portion consisting of Vizio's own public documents were produced in response to Vizio's Interrogatory No. 1 and are extensively cited in Sony's response to that Interrogatory.

With respect to the production of documents from the Westinghouse litigation in general, Sony continues to review the Westinghouse-related documents for relevancy and responsiveness to Vizio's discovery requests and will produce additional documents as stated in Sony's response to Vizio's Request for Production No. 32. As noted in the response that request, Sony's production of non-Sony documents from the Westinghouse matter will necessarily be limited to non-confidential documents that are not subject to the Protective Order in that matter. Sony does not object to Vizio obtaining and reviewing materials produced by Westinghouse and others under the Protective Order in that matter. But in order for Sony to produce such materials, we will need written confirmation from Westinghouse that it does not object. Upon receiving such written confirmation, Sony will produce the entirety of the parties' productions and filings in the Westinghouse matter, provided that Vizio agrees to reimburse Sony for any copying expenses of documents kept in hard copy format and any expenses related to database extraction or disk burning.

With respect to the inspection of Vizio's products in its control, as stated in your letter, please provide a proposal for the date, time, and protocol for such an inspection, to take place within 60 days of April 29, 2009. As already stated in the Todd Kennedy's letter, Sony expects Vizio to permit Sony to bring its experts, a photographer, and a videographer to the inspection.

With respect to Sony's specific document requests, we expect Vizio to provide an appropriate privilege log for any documents Vizio withholds on the basis of any privilege. In addition, for Document Requests Nos. 55-57, Sony notes that documents and information provided by Vizio to third parties, including Sony, during pre-filing negotiations are not privileged. The other requests described in Todd Kennedy's letter to you will be part of the parties' meet and confer.

With respect to Interrogatory No. 2, as you know our letter sought information on AmTRAN Logistics, Inc., which according to publicly available documents is involved in the importation and distribution of the AmTRAN televisions that Vizio sells in the United States under its brand name. AmTRAN Logistics is not mentioned in Vizio's response to this interrogatory. Sony will renew its request to meet and confer on this Interrogatory if Vizio's response remains deficient after Vizio has provided documents and supplemented its interrogatory response, as you indicate Vizio will do in your letter.

In its response to Interrogatory No. 3, Vizio promised to supplement its response once it received "the identity of the asserted claims and the products accused of infringing each of those claims."

---

[1] As stated in its responses to Vizio's interrogatories, Sony makes no admission that any of these documents are prior art to any of the patents-in-suit.

Sony provided that information to Vizio on April 30, 2009 in Sony's responses to Vizio's interrogatories. Accordingly, we expected that Vizio would provide its non-infringement claim charts to Sony within approximately 30 days from Vizio's receipt of Sony's claim charts. Your letter, however, now arbitrarily suggests Vizio has no intention of disclosing its noninfringement positions until three weeks before the pre-trial conference. This position is unreasonable and we intend to raise it during the meet and confer.

We also disagree with your position on Sony's Interrogatory No. 11 and do not see how it could possibly be the case that Vizio does not have readily available information that would permit it to provide a substantive response to this interrogatory. Sony will renew its request to meet and confer once Vizio has provided the documents indicated and supplemented its response, if such response does not meet the requirements of Judge Olguin's order, which was attached to Todd Kennedy's letter.

For Interrogatory No. 12, Sony reiterates its request that Vizio supplement its response with any additional names of persons having knowledge of these topics. If these three individuals are the only persons having knowledge of these topics, then Vizio should so state. On the other hand, if other Vizio personnel do have knowledge of these topics and Vizio refuses to identify them, Sony reserves the right to later move to preclude Vizio from relying on such persons as witnesses or declarants.

With respect to the subjects above that are still in dispute, please confirm that counsel for Vizio can meet and confer in our Los Angeles office on either May 8 or May 11, 2009.


Very truly yours,

/s/ Peter A. Klivans

Peter A. Klivans

# EXHIBIT 5

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

 4

 5   SONY CORPORATION, a Japanese    )
     corporation,                   )
 6                                   )
                    Plaintiff,       )
 7                                   )
          vs.                        )   No. 8:08-cv-01135-
 8                                   )       RGK-FMO
     VIZIO, INC., a California       )
 9   corporation,                    )
                                     )
10                   Defendant.       )
     _____)

11

12

13

14

15        Transcript of proceedings, taken at 865 South

16   Figueroa Street, 10th Floor, Los Angeles,

17   California, commencing at 12:09 p.m. Monday,

18   May 11, 2009, before BETH FELIX, Certified

19   Shorthand Reporter No. 12766.

20

21

22

23

24

25

```
 1    APPEARANCES:
 2
 3    For Plaintiff:
 4         QUINN EMANUEL URQUHART OLIVER & HEDGES
           BY:   RORY S. MILLER
 5         Attorney at Law
           865 South Figueroa Street, 10th Floor
 6         Los Angeles, California  90017
           (213) 443-3000
 7
           QUINN EMANUEL URQUHART OLIVER & HEDGES
 8         BY:   TODD KENNEDY
           BY:   PETER KLIVANS
 9         Attorneys at Law
           50 California Street, 22nd Floor
10         San Francisco, California  94111
           (Telephonic appearance.)
11
           QUINN EMANUEL URQUHART OLIVER & HEDGES
12         BY:   THOMAS PEASE
           Attorney at Law
13         51 Madison Avenue, 22nd Floor
           New York, New York  10010
14         (Telephonic appearance.)
15    For Defendant:
16         JONES DAY
           BY:   STEVEN J. CORR
17         Attorney at Law
           555 South Flower Street, 15th Floor
18         Los Angeles, California  90071
           (213) 243-2327
19
           JONES DAY
20         BY:   RYAN MC CRUM
           Attorney at Law
21         901 Lakeside Avenue
           Cleveland, Ohio  44114
22         (Telephonic appearance.)
23
24
25
```

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

INDEX

EXHIBITS FOR IDENTIFICATION

1   Vizio's response to Sony's first set of
    requests for production; 99 pages

2   Vizio's response to Sony's first set of
    interrogatories; 38 pages

3   Letter to James Wamsley, dated April 29,
    2009; 10 pages

4   Letter to Todd Kennedy, dated May 6, 2009;
    5 pages

5   Letter to Ryan McCrum, dated May 7, 2009;
    3 pages

Page 4

Los Angeles, California, Monday, May 11, 2009
12:09 p.m. - 1:09 p.m.

MR. MILLER: So let's go on the record now. So from Quinn Emanuel representing Sony, Rory Miller.

MR. CORR: And from Jones Day representing Vizio, Steve Corr.

MR. MILLER: Everyone else.

MR. MC CRUM: Ryan McCrum from Jones Day representing Vizio.

MR. PEASE: Tom Pease from Quinn Emanuel representing Sony.

MR. KLIVANS: Peter Klivans from Quinn Emanuel representing Sony.

MR. KENNEDY: And Todd Kennedy from Quinn Emanuel representing Sony.

MR. MILLER: Okay. So we can go ahead and launch into this. Tom, do you know where you'd like to begin?

MR. PEASE: I think Todd is going to take the lead going forward.

MR. KENNEDY: Okay. Why don't we start with Vizio's refusal to produce third-party documents containing confidential information. As an initial matter, I was curious what Vizio considers to be

Page 5

confidential information.

MR. MC CRUM: Obviously, our gathering of information is ongoing. We can't predict the full extent of what information is going to contain third-party information at this point, but we had, at least, identified some initial documents that contained third-party confidential information.

As I'm sure it's no secret here, a lot of the technology in the products that have been accused is in the chips that are used in these products, and Vizio does not manufacture these chips. They don't design and develop these chips. They're made by third parties. As our interrogatory responses reflect, a large number of these chips are made by a company known as Media Tech, so we have documents with Media Tech confidential information in them as one example.

MR. KENNEDY: I don't think that answers the question, which is how do you define confidential information. I understand you have information that Vizio considers to be confidential. I want to know going forward what kinds of documents are you going to be withholding? Does it require a contract with the third party or some kind of oral agreement that the documents will be confidential?

MR. MC CRUM: Well, I don't know the answer to

Page 6

that question. Maybe since Sony has raised the same concern, we ought to talk about each party's position on what confidential information is. I think we are here to talk about Sony's concerns about our discovery. I think they go hand in hand.

To the extent you folks have indicated quite clearly you are withholding documents based on confidential information of third parties, I'm happy to discuss what we collectively think is the correct definition of confidential information and what we're withholding, but I think that any information that we have a reason to believe is proprietary and that we have a reason to believe should not be disclosed without the consent of a third party is, at least, at first go confidential information in our view.

MR. KENNEDY: Am I correct to say that Vizio intends to withhold documents that it has decided alone are confidential even though those are not the subject of a formal confidentiality contract?

MR. MC CRUM: We're not in a position to say that. We have documents we know that contain confidential information because we've been told that. As I'm sitting here right now, I'm not aware of a decision that we made -- a unilateral decision that we made to withhold documents because we think they might

Page 7

Page 8:

```
 1   be confidential. If there is a question about a third
 2   party's documents, we are going to respect that and we
 3   are going to seek out that company's consent to produce
 4   those documents.
 5          MR. KLIVANS: This is Peter Klivans. You are
 6   seeking permission from those parties where necessary
 7   to produce them?
 8          MR. MC CRUM: I think that's what we said in
 9   our letter, and, yes, we are taking steps to secure
10   that consent.
11          MR. KENNEDY: What kinds of steps are you
12   taking?
13          MR. MC CRUM: We are preparing letters and
14   sending those out.
15          MR. KENNEDY: Will you provide those letters
16   to Sony?
17          MR. MC CRUM: I will be happy to give you
18   copies.
19          MR. KENNEDY: When will Vizio do that?
20          MR. MC CRUM: At this point, I don't know. I
21   know we are in the process of doing that now.
22          MR. KENNEDY: One concern that we have in
23   particular is that AmTRAM, which is a third party,
24   technically, to this case produces, according to Vizio,
25   most of Vizio's products, and I'm curious if Vizio
                                                  Page 8
```

Page 9:

```
 1   intends to withhold documents generated by AmTRAM.
 2          MR. MC CRUM: We haven't made a determination
 3   on that yet. We are in talks with all third parties
 4   that we think have confidential information, and quite
 5   frankly, we haven't gotten that far with AmTRAM yet.
 6          MR. KENNEDY: Have you reviewed any AmTRAM
 7   documents that you currently consider to be
 8   confidential?
 9          MR. MC CRUM: I don't think we need to talk
10   about that. I think we're on the fringe of work
11   product here, guys. Sufficed to say, we are going to
12   take the steps to secure the third-party consent that
13   we need to. If we have trouble doing that, we will
14   certainly let you know.
15          MR. KENNEDY: At this point, I still don't
16   have any idea what you consider to be confidential
17   information.
18          MR. MC CRUM: If we are going to withhold
19   documents because we're unable to secure third-party
20   consent, we will let you know, and you will know the
21   nature of the documents.
22          MR. KENNEDY: Is Vizio willing to provide Sony
23   a written definition of confidential information so the
24   parties have an understanding?
25          MR. MC CRUM: Why don't you propose your
                                                  Page 9
```

Page 10:

```
 1   understanding. We'll let you know if it's different.
 2   The term "confidential information" can be construed in
 3   a number of different ways. I don't know what you are
 4   looking for. What are you looking for?
 5          MR. KENNEDY: What we're looking for is
 6   identified in our interrogatory request and our
 7   document request. Your objection is that you will
 8   provide information that is responsive unless it's
 9   considered by Vizio confidential information, which
10   brings us to the question. You asked me to provide you
11   with a definition. I think the burden is on Vizio to
12   provide a definition. It's initially your objection.
13   We're talking about Vizio's responses during this
14   telephone call.
15          MR. MC CRUM: I can't decide what's
16   confidential to these third parties. If we feel that
17   there is information in our documents that could be the
18   subject of a confidentiality claim, then we're going to
19   seek permission from those third parties to produce it.
20   Whether it is confidential or not, I don't know.
21          MR. KENNEDY: When can Sony expect to hear
22   from Vizio about which parties it has propounded on --
23   excuse me. When can Sony expect to hear from Vizio
24   about which parties it is asking to produce
25   confidential information?
                                                 Page 10
```

Page 11:

```
 1          MR. MC CRUM: As we obtain those documents
 2   that are subject to potential third-party
 3   confidentiality restrictions, we'll let you know. I've
 4   already told you one. That's Media Tech.
 5          MR. KENNEDY: You asked Sony to provide you
 6   with a definition of confidential information. I think
 7   we can discuss that. As an initial starting point, why
 8   don't I suggest confidential information is only that
 9   information that is subject to a formal contract of
10   confidentiality between a party and a third party.
11   Does that sound reasonable to you?
12          MR. MC CRUM: I would have to talk to our
13   client about that because I'm not sure that information
14   that may have a claim of confidentiality is subject to
15   a formal written agreement. I have to check with my
16   client to see if that's acceptable.
17          MR. KENNEDY: That sounds reasonable to us.
18   Can you, please, talk with your client and get back to
19   us on Friday about whether that's a reasonable
20   definition going forward?
21          MR. MC CRUM: We'll try to get back to you on
22   Friday, if we can get in touch with you.
23          MR. KENNEDY: Does anyone else have anything
24   on --
25          MR. KLIVANS: We have an agreement by letter
                                                 Page 11
```

1 now to produce stuff outside counsel's eyes prior to
2 entry of the protective order. We'll be going forward
3 with that. That falls under that category. I just
4 want to check with you. We got the first disk we
5 produced this morning. It was user manuals and a
6 couple servers' manuals. Can we expect to be receiving
7 outside counsel's eyes only stuff too soon?
8     MR. MC CRUM: Yeah. I think we reached an
9 agreement on production of confidential information
10 outside attorney's eyes only, and we are, also,
11 preparing to move forward with that understanding as
12 well.
13     MR. KLIVANS: I know how these things take
14 time and effort to get these out the door. Do you have
15 a rough guess?
16     MR. MC CRUM: I don't. I don't know when our
17 next production is going to be.
18     MR. PEASE: Can we assume we'll have it within
19 30 days?
20     MR. MC CRUM: That's, probably, a fair
21 assumption. I don't want to commit to anything. I
22 don't see anything that would prevent us from giving it
23 to you in 30 days.
24     MR. PEASE: This is Tom again. Putting aside
25 the definition what's third-party confidential, other

1 than the Media Tech that you identified so far, are
2 there any other documents that you know of that you are
3 withholding based on a third-party confidentiality
4 concern?
5     MR. MC CRUM: I haven't reviewed documents
6 myself. I can't speak to that. I'm not personally
7 aware. That doesn't mean there are not others. The
8 only ones I'm personally aware of are Media Tech
9 documents. It's quite possible that our reviewers have
10 identified others.
11     MR. PEASE: For the Media Tech docs, are those
12 schematics and spec sheets and the like, or is it a
13 broader category than that?
14     MR. MC CRUM: I think right now what I've been
15 referring to is those types of technical documents.
16     MR. PEASE: Okay.
17     MR. KLIVANS: What about server manuals? Will
18 more of those be coming soon?
19     MR. MC CRUM: Steve Corr, the server manuals,
20 do you know whether we've been able to find any
21 additional ones? I don't know if we have them all.
22 We're searching for as many as we can find.
23     MR. CORR: This is an ongoing project right
24 now. We would expect to include those in future
25 productions that we expect to get out in the next 30

1 days. There are just some challenges in identifying
2 each one relative to the various models. Sufficed to
3 say, that's included in our efforts to move our
4 production forward.
5     MR. MILLER: One follow-up to the third-party
6 things you stated that you're aware of Media Tech being
7 aware one of the third parties have you notified Media
8 Tech of the request for production yet.
9     MR. MC CRUM: I don't know the answer to that.
10 I can tell you that I have seen a letter that we
11 prepared. It's been over a week ago now. Whether
12 we've, actually, sent it out yet I can't say for sure,
13 so I hope that we contacted them. But if we haven't,
14 it will be imminent.
15     MR. CORR: My answer is the same.
16     MR. MILLER: I figured, if it was different,
17 you would have jumped in.
18     MR. KENNEDY: Okay. Anything else on
19 confidential third-party information?
20     MR. MC CRUM: Not from me.
21     MR. KENNEDY: Why don't we move on to Sony's
22 Request for Production Number 1, which requests an
23 inspection of the accused product. We appreciate Vizio
24 has agreed to allow Sony to inspect all of the accused
25 products in its inventory. We should talk about when

1 that inspection can take place.
2     MR. MC CRUM: Well, you folks offered doing
3 that within -- or proposed doing it within 60 days. I
4 can tell you that we have already broached the topic
5 with our client, and we are taking steps to try to get
6 moving on that front. But we need to talk to them
7 about the logistics, what they have, a practical place
8 for this to take this place. I think we shouldn't
9 haven't a problem complying with your request to get
10 this done within 60 days.
11     MR. KENNEDY: Does Vizio accept Sony's
12 proposal that Sony will be able to take its experts as
13 well as a photographer and a videographer to the
14 inspection?
15     MR. CORR: Ryan, can I jump in on that one
16 issue, Todd? It's going to have to be broached before
17 we move forward. We're going to have to hammer out the
18 protective order so that experts are properly disclosed
19 and signed up to it, and so at this point, I'm not sure
20 why we would need to agree or not agree to that. Once
21 we have a protective order in place, we'll know the
22 disclosure of your experts. We can respond at that
23 time.
24     MR. KENNEDY: I was just curious if Vizio
25 right now has any particular objection to the idea of

| | |
|---|---|
| 1  Sony bringing an expert as well as a photographer and | 1  subtle points by the end of this week, and then as long |

Page 16

1 Sony bringing an expert as well as a photographer and
2 videographer to the inspection. I want to identify any
3 disputes we may have right now.
4      MR. CORR: To refer to my earlier answer, I
5 don't think that Vizio could generate any concern
6 without any disclosure of the experts. Regarding your
7 other abilities to take discovery, I think as long as
8 we comply with the rules related to inspection, I don't
9 foresee any issues.
10      MR. KENNEDY: Okay.
11      MR. PEASE: This is Tom. Other than the
12 specific objection to the specific experts Sony will,
13 eventually, identify under the protective order, Vizio
14 doesn't have an objection to the inspection or to the
15 concept of Sony bringing experts to the inspection;
16 correct?
17      MR. CORR: We haven't delved into this topic
18 with the client specifically. Until we get the
19 logistics of the inspection worked out and the
20 protective order, I'm not committing there wouldn't be
21 a future dispute. We haven't broached the subject to
22 the client until we get into the details of the
23 examination.
24      MR. PEASE: Well, we did raise the topic in
25 our letter. We thought you would have broached it, to

Page 16

1 the extent that you could, with your client. You have
2 60 days from the letter, so that takes us to the end of
3 June. So, hopefully, we'll have a protective order in
4 place long before that.
5      MR. MC CRUM: Further to Steve's point, the
6 answer is going to depend on the logistics of the
7 inspection and the finalization of the protective order
8 where this takes place. If it's at Vizio's facilities
9 or elsewhere, it's going to bear on whether or not we
10 allow video cameras into our facilities or whether we
11 do it somewhere else. We've got to hammer out the
12 logistics, figure out where we're going to have the
13 inspection before we can talk about whether video
14 cameras and unknown unidentified personnel are going to
15 be able to attend. We're open to the idea. We just
16 need to nail down the logistics of it at this point.
17      MR. PEASE: I think, from our standpoint, the
18 logistics are going to include photography and
19 videotaping. If you're saying you're not going to
20 allow that, that's something we ought to be discussing
21 because we're going to need that. That's something we
22 ought to tee up with the Court independent of who the
23 experts are and whether you have objections or not.
24      MR. CORR: Yeah. Why don't -- Tom, this is
25 Steve. Why don't we endeavor to work out those two

Page 17

1 subtle points by the end of this week, and then as long
2 as -- I mean, I agree with Ryan's point that some of
3 this is premature. If you're asking if the client
4 fundamentally has an opposition to the use of
5 videographers and photographers, that may guide our
6 conversations of where we're going to have this
7 inspection.
8      MR. PEASE: We'll agree to reach a resolution
9 or try to by the end of this week. How about that?
10      MR. CORR: That's fine.
11      MR. KENNEDY: Why don't we move on to Sony's
12 Interrogatory Number 2, which requests information
13 about how, when and by whom Vizio products were
14 manufactured, sold and distributed. Sony has a couple
15 of issues with Vizio's response. The response does not
16 mention the company AmTRAM Logistics, Inc.
17      MR. MC CRUM: We raised this in our responsive
18 letter. Did you guys look at the chart we refer to?
19      MR. KENNEDY: I have it in front of me right
20 now.
21      MR. MC CRUM: There's a column for vendor.
22 AmTRAM is listed literally a dozen times.
23      MR. KENNEDY: Does that refer to AmTRAM
24 Logistics, Inc.?
25      MR. MC CRUM: Yes. It does as far as I know.

Page 18

1      MR. KENNEDY: AmTRAM Logistics, Inc., is
2 incorporated in the state of California. Am I
3 understanding there's another AmTRAM entity that
4 operates under the laws of Taiwan? By looking at your
5 reference to AmTRAM, it's unclear to me which of those
6 entities you're referring to.
7      MR. MC CRUM: Okay. That confusion wasn't
8 clear from your letter. We can certainly go back and
9 figure out the precise name of the vendor, and we can
10 put who that is in this chart. Would that be
11 sufficient?
12      MR. KENNEDY: I think that would be a starting
13 point. I don't know if just by simply listing, you
14 know, one vendor or the other that that's responsive,
15 and it may be that the entities are involved in the
16 manufacturing and distribution of the products in
17 different ways. And, I mean, just the column that says
18 vendor does not describe in any way or identify in any
19 way how that company is involved. It could be
20 manufacturer or distribution or both.
21      MR. MC CRUM: Well, if they were involved in
22 any of the information -- if they're involved in any of
23 those tasks, we would be including it in our response
24 just for, you know -- as I mentioned earlier, you know,
25 Vizio itself does not manufacture anything. They get

Page 19

| | |
|---|---|
| 1  products from their vendors.  How their vendors make,<br>2  design and develop the products -- that's information<br>3  in their possession, custody and control.  AmTRAM is<br>4  one of our vendors, and I will be happy to supplement<br>5  our chart to give the full and complete name of the<br>6  company for whom we purchase our TVs from.<br>7      MR. KENNEDY:  Will Vizio agree to identify<br>8  each company that manufactures each of its accused<br>9  products as well as each company that distributes each<br>10  of its accused products?<br>11      MR. MC CRUM:  I don't know.  What do you mean?<br>12  Let me get the Interrogatory in front of me before I<br>13  answer that question.  Okay.  So you want to know -- I<br>14  mean, what we are providing in the vendor column is who<br>15  we get the products from.<br>16      MR. KENNEDY:  That's not really responsive to<br>17  the interrogatory, which requires Vizio to, actually,<br>18  describe how, when and by whom the product was<br>19  manufactured, sold, offered for sale, distributed in or<br>20  imported into the United States.  Simply having a<br>21  column that lists companies is not responsive.<br>22      MR. MC CRUM:  Well, I mean, we're all still<br>23  going to be relying on documents as providing<br>24  responsive information as well.  What more are you<br>25  looking for?<br><div align="right">Page 20</div> | 1  interrogatory until Sony identified the asserted claims<br>2  and accused products.  Sony did that on April 29th in<br>3  my letter to Vizio, and now, Vizio is refusing to<br>4  answer because it views this as requiring legal<br>5  contentions.  I think Sony's position -- as an initial<br>6  matter, we're really more interested in the factual<br>7  contentions.  For example, if Vizio contends a<br>8  particular television does not have a particular<br>9  feature required by its claims, Vizio would be required<br>10  to say so in response to the interrogatory.<br>11      MR. MC CRUM:  Well, I think that any time<br>12  you're applying the terms of a claim to a product it's<br>13  going to involve legal contentions.  We've all been<br>14  around and done this enough that that involves issues<br>15  in claim construction.  That is the first step of any<br>16  type of infringement analysis.  I don't think you can<br>17  separate one from the other that easily, but, you know,<br>18  more to the point here is the fact that, as plaintiff,<br>19  our position is that -- well, let me step back a<br>20  minute.<br>21      We had tried to propose an orderly exchange of<br>22  this type of information, and that offer was rejected<br>23  by Sony.  And I really believe that the best way to<br>24  deal with these types of issues is to work together,<br>25  per Judge Klausner's instructions, as professionals and<br><div align="right">Page 22</div> |
| 1      MR. KENNEDY:  I think what we're, actually,<br>2  looking for is for each product a description what<br>3  companies are involved in the distribution, manufacture<br>4  and sale.<br>5      MR. MC CRUM:  It's a lot more simpler than you<br>6  think.  We purchase the products from our vendors, and<br>7  Vizio sells them.<br>8      MR. KENNEDY:  When can we expect a supplement<br>9  to your response?<br>10      MR. MC CRUM:  I think we'll be in a position<br>11  to do that within 30 days of your letter.<br>12      MR. KENNEDY:  We know that Vizio purchases,<br>13  for example, products made by AmTRAM Technology Co.,<br>14  Ltd. -- I think is the formal name of the company in<br>15  Taiwan, but how those products get from that company to<br>16  Vizio is what we're concerned with.  And we think there<br>17  may be other companies, like AmTRAM Logistics, which we<br>18  identified, that were involved as intermediaries in<br>19  some way.  That's the kind of information we're looking<br>20  for through this interrogatory response.<br>21      MR. MC CRUM:  Okay.<br>22      MR. KENNEDY:  Anything else on that one?<br>23  Let's move on to Sony's Interrogatory Number 3, which<br>24  requests Vizio's contentions in plain short form.<br>25  Vizio, basically, said it would not answer that<br><div align="right">Page 21</div> | 1  come to some type of an agreement by which we can<br>2  exchange these types of contentions.<br>3      MR. KENNEDY:  I think the information that<br>4  you're referring to, at least, from Sony's end has<br>5  already been exchanged.  Sony has provided Vizio with<br>6  extremely detailed infringement claim charts.  Really,<br>7  this meet and confer is about Interrogatory Number 3<br>8  and Vizio's failure to --<br>9      MR. MC CRUM:  I understand that, and with all<br>10  due respect -- was that Rory that made that statement<br>11  about your infringement contentions?<br>12      MR. MILLER:  I believe that's Todd.<br>13      MR. MC CRUM:  Todd, those infringement<br>14  contentions were just wholly deficient.  I don't know<br>15  if you personally prepared them, but they were almost<br>16  useless in many regards.<br>17      MR. KENNEDY:  I think that the parties are<br>18  going to have a meet and confer about that.<br>19      MR. MILLER:  Guys, I hate to jump in here and<br>20  play moderator, but we do have a court reporter who is<br>21  trying valiantly to keep all of this straight.  So if<br>22  we could remember to identify ourselves before we begin<br>23  speaking for her benefit, that would be helpful.<br>24      MR. MC CRUM:  I know that we're here to talk<br>25  about Vizio's responses today.  We did ask a few times<br><div align="right">Page 23</div> |

to talk about both today, but you folks didn't want to
do that. Our response to these interrogatories depends
largely on what claims you, as plaintiff, are making in
your infringement contentions. To date, we don't have
complete and comprehensive infringement contentions
from Sony. There are -- there are a number of
deficiencies in them. For Sony to insist that we now
provide noninfringement contentions based on what you
provided in your interrogatory responses is just -- it
just can't happen. I mean, we need complete and
comprehensive infringement contentions before we can
answer your demands to provide our legal contentions.
    MR. KENNEDY: This is Todd Kennedy. Sony
disagrees with Vizio's view that its infringement
contentions are deficient. It's certainly no excuse
for Vizio to not provide the information it has
currently responsive to this interrogatory. Vizio has
provided no information about why it thinks its
products do not infringe these claims.
    MR. MC CRUM: I think our correspondence
speaks for itself. Our position is that there's
nothing that we have been ordered to provide in terms
of legal contentions during fact discovery. We think
it's severely premature to be insisting on this stuff
right now. This is fact discovery. It's early in fact

discovery. What you're seeking relates to legal
issues.
    With that said, we are willing to talk about a
schedule by which we can have an orderly exchange of
this information and remove all of the future disputes
about this. We don't have to get on the phone with the
court reporter and argue about this. We can have
deadlines by which these contentions on these issues
are due.
    Short of that, there's nothing in any local
rule or court order that mandates that we provide these
legal contentions this early in fact discovery
especially given the charts provided by Sony in
response to our interrogatories.
    MR. PEASE: I think we kind of crystallized
the dispute here then. You asked Sony to produce claim
charts and infringement contentions, and you didn't
seem to have a problem with those calling for legal
conclusions when you propounded those interrogatories.
You're not willing to do the same in response to our
interrogatories.
    MR. MC CRUM: That's, actually, not right
because we don't dispute that you're entitled to our
legal contentions at some point. In fact, the order
that was issued by the judge indicates that detailed

legal positions have to be provide, at least, 21 days
before the final conference. We're willing to comply
with that for sure. You're entitled to that.
    Our mission is that right now on this record
you're not entitled to that stuff right now, but we are
willing to agree to something where parties exchange
this stuff before that 21-day deadline that I referred
to, and I think that makes an abundance of sense.
    MR. KENNEDY: I understand that Vizio would
like to exchange this information in a different
manner, but I don't see how that desire somehow excuses
Vizio from answering the interrogatories that's already
been propounded.
    MR. MC CRUM: We're not asking to be excused
from answering. We just don't think that legal
contentions and that type of information is the proper
subject of fact discovery, particularly, this early in
fact discovery and, particularly, given the contentions
that you folks have provided to date.
    MR. PEASE: Well, I think we've got a dispute.
I think that's an issue we can raise with the Court at
this point. We've given you hundreds, if not
thousands, of pages of claim charts. In your view,
they're not sufficient. We think we did a very
thorough job setting forth our contentions, and we need

to know Vizio's response to those contentions.
    MR. MC CRUM: Just so the record is clear, I'm
not trying to take unfair jabs here. The reference to
hundreds of pages of claim charts I would encourage you
all who haven't looked at them to look closely at them.
It is a cut-and-paste for every single limitation of,
like, five to six pages of the same cut and paste over
and over again. Most of which is irrelevant to the
claim limitations. I want the record to be clear on
that. The fact that there's hundreds of pages of claim
charts does not mean there was a substantive analysis
done. That's an important point I want to make sure is
clear on the record.
    MR. KENNEDY: Sony absolutely disputes that.
Sony took great care in preparing those claim charts.
It is far from a cut-and-paste job. Every single
element was addressed specifically, but this meet and
confer is not about Sony's responses. It's about
Vizio's.
    Unless anyone else has something to say about
number 3, why don't we move to Interrogatory Number 8,
which requires Vizio to produce sales information, and
Vizio, it appears, is relying on 33(d). I would just
like Vizio to confirm when it will produce those
documents.

| | |
|---|---|
| 1   MR. MC CRUM: I can't give you a date by which | 1   MR. MC CRUM: Gosh, that's a loaded question. |
| 2   we'll have those. Those are one of our top priorities | 2   I guess my -- the only way I can answer that -- you'll |
| 3   for gathering information. We recognize and we put on | 3   see our documents. If you have a problem and don't |
| 4   the top of our list information that is responsive to | 4   think they're satisfactory, you can let us know then. |
| 5   interrogatories. So we do -- we do have some of this | 5   We think they're responsive and have responsive |
| 6   stuff that we are gathering right now, and we are | 6   information. |
| 7   working very hard to get the rest of it. I should have | 7   MR. KENNEDY: I don't see how documents could |
| 8   an answer for you by Friday. I should be able to give | 8   possibly answer this interrogatory under 33(d). It |
| 9   you some sense of when those documents are going to be | 9   seems to me the interrogatory is quite simple and |
| 10   produced. | 10   straightforward and just requires Vizio to list for |
| 11   MR. KLIVANS: Our understanding is that the | 11   each product which of 11 features -- |
| 12   parties will do rolling productions as they gather and | 12   MR. MC CRUM: Let me ask you this: You |
| 13   review stuff. You mentioned you already have some | 13   provided claim charts; right? Those claim charts were |
| 14   stuff that is responsive to this interrogatory. Is | 14   filled with pictures from user manuals purportedly |
| 15   there any reason why that wouldn't be produced in the | 15   showing certain features. If our documents can't |
| 16   near future? | 16   possibly establish these features, by your own |
| 17   MR. MC CRUM: I said we're in the process of | 17   admission, your claim charts are equally deficient. |
| 18   gathering stuff. If I led you to believe otherwise, I | 18   Our position is that there are documents that |
| 19   apologize. | 19   do show these features, and I think that's evidenced by |
| 20   MR. KLIVANS: If I misunderstood, sorry. | 20   the fact that you're relying on this type of thing in |
| 21   MR. MC CRUM: That's okay. So, yes, we are | 21   your claim charts. We disagree with you about that. |
| 22   trying to gather the interrogatory responsive documents | 22   We think there are documents out there that can show |
| 23   as quickly as we can. For this one, I will give you a | 23   the existence or nonexistence of these things. Look |
| 24   report on Friday as to where we stand on that. | 24   for them yourself when you receive them. |
| 25   MR. KENNEDY: Let's move on to Interrogatory | 25   MR. MILLER: When can we expect to receive all |
| Page 28 | Page 30 |

| | |
|---|---|
| 1   Number 10, which requires Vizio to provide information | 1   of the documents necessary to, in your opinion, respond |
| 2   about when and how it became aware of each of the | 2   to this interrogatory under 33(d)? |
| 3   patents in suit. I understand Vizio says that it will | 3   MR. MC CRUM: I don't know. Again, I'll get |
| 4   supplement it's response to include the 373472 and 468 | 4   back to you on Friday and see where we are on gathering |
| 5   patents. Can we expect Vizio to do that within 30 days | 5   and producing those documents. |
| 6   of the date of my letter? | 6   MR. KENNEDY: I think the fundamental issue is |
| 7   MR. MC CRUM: Yes. | 7   that these are Vizio's own products, and Sony is not -- |
| 8   MR. KENNEDY: Interrogatory Number 11 requires | 8   has not asked Vizio to perform some kind of |
| 9   Vizio to identify for each Vizio product which of the | 9   complicated, super technical analysis of these |
| 10   11 features it incorporates. As I'm sure Vizio is | 10   products. It's to provide 11 simple features, and it |
| 11   aware, Sony propounded an almost identical | 11   asks Vizio to identify which of those products |
| 12   interrogatory in the Westinghouse case. Judge Olguin | 12   incorporate those features. I don't see how the burden |
| 13   found the interrogatory is proper. What is Vizio's | 13   can be equal between the parties of identifying those |
| 14   position? | 14   features under 33(d). |
| 15   MR. MC CRUM: Our position is we provided you | 15   MR. MC CRUM: Well, I don't know what else to |
| 16   an answer. We have not taken the position we're not | 16   say. I disagree with you that these -- you're asking |
| 17   going to answer. We've answered the interrogatory. | 17   us to do an analysis of our products that can just as |
| 18   MR. KENNEDY: From Sony's perspective, the | 18   easily be done by Sony. Essentially, asking us to do |
| 19   answer is deficient. It does not list any feature for | 19   Sony's work for it. We're going to give you the |
| 20   any product. | 20   information that we have that would allow you to obtain |
| 21   MR. MC CRUM: That's because we relied on | 21   this information, and it's -- our position is going to |
| 22   33(d). | 22   be no harder for Sony to get that information from the |
| 23   MR. KENNEDY: Can you explain how documents | 23   documents we'll produce. |
| 24   produced under 33(d) will be sufficient to answer that | 24   MR. KENNEDY: What kinds of documents are we |
| 25   interrogatory? | 25   talking about? Vizio produced user manuals and I |
| Page 29 | Page 31 |

| | |
|---|---|
| 1  believe two server manuals. Are you talking about | 1    MR. CORR: I'm trying to get some insight into |
| 2  documents duplicative of those manuals? | 2  the nature of this dispute here. |
| 3    MR. MC CRUM: The manuals will be some of the | 3    MR. PEASE: We want to know, for the sake of |
| 4  documents we'll refer to in response to this. Is it | 4  completeness, that we've identified all products that |
| 5  going to be all of them? I don't know yet. | 5  fall within each of these categories. The fact that we |
| 6    MR. KENNEDY: I'm trying to imagine what kinds | 6  identified some products from which you think we can |
| 7  of documents would possibly answer this interrogatory. | 7  derive this information isn't sufficient. We want to |
| 8    MR. MC CRUM: The user manuals are, at least, | 8  make sure that we identify all of the products that |
| 9  one example of documents that will have responsive | 9  have Feature A, Feature B, Feature C. |
| 10  information. | 10  We propounded the same interrogatory to Westinghouse, |
| 11    MR. KENNEDY: Will it have that information | 11  and they fought us on it. And we moved to compel, and |
| 12  for all of the products in Interrogatory Number 1? | 12  they were ordered to produce this information. We'll |
| 13  That's what this interrogatory seeks. You mentioned | 13  take a look at the documents you produce, but if it's a |
| 14  that we provided information in our claim charts, but | 14  matter of your engineers being able to identify these |
| 15  this interrogatory isn't directed to claim limitations. | 15  products versus us having to sit down with our experts |
| 16  It's directed to high-level product features; | 16  and comb through your documents, that's not the same |
| 17  therefore, what we put in our interrogatory response | 17  burden on us as it would be on you. If it's easier for |
| 18  relating to infringement, you know, isn't necessarily | 18  you to do it and your engineers to do it, then we're |
| 19  implicated directly by this interrogatory. It's | 19  going to go back to the Court and insist that you |
| 20  different. | 20  provide this information in a substantive interrogatory |
| 21    MR. MC CRUM: Well, it's seeking the same type | 21  response and not be permitted to just rely on Rule |
| 22  of things and same type of information -- menu displays | 22  33(d). |
| 23  capable of displaying more than one color, more than | 23  You guys relied on 33(d), but you didn't |
| 24  one brightness. You folks relied on things from our | 24  produce documents to support the 33(d) response. It's |
| 25  user manuals, pictures of TVs and the menus and all of | 25  hard for us to say what this interrogatory response is, |
|   Page 32 |   Page 34 |
| 1  these types of things. Some of these things, if not | 1  ultimately, going to look at because we haven't seen |
| 2  all, are readily available from our user manual | 2  the documents. Hopefully, you'll get them to us soon, |
| 3  documents. | 3  and we'll be able to move forward on this. |
| 4    MR. KENNEDY: Why don't I give you an example | 4    MR. MC CRUM: Why don't we do that. If |
| 5  of one of the features that I don't think is going to | 5  there's still an issue, then you can raise it with us |
| 6  be disclosed in the documents for each product, and | 6  then. I don't see any reason to keep going around in |
| 7  that is letter B, which is, "Menu displays capable of | 7  circles on this one. We're relying on documents. |
| 8  displaying in more than one level of transparency." | 8  We'll produce those as quickly as we can and go from |
| 9  Certainly, in some of the user manuals, that is | 9  there. |
| 10  apparent by looking at the manual. There are screen | 10    MR. KENNEDY: I'm just curious. Again, with |
| 11  shots that show transparency. For the vast majority of | 11  respect to B -- letter B, does Vizio know of any |
| 12  Vizio products, there is no such screen shot. It's | 12  documents -- any type of documents that could list that |
| 13  impossible to tell by just looking at the user manual | 13  feature or show that that feature is incorporated into |
| 14  whether or not there are transparency features | 14  each of Vizio's products? |
| 15  incorporated in those products. Unless you have | 15    MR. MC CRUM: Well, like I said, I know there |
| 16  documents in mind that, actually, show the transparency | 16  are user manuals that have -- that bear on this issue. |
| 17  features, I don't possibly see how Rule 33(d) can get | 17  To the extent that they don't, we will be relying on |
| 18  you out of responding to this interrogatory in a | 18  other documents that do. |
| 19  written format. | 19    MR. KENNEDY: What kinds of documents is my |
| 20    MR. CORR: You focused on B there. What other | 20  question? |
| 21  ones don't you think can't be answered from user-type | 21    MR. MC CRUM: I don't know. We're still in |
| 22  materials? | 22  the process of gathering our documents. I do know we |
| 23    MR. KENNEDY: I would have to look at these | 23  have identified documents that have responsive |
| 24  and spend a few minutes with them. I don't know if I'm | 24  information including user manuals, the service |
| 25  able to answer that sitting right here. | 25  engineering documents as well. We will be identifying |
|   Page 33 |   Page 35 |

**Page 36**

```
 1    those.
 2         MR. KENNEDY: Okay. Why don't we move on to
 3    Interrogatory Number 14, which requests Vizio to
 4    identify the digital television standards that its
 5    products incorporate. The interrogatory specifically
 6    gives as examples the closed captioning standards and
 7    the standards for HDCP. It seems like a similar
 8    dispute as with Interrogatory Number 11. Vizio is
 9    again, we don't understand how
10    Vizio can possibly respond to this interrogatory just
11    by producing documents, and we'd like to have some kind
12    of idea of what kinds of documents Vizio thinks will be
13    responsive.
14         MR. MC CRUM: Well, again, I think that you
15    know our position. Obviously, we served these
16    responses, and we felt like this was an interrogatory
17    that we had documents on that were responsive. I did
18    not specifically prepare the response to this myself,
19    but we represented we had documents that are
20    responsive. Again, I'm beating a dead horse here, but
21    we will produce those as quickly as we can. If you
22    folks have an issue with it then, we can revisit it.
23    Before the documents, it's premature to be arguing
24    about this. I understand you want the documents now,
25    and I'm telling you the best we can do is we will get
                                                    Page 36
```

**Page 37**

```
 1    them to you as quickly as possible. The documents that
 2    have responsive information are the ones that we are
 3    endeavoring to get out to you first.
 4         MR. MILLER: Can we expect a time certain on
 5    the production of documents that you believe are
 6    responsive to this interrogatory on Friday along with
 7    the other days?
 8         MR. MC CRUM: I'm not going to commit to
 9    giving you a time certain. I hope we have a date by
10    which we can do that. I'm not going to commit to
11    something that I'm not in a position to commit to right
12    now.
13         MR. MILLER: Will we, at least, receive an
14    estimated time frame on Friday with the other documents
15    you're promising?
16         MR. MC CRUM: I don't know. I'll let you know
17    on Friday. I don't know what else to tell you.
18         MR. KENNEDY: I don't understand how Rule
19    33(d) is appropriate for this kind of interrogatory
20    because the interrogatory merely requests Vizio to list
21    the standards with which it complies. I assume there
22    is some employee at Vizio who is responsible for
23    ensuring that its products comply with these particular
24    standards. Why is it a burden for Vizio to simply have
25    conversations with that employee and provide that
                                                    Page 37
```

**Page 38**

```
 1    information in a written format?
 2         MR. MC CRUM: I think you're making
 3    assumptions about our client and the way they operate
 4    and how they're structured that may not be entirely
 5    accurate. I told you we've got documents that are
 6    responsive to this interrogatory, and we're going to
 7    identify those. I know it's hard for you to imagine
 8    that there might be documents that are responsive.
 9    What I'm telling you is they do exist, and we will
10    identify them.
11         MR. KENNEDY: Does Vizio employ anyone who is
12    responsible for ensuring that its products comply with
13    closed captioning standards or any other digital
14    television standards?
15         MR. MC CRUM: I feel like I'm in a deposition.
16    I don't know.
17         MR. KENNEDY: You've just represented you are
18    confident that there are documents responsive to the
19    interrogatory. I'm curious. What kinds of documents
20    are these?
21         MR. CORR: I think we're having the same
22    discussion on the earlier interrogatory. We'll get you
23    the materials. To the extent you don't think the
24    information is there, you can let us know. This is the
25    same question. I hate to object under asked and
                                                    Page 38
```

**Page 39**

```
 1    answered.
 2         MR. KENNEDY: I understand that. I would like
 3    to go down each interrogatory in order so the disputes
 4    are clear on the record.
 5         Why don't we move on to Interrogatory Number
 6    18, which I think is an interrogatory over which we
 7    have a similar dispute. That requires Vizio to
 8    identify the industry and standard organizations that
 9    it participates in.
10         Once again, Vizio is relying on 33(d). Sony's
11    position is that Rule 33(d) is an inappropriate
12    response to this interrogatory, which is a simple and
13    straightforward request that Vizio just identify the
14    organizations it participates in. I was hoping Vizio
15    could explain why Rule 33(d) is appropriate here.
16         MR. MC CRUM: Well, we think it's appropriate
17    because we have -- we have documents that provide
18    responsive information.
19         MR. MILLER: But that's only one half of the
20    33(d) equation. It, also, has to be equally burdensome
21    to Vizio, which, clearly, it isn't, if Vizio is
22    participating in these organizations, rather than
23    forcing us to comb through all of the documents and
24    assemble a complete list.
25         MR. MC CRUM: I will take this under
                                                    Page 39
```

| | Page 40 | | Page 42 |
|---|---|---|---|

**Page 40**

1  advisement and talk to our client and whether we'll
2  provide a narrative answer to anything. I'm not going
3  to promise anything, but I'll get back to you on Friday
4  on this one.
5  MR. KENNEDY: Thank you.
6  MR. MC CRUM: You're welcome. Peter, did you
7  have any disputes you wanted to discuss?
8  MR. KLIVANS: To follow up on some of the
9  requests for production, you objected, in part, that
10  some responsive documents would be privileged or
11  otherwise protected, such as, Request for Production
12  55, 6 and 7, also, 82. So can we expect a privilege
13  log for those documents at a certain point in time?
14  MR. MC CRUM: Of course, any documents that we
15  feel too are responsive that are privileged we will
16  provide on a privilege log.
17  MR. MILLER: Have any such documents been
18  identified as of today?
19  MR. MC CRUM: I don't know.
20  MR. KLIVANS: Do you have any time frame on
21  when we will get a privilege log? Would it be around
22  30 days by the time we get your next production?
23  MR. CORR: This is Steve. Ryan, if you don't
24  mind, I'm going to jump in. As we collect documents
25  and pull them together, we'll give you a timely

Page 40

**Page 42**

1  MR. KENNEDY: I don't have a case to cite to
2  you right now. The idea is that, if Vizio is
3  withholding documents that are responsive to Sony's
4  interrogatories -- I mean, Sony's position is that
5  Vizio is required to produce the documents. At the
6  very least, Sony would be entitled to see some kind of
7  list of documents that are being withheld; otherwise,
8  Sony wouldn't have any idea of what documents you're
9  not producing.
10  MR. MC CRUM: We can tell you the party's
11  information that we think may have a claim of
12  confidentiality. Until I see something convincing
13  otherwise that would require me to log that information
14  like a privilege log, I have no plans to provide that
15  at this time. Is that something you folks are planning
16  to do? Maybe we can talk about mutually how we're
17  going to deal with third-party information. Obviously,
18  it would be a reciprocal thing. We ought to talk about
19  some agreed-upon approach for handling that issue.
20  MR. KENNEDY: Well, again, I think we're going
21  to be discussing Sony's production and objections to
22  Vizio's request later on this week. We can certainly
23  talk about that then.
24  MR. MC CRUM: That's fine. We'll table it
25  until then.

Page 42

**Page 41**

1  privilege log, but at this point, we're chasing a lot
2  of documents. So I don't know we'd have any more
3  ascertainment of when we're going to give you a
4  privilege log as we would the other documents. As we
5  uncover those documents, we'll give you a timely
6  privilege log. I don't know that we can commit at this
7  point until we identify those documents that we believe
8  are privileged.
9  MR. KENNEDY: I'm sorry to go back to the
10  third-party confidential information, but I don't
11  believe we asked you whether or not Vizio is logging
12  all of those third-party documents that it considers to
13  contain confidential information.
14  MR. CORR: I'm sorry. I'm not following you.
15  We were just talking about privilege.
16  MR. KENNEDY: I'm kind of going back to the
17  discussion about third-party documents that Vizio
18  believes contain confidential information. Vizio has
19  stated that it is going to withhold those documents
20  unless it gets permission from the third parties. My
21  question is whether or not Vizio is going to be
22  providing a log of documents from third parties that
23  may or may not be privileged that Vizio is withholding.
24  MR. MC CRUM: Under what theory are you
25  claiming that you're entitled to that?

Page 41

**Page 43**

1  MR. KENNEDY: Does anyone else have anything
2  to discuss? Is everybody available Wednesday or
3  Thursday?
4  MR. MC CRUM: I think we're still checking on
5  that. We'll just try to get back with you, hopefully,
6  sometime today.
7  MR. KENNEDY: Okay. We are --
8  MR. MC CRUM: I'm, basically, wide open on
9  Wednesday and Thursday. I've kept my schedule clear.
10  The only potential conflict I have is 1:00 p.m. eastern
11  time on Wednesday; otherwise, we've kept our calendar
12  clear. Since we made the offer for the meeting, if you
13  can, let us know. I would appreciate it.
14  MR. KENNEDY: No problem. Okay. I think that
15  is the end of the meet and confer.
16  MR. MC CRUM: All right. Thank you all very
17  much, and I look forward to doing this again.
18  (Whereupon the proceedings
19  concluded at 1:09 p.m.)
20  - oOo -
21
22
23
24
25

Page 43

Deposition Officer's Certificate

1       Deposition Officer's Certificate
2
3
4       I, BETH FELIX, hereby certify:
5       I am a duly qualified certified shorthand reporter
6  in the state of California, holder of Certificate
7  Number CSR 12766 issued by the Court Reporters Board of
8  California and which is in full force and effect. [FED.
9  R. DIV. P. 28(A)].
10      I am authorized to administer oaths or
11 affirmations pursuant to California Code of Civil
12 Procedure, Section 2093(B) and prior to being examined,
13 the deponent was first duly sworn by me. [FED. R. CIV.
14 P. 28(A), 30(F)(1)].
15      I am not a relative or employee or attorney or
16 counsel of any of the parties, nor am I a relative or
17 employee of such attorney or counsel, nor am I
18 financially interested in this action. [FED. R. CIV. P.
19 28].
20      I am the deposition officer that stenographically
21 recorded the testimony in the foregoing deposition and
22 the foregoing transcript that is a true record of the
23 testimony given by the deponent. [FED. R. CIV. P.
24 30(F)(1)].
25      Before completion of the deposition, review of the

                                    Page 44

1  transcript [ ] was [ ] was not requested.  If
2  requested, any changes made by the deponent (and
3  provided to the reporter) during the period allowed are
4  appended hereto. [FED. R. CIV. P. 30(E)].
5
6
7       Dated:_____,_____, 2009.
8
9
10
11
12         _____
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 45

I, BETH FELIX, hereby certify:

I am a duly qualified certified shorthand reporter in the state of California, holder of Certificate Number CSR 12766 issued by the Court Reporters Board of California and which is in full force and effect. [FED. R. DIV. P. 28(A)].

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(B) and prior to being examined, the deponent was first duly sworn by me. [FED. R. CIV. P. 28(A), 30(F)(1)].

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. [FED. R. CIV. P. 28].

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript that is a true record of the testimony given by the deponent. [FED. R. CIV. P. 30(F)(1)].

Before completion of the deposition, review of the

44

1    transcript [  ] was [  ] was not requested.   If

2    requested, any changes made by the deponent (and

3    provided to the reporter) during the period allowed are

4    appended hereto. [FED. R. CIV. P. 30(E)].

5

6

7    Dated: _May 29th_____, _____, 2009.

8

9

10

11

12    _Beth Felix_____

13

14

15

16

17

18

19

20

21

22

23

24

25

45

# EXHIBIT 8

Direct Number: (216) 586-7291
rbmccrum@jonesday.com

May 6, 2009

VIA EMAIL

Todd M. Kennedy, Esq.
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
50 California Street
22nd Floor
San Francisco, CA 94111

Re:     *Sony Corporation v. Vizio Inc.*

Dear Todd:

I am writing in response to your letter of April 29, 2009 to James Wamsley regarding alleged deficiencies in Vizio's discovery responses.

As an initial matter, we are surprised by the lack of care and attention that appears in your letter. It seems you have simply taken an old letter from the Westinghouse litigation – as evidenced by your request for ***Westinghouse's*** availability for a meet and confer – doctored it up, and sent it to Vizio without carefully reviewing Vizio's discovery responses. Particularly troubling are your complaints regarding information that was clearly provided to Sony. For example, you claimed that Vizio failed to even mention AmTran in response to Interrogatory No. 2, even though AmTran was identified in response to that interrogatory dozens of times as the supplier of numerous Vizio products. Furthermore, you accused Vizio of failing to identify specific models of Vizio's televisions, when the models from your letter are in fact identified. You also accused Vizio of failing to identify a single Video Processor or Graphics Processor, even though numerous processor models have been identified in Attachment A to Vizio's responses.

Furthermore, while Sony has objected to providing any 3rd party confidential business information ("CBI") before obtaining consent to do so, you have insisted Vizio produce such information before obtaining 3rd party consent. You have also insisted on Vizio providing claim constructions for all asserted claims (and originally did so before Vizio received any infringement contentions), even though Sony has taken the extraordinary position that no claim construction is necessary for any terms, despite the fact that numerous claim terms are in means-plus-function form. Such demands are inconsistent with Sony's own positions and are disingenuous.

In the future, we ask that you closely review Vizio's discovery responses and consider Sony's positions on issues before firing off letters complaining about purported deficiencies in Vizio's discovery responses. The standards adopted by the Local Rules and Judge Klausner require at least as much, and we will certainly endeavor to do the same.

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

You complained that Vizio failed to produce any documents with its discovery responses. Vizio is working diligently to gather and review documents and plans to make productions of confidential information on a rolling basis after a protective order has been entered. In the meantime, Vizio plans to make its first production of non-confidential information no later than Monday, May 10. Vizio is willing to agree to the production of documents for "Outside Attorneys' Eyes Only" provided Sony is willing to do the same. Please let us know.

It bears noting that Sony's first production consisted almost entirely of Vizio's own public documents and other public documents (patents and file histories), and Sony still has not produced documents from the Westinghouse litigation. Sony cannot expect Vizio to produce confidential documents prior to entry of a protective order when Sony has been unwilling to do the same. We are still awaiting Sony's comments on the draft protective order that Vizio provided.

You also demanded that Vizio produce documents containing 3rd party CBI before obtaining consent from those 3rd parties to produce such documents. As noted above, Sony has objected to producing 3rd party CBI before obtaining consent to do so (See Sony's General Objection No. 4 and response to Interrogatory No. 13). Consistent with Sony's objection, the law does not require production of 3rd party information prior to receiving their consent. The law cited in your letter at most suggests that 3rd party CBI may be discoverable. Vizio is taking steps to get consent from third parties to produce their CBI.

With regard to your requested inspection of "fully operational exemplar[s] of each of the Vizio Products," please be advised that Vizio does not have exemplars of all such products. For those products that it does have in inventory, Vizio is willing to arrange an inspection, and will provide a proposal for the date, time and protocol for such an inspection.

For Document Request Nos. 55-57, 64, 82, 106, 125 and 126, Vizio is standing on its objections. For Request Nos. 55-57 and 82, to the extent any documents exist, they are privileged. Request No. 64 is vague and ambiguous, and to the extent understood, does not appear to seek information reasonably calculated to lead to the discovery of admissible evidence. To the extent Vizio has "exemplars" responsive to Request No. 106, it will make those available for inspection pursuant to mutually agreed-upon terms. Request Nos. 125 and 126 are overbroad and vague and ambiguous to such an extent that Vizio does not understand what documents are being sought. Vizio requests that Sony clarify these requests so Vizio can determine if it has responsive, non-privileged documents, or otherwise objects to these requests on other grounds.

## INTERROGATORIES

Your contention that Vizio provided an incomplete list of relevant products in response to Interrogatory No. 1 is incorrect. Vizio did identify all relevant products to the best of its ability, including those identified in your letter:

VX20L HDTV1A is on page 3 of Attachment A.

L32 HDTV is on pages 6 and 9 of Attachment A.

L42 HDTV is on page 4 of Attachment A.

P42 ED is on page 4 of Attachment A.

P42 HDTV is on page 6 of Attachment A.

VP42 HDTV is on pages 6 and 9 of Attachment A.

VP50 HDTV is on pages 6 and 9 of Attachment A.

VM60P HDTV10A is on page 2 of Attachment A.

VO22L FHDTV10A is on page 6 of Attachment A.[1]

Your claims regarding Vizio's response to Interrogatory No. 2 are wrong. You contend that "Vizio has not even mentioned" AmTran in its response, but even a cursory review of Attachment A (which was incorporated into Vizio's response to Interrogatory No. 2) shows that AmTran was identified numerous times as the "Vendor" of multiple Vizio products. As for "when" the products in Attachment A were manufactured and sold, Vizio is relying on documents that have responsive information. The burden of ascertaining this information from the documents that Vizio will rely on is substantially the same for Sony as it is for Vizio, and Vizio will identify such documents in a supplemental response as soon as they are produced.

With regard to Sony's Interrogatory No. 3 seeking Vizio's non-infringement contentions, there is nothing in the Local Rules or in any Order issued by the Court requiring Vizio to provide the requested *legal* contentions at this time. The parties are currently engaged in *fact* discovery,

---

[1] In the chart attached to Vizio's discovery responses, Vizio made a good faith effort to minimize any duplication of information. To that end, in very few instances, Vizio identified a model that is representative of other models in a family having substantially the same model number. For example, the VO22L FHDTV10A contains the same chip as the VO22L HDTV10A, so Vizio only identified the VO22L HDTV 10A.

and this Interrogatory seeks *legal* and expert opinions which are generally disfavored at this stage of the litigation. *E-Bay Seller AntiTrust Litigation*, 2008 WL 5212170 (N.D. Cal.) ("Courts using their Rule 33(a)(2) discretion *generally disfavor contention interrogatories asked before discovery is undertaken*.") As you know, Vizio proposed a detailed schedule by which legal contentions such as those requested by this Interrogatory would be exchanged. Vizio's schedule followed the format set forth in Patent Rules adopted by other courts that are intended to facilitate the timely disclosure of these types of contentions. Sony rejected that approach. Accordingly, Vizio will provide the requested legal contentions in its expert narrative statements twenty-one days before the pre-trial conference in accordance with the Court's Scheduling Order.

Alternatively, if you would like to discuss a mutually agreeable schedule by which legal contentions and expert opinions are to be exchanged, Vizio would be happy to do that. Agreeing to such a schedule would be in keeping with Judge Klausner's remarks that the parties are in the best position to work out these issues in an orderly and amicable manner. Such a schedule would resolve these issues and related issues in their entirety and prevent the parties and the Court from having to waste valuable resources continuing to address such issues in the future.

It is also important to note that just last week was the first time Sony identified the claims it is asserting. Also, while Sony just recently provided Vizio with claim charts, those claim charts are very conclusory and incomplete, as will be outlined in a separate letter. It is premature to ask Vizio for its responses to infringement charges when it does not have a complete and comprehensive set of infringement charts from Sony. Sony has the burden of providing its infringement contentions, and the claim charts provided do not satisfy that burden.

As with Interrogatory No. 7, Sony's Interrogatory No. 4 is premature in that it seeks Vizio's *legal* contentions regarding claim construction during *fact* discovery. Again, Vizio proposed a schedule for an orderly exchange of claim terms in dispute and proposed constructions, which was rejected by Sony. Accordingly, claim construction will be conducted as part of summary judgment briefing as Sony requested, and the Court has ordered. At that time, Vizio will provide its proposed constructions as necessary. Vizio is still willing to discuss a mutually agreeable schedule for exchanging claim terms in dispute and proposed constructions if Sony is interested in that approach. Moreover, Sony cannot insist on Vizio's proposed claim constructions when Sony has failed to provide complete and comprehensive infringement claim charts.

With regard to Sony's Interrogatory No. 8 regarding sales information, Vizio will be relying on documents that have responsive information. The burden of ascertaining this information from the documents that Vizio plans to rely on is substantially the same for Sony as it is for Vizio. Vizio will produce these documents after entry of a suitable protective order (or as Outside Attorneys' Eyes Only assuming Sony is willing to do the same), and will identify them in a supplemental response.

Vizio will supplement its response to Interrogatory No. 10 to more specifically describe how it first became aware of the '373, '472 and '468 patents.

With regard to Sony's Interrogatory No. 11, Sony is improperly asking Vizio to do Sony's analytical work. Vizio will be relying on documents that have responsive information. The burden of ascertaining this information from the documents that Vizio plans to rely on is substantially the same for Sony as it is for Vizio. Vizio will produce these documents after entry of a suitable protective order (or as Outside Attorneys' Eyes Only assuming Sony is willing to do the same), and will identify them in a supplemental response.

Your claims regarding Vizio's response to Interrogatory No. 12 have no merit. Sony is not entitled to a set number of people most knowledgeable about certain topics. Vizio identified, in each case, a number of individuals most knowledgeable about the topics set forth in Interrogatory No. 12. By insisting on more names, Sony is improperly seeking duplicative discovery.

With respect to Interrogatory No. 13, you claim that Vizio has failed to identify even a single processor in its response. However, Attachment A to Vizio's responses set forth nearly all the processors used in Vizio's products by model number. Vizio will supplement its response to Interrogatory No. 13 to more clearly refer to Attachment A as having information responsive to this Interrogatory.

With regard to Sony's Interrogatory Nos. 14 and 18 regarding television standards and standards organizations, Vizio will be relying on documents that have responsive information. The burden of ascertaining this information from the documents that Vizio plans to rely on is substantially the same for Sony as it is for Vizio. Vizio will produce these documents after entry of a suitable protective order (or as Outside Attorneys' Eyes Only assuming Sony is willing to do the same), and will identify them in a supplemental response.

In view of the foregoing, Vizio does not believe that an in-person meet and confer is necessary. Nevertheless, if you still feel that a meet and confer is necessary, we are available May 15, 2009. If your question regarding Westinghouse's availability for a meet and confer was not simply a carryover from a letter in the Westinghouse litigation, we fail to see the need for them to attend any meet and confers.

Please feel free to call me if you would like to discuss this further.

Very truly yours,

Ryan B. McCrum

# EXHIBIT 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

SONY CORPORATION, a
Japanese Corporation,

    Plaintiff,

    vs.    No. SA CV08-01135-RGK
             (FMOx)
VIZIO, INC.,

    Defendant.

---

MEET AND CONFER CONFERENCE CALL
Los Angeles, California
Monday, June 22, 2009

Reported by:
JULIE SEYMOUR
CSR NO. 12341
Job No. 115053

Page 1

---

1  APPEARANCES:
2  FOR THE PLAINTIFF:
3    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     BY: RORY S. MILLER
4    Attorney at Law
     865 South Figueroa Street
5    10th Floor
     Los Angeles, California 90017
6    (213)443-3004
7    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     BY: THOMAS PEASE
8    Attorney at Law
     51 Madison Avenue
9    22nd Floor
     New York, New York 10010
10   (212)849-7000
     (VIA TELEPHONE)
11
     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
12   BY: TODD KENNEDY
     BY: PETER KLIVENS
13   Attorneys at Law
     50 California Street
14   22nd Floor
     San Francisco, California 94111
15   (415)875-6600
     (VIA TELEPHONE)
16
     FOR THE DEFENDANT:
17
     JONES DAY
18   BY: STEVEN J. CORR
     Attorney at Law
19   555 South Flower Street
     15th Floor
20   Los Angeles, California 90071
     (213)489-3939
21
     JONES DAY
22   BY: RYAN MCCRUM
     Attorney at Law
23   901 Lakeside Avenue
     Cleveland, Ohio 44114
24   (216)586-3939
     (VIA TELEPHONE)
25

Page 3

---

1     UNITED STATES DISTRICT COURT
2    CENTRAL DISTRICT OF CALIFORNIA
3      WESTERN DIVISION
4  SONY CORPORATION, a
   Japanese Corporation,
5
6    Plaintiff,
7  vs.   No. SA CV08-01135-RGK
         (FMOx)
8  VIZIO, INC.,
9    Defendant.
10
11
12
13
14
15
16  Meet and Confer Conference Call held at
17  865 South Figueroa Street, 10th Floor, Los Angeles,
   California, beginning at 6:10 p.m. and ending at
18
   7:07 p.m. on Monday, June 22, 2009, before
19
   Julie Seymour, Certified Shorthand Reporter No. 12341.
20
21
22
23
24
25

Page 2

---

1       EXHIBITS
2  1  Sony's First Set of Interrogatories to
     Vizio
3
4  2.1 Vizio's Response to Interrogatory No. 3
5  2.2 Attachment A (Revised) Vizio's First
     Supplemental Response to Sony's
     Interrogatory Nos. 2, 3, 8, 10, 11, 14, 18
6
   2.3 Vizio's Response to Interrogatory No. 3
7    Non-Infringement Claim Chart 472 Patent
8  2.4 Visio's Response to Interrogatory No. 3
     Non-Infringement Claim Chart 542 Patent
9
   2.5 Visio's Response to Interrogatory No. 3
10   Non-Infringement Claim Chart 577 Patent
11  2.6 Visio's Response to Interrogatory No. 3
     Non-Infringement Claim Chart 614 Patent
12
   2.7 Visio's Response to Interrogatory No. 3
13   Non-Infringement Claim Chart 626 Patent
14  2.8 Visio's Response to Interrogatory No. 3
     Non-Infringement Claim Chart 847 Patent
15
   2.9 Visio's Response to Interrogatory No. 3
16   Non-Infringement Claim Chart 373 Patent
17  2.10 Visio's Response to Interrogatory No. 3
     Non-Infringement Claim Chart 468 Patent
18
   2.11 Visio's Response to Interrogatory No. 3
19   Non-Infringement Claim Chart 055 Patent
20  2.12 Visio's Response to Interrogatory No. 3
     Non-Infringement Claim Chart 182 Patent
21
   3  Letter to James Wamsley from Todd Kennedy,
22   Dated April 29, 2009
23  4  Letter to Todd Kennedy from Ryan McCrum,
     Dated May 6, 2009
24
   5  Letter to Ryan McCrum from Todd Kennedy,
25   Dated May 26, 2009

Page 4

---

1  (Pages 1 to 4)

1     EXHIBITS (Continued)
2  6  Letter to Todd Kennedy from Ryan McCrum,
      Dated May 28, 2009
3
4  7  Letter to Ryan McCrum from Todd Kennedy,
      Dated June 3, 2009
5  8  Letter to Steven Corr from Todd Kennedy,
      Dated June 4, 2009
6
   9  Letter to Todd Kennedy from Ryan McCrum,
7     Dated June 5, 2009
8  10 Letter to Ryan McCrum from Todd Kennedy,
      Dated June 12, 2009
9
   11 Letter to Todd Kennedy from Ryan McCrum,
10    Dated June 19, 2009
11
12 (The exhibits were subsequently
13 sent electronically to the court
14 reporter and are attached hereto.)
15
16
17
18
19
20
21
22
23
24
25
                                           Page 5

1  identify for each tubed television which of 11 features
2  it incorporates, and the interrogatory identifies each
3  of those 11 features. And Vizio's response has been to
4  invoke Rule 33(d) and point to documents instead of
5  actually listing the televisions and listing which
6  features each television incorporated.
7       And Sony's position is that 33(d) is an
8  inappropriate response to this interrogatory because
9  these are Vizio televisions and the burden would be much
10 greater for Sony than for Vizio to determine which of
11 the features each television incorporates.
12 MR. MCCRUM: This is Ryan McCrum for Jones Day. I
13 think we have gone back and forth and I think we have
14 both set our positions out pretty clearly in the
15 letters. But just to kind to summarize where we stand
16 on this, as I stated in my letter June 19, these are
17 features that Vizio does not track in the ordinary
18 course of its business.
19      And so what we would need to do in order to
20 attempt to answer this interrogatory -- and I will get
21 to another point later where we don't really understand
22 what it is that Sony is seeking here, but assuming we do
23 understand some portion of it, these are not features
24 that we track and it would require Vizio to go back and
25 thoroughly review a number of its documents that
                                           Page 7

1  LOS ANGELES, CALIFORNIA, MONDAY, JUNE 22, 2009
2       6:10 p.m. - 7:07 p.m.
3
4  MR. MILLER: Okay. Well, with everyone here, let's
5  go ahead and begin. As usual, guys, the standard
6  telephone rules apply. Before you begin talking, please
7  try to say your name for the court reporter. We do our
8  best here to signal to her who everyone is because it
9  does help to keep the record clean, but try to remember.
10      So to start with, this is Rory Miller from
11 Quinn Emanuel Los Angeles on behalf of Sony.
12 MR. PEASE: Tom Pease for Quinn Emanuel New York on
13 behalf of Sony.
14 MR. KENNEDY: Todd Kennedy Quinn Emanuel
15 San Francisco on behalf of Sony.
16 MR. KLIVANS: Peter Klivans Quinn Emanuel
17 San Francisco on behalf of Sony.
18 MR. CORR: Steve Corr Jones Day Los Angeles on
19 behalf of Vizio.
20 MR. MCCRUM: Ryan McCrum Jones Day Cleveland on
21 behalf of Vizio.
22 MR. KENNEDY: This is Todd Kennedy. Why don't we
23 get started with Interrogatory No. 11. And as you know,
24 this is the party's second meet and confer on this
25 interrogatory. The interrogatory requested Vizio
                                           Page 6

1  potentially operate the TVs that it has in its
2  possession. And these are exactly the same things that
3  Sony can do to try to determine whether or not these
4  features are available.
5       Our position is that the burden of doing that,
6  given that these are not normally tracked, is the same
7  or probably less on Sony than it is on Vizio. We are
8  willing to make whatever information available as
9  necessary for Sony to feel comfortable answering this
10 interrogatory. We will give you all of the documents
11 that we would need to review. We will let you operate
12 whatever TVs we have in our possession. We will be
13 putting witnesses up to answer these questions. But
14 these just are not things that we normally track in the
15 ordinary course of our business. And for over 100
16 products, it would be an extremely difficult and
17 burdensome task for us to try to figure out which ones
18 have these various features.
19      Now, the other problem with this which I
20 mentioned is, you know, we have these 11 features and we
21 objected to them as vague and ambiguous. And as I said
22 in my letter, we really don't know what it is that Sony
23 is seeking because there are arguably a number of ways
24 to interpret these quote/unquote features.
25      So rather than have us try to guess at what it
                                           Page 8

! (Pages 5 to 8)

1  is that you're looking for -- like I said, we're not
2  going to hide anything, we're going to give you
3  everything that we would have at our disposal for you to
4  look at and review and find out for yourself whether or
5  not they have the features that you're looking for.
6      So that's our position on this right now.
7      MR. KENNEDY: This is Todd Kennedy. And I think we
8  understand that Vizio has two different categories of
9  objections. And I just want to talk about the second
10  one first, which is Vizio's position that these
11  features, the way that they are worded in the
12  interrogatories are vague and ambiguous. And I wanted
13  to point out that this is the first time that Vizio has
14  raised that issue. I mean, this issue was initially
15  tee'd up in the April 24 letter to Vizio. And Vizio
16  responded on May 6 in a letter and did not raise that
17  issue at all. And then the parties had a meet and
18  confer on May 11, and again Vizio didn't raise that
19  issue at all. In fact Vizio said it would be producing
20  documents that it felt would be responsive to each of
21  those features.
22      So I don't understand how back then Vizio felt
23  that the request was clear enough to actually answer
24  with documents and now all of a sudden Vizio thinks that
25  the request is vague and ambiguous.
                                              Page 9

1      MR. MCCRUM: This is Ryan. Well, if I could
2  respond to that we informed you, Todd, in our initial
3  response that we served. We objected that, quote:
4      "Vizio objects to this
5      interrogatory as vague and ambiguous and
6      its listed products features are
7      unclear. For example, it is unclear
8      whether menu displays capable of
9      displaying more than one level of
10      transparency is intended to mean that
11      the level of transparency of an entire
12      menu can be changed over time or whether
13      different parts at a given moment in
14      time have different levels of
15      transparency."
16      We then went on to say:
17      "This ambiguity and others apply to
18      many other listed product features."
19      Now, subject to those objections, we
20  indicated that we would provide an answer. And we
21  supplemented, as we said we would, and we provided an
22  answer and we cited the documents to the best that we
23  could.
24      So I don't know where you have a basis in
25  saying that this is the first time that we raised this
                                              Page 10

1  objection. We had this objection from the very
2  beginning, you know, and that's a problem. We answered
3  the interrogatory.
4      I'll also note that the documents that we
5  relied on are the same exact types of documents that
6  Sony is relying on entirely for at least some of the
7  patents in its infringement contention. So we don't
8  really understand how Sony can take the position in
9  making its infringement contentions that these documents
10  are adequate to disclose the features of the claims and
11  then on the other hand say for a much broader set of
12  features say that these documents are not adequate.
13      And if you wouldn't mind explaining to me how
14  those two positions are consistent, I would be
15  interested in knowing what Sony's position is on that.
16      MR. KENNEDY: Well, obviously, we're here to talk
17  about Vizio's responses to Sony's interrogatories, but
18  just to quickly address that point, I'll say that at
19  bottom we are talking about Vizio's products and the
20  information is in Vizio's possession and not Sony's
21  possession; so that's what the difference is.
22      And I guess that would bring us to your second
23  objection which is that Vizio apparently doesn't know
24  which of these feature its televisions embody. And I
25  don't understand how that could possibly be the case
                                              Page 11

1  given the fact that these features are simple and the
2  fact that Vizio is the one that is selling its own
3  televisions and public information that shows that Vizio
4  is involved in the design of its own televisions.
5      MR. MCCRUM: Well, you know, there may be some
6  truth to the statement that we sell televisions and at
7  some level may be involved in the development. But as I
8  mentioned, these features are not the subject of any
9  information that is tracked at Vizio, whether it be
10  through development or selling or through marketing and
11  things like that beyond what is in our user manuals.
12      So, yeah, they may be simple features; and if
13  they are, that's how Sony is interpreting these things
14  and they should be readily apparent from reviewing our
15  documents and inspecting our products.
16      And, you know, the other thing that is equally
17  important here, if not more so, is we're not going to
18  answer an interrogatory that we don't know what it is
19  that you're looking for. We're not going to risk saying
20  that we have something that quote/unquote securely
21  transfers information and then have you come back and
22  say, aha, they said securely transfer and that means
23  that it encrypts and that infringes this limitation of
24  the reissue patents, when we have a certain
25  understanding of securely transfers that may be totally
                                              Page 12

**3 (Pages 9 to 12)**

1  different from yours. And it's unclear from the
2  interrogatory how Sony is defining some of these terms
3  and what it means by some of these things.
4      MR. PEASE: This is Tom and let me just jump in
5  here for a second. You know, on some of them, we just
6  don't understand your position, like closed captioning,
7  subtitle information. It ought to be a simple matter
8  for Vizio engineers to figure out which Vizio products
9  allow closed caption information to be transmitted. We
10 suspect it's all of them and we're looking for you to
11 confirm that.
12     And we have a couple reasons for doing that.
13 One, you know, it's just relevant to how we segregate
14 the products in our own minds going forward for the
15 various different issues that are presented by this
16 case, but we want to make sure we have captured all of
17 the products that are out there. Vizio makes products
18 that provide closed caption information that allows
19 closed caption information to be displayed on its TV
20 screen. And we want to make sure -- that was one
21 allegation and we want to make sure that we know about
22 all of them. You guys say you don't know what close
23 captioning means, well, we don't think that's a
24 reasonable position.
25     The same thing with you talk about securely

1  that Vizio makes that allows closed caption information
2  and that's part of the purpose of this interrogatory.
3      MR. MCCRUM: Well, we have. We've given you a
4  chart that we've -- that's based on currently available
5  information. We have given you the identity of every
6  single one of the TVs that we understand to be accused
7  and we have identified to the extent available all
8  corresponding user manuals and service manuals in our
9  possession.
10     MR. PEASE: Okay. So now the next step is talk to
11 your engineers and confirm, for example, that those
12 products are capable of allowing closed caption
13 information to be displayed or whatever the exact
14 wording is of the interrogatory --
15     MR. MCCRUM: Well, there's a lot more than --
16     MR. PEASE: -- it's a simple matter.
17     MR. MCCRUM: -- and just --
18     MR. PEASE: That's just one feature and you can
19 probably confirm that with one phone call with somebody
20 knowledgeable at Vizio. It's not a matter of combing
21 through the service manual, just one phone call.
22     MR. MCCRUM: Well, I beg to differ with you. You
23 know, that's not the way that Vizio operates. If it
24 were that easy for that particular feature, then maybe
25 we would be able to accommodate your request, but it's

1  transfer. You know, none of these are claim
2  limitations, per se. I mean, they would generally --
3  could be to the fields of the patents, but none of them
4  are claim limitations. I mean, that's the exact
5  argument that Westinghouse made and lost on in the last
6  case. They said that if they answered this and allowed
7  it to be tantamount to admitting infringement
8  and Magistrate Judge Olin didn't buy that.
9      MR. MCCRUM: Well, part of the argument that we're
10 making, Tom, I mean securely transfer, do you want to
11 tell me what that means.
12     MR. PEASE: Well, I think it's clear what that
13 means. I mean, I don't have it in front of me exactly
14 the language, but, you know, if you want to hedge it and
15 explain what you understand it to mean. And we think
16 we're entitled to know which products, for example, are
17 compliant with, you know, HDMI connections and which
18 one's have DBI connectors.
19     MR. MCCRUM: Well, that is readily apparent from
20 our user manuals and that is something you can very
21 easily look at and confirm for yourself.
22     MR. PEASE: Well, number one, we don't know that we
23 even have all the manuals. We don't know that you have
24 identified all of the products. It's where you guys are
25 going to go through and tell us every single product

1  not as simple as that unfortunately. As you know or may
2  know or should know by now, Vizio does not -- it's not
3  in the business of designing and developing televisions.
4  They sell televisions. They market televisions. But
5  you're going to -- to figure out these features, you're
6  going to have to go talk to some other entities, which
7  is what, I believe, your third-party subpoenas are
8  intended to go and do.
9      MR. PEASE: Well, we do have document requests
10 outstanding that ask for the specifications that Vizio
11 provides to its -- the companies that put -- make it for
12 it like the AmTrans of the world. I don't know that we
13 have seen any of those documents yet, but I suspect that
14 in those specificities are a lot of the features that
15 are the subject of Interrogatory No. 11. Closed
16 captioning, for example, you know, closed captioning, my
17 understanding is it's required by federal law. It
18 should be a simple matter for somebody at Vizio to
19 confirm that closed caption information is -- can be
20 seen on a Vizio TV.
21     Well, anyway, I just think we have reached a
22 log jam here. I don't think we're going to be able to
23 resolve this during the course of the call. We think
24 Vizio should go through and tell us which of its
25 products have these features and it sounds like your

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1  position is Sony and its lawyers should go look at the
2  service manuals and user manuals.
3      MR. MCCRUM: Yeah, and it's twofold. We have given
4  you everything that we have to locate to determine
5  whether or not we can even try to see whether these
6  features are in Vizio's products. We have to go through
7  those. And to do so thoroughly and extensively, it
8  would take a lot of time and effort and the burden of
9  doing that is exactly the same for Vizio as it is for
10  Sony.
11      And beyond that, like I said, we simply don't
12  understand what nearly all of these limitations are
13  seeking. So, you know, that's the problem. I mean, we
14  don't know what these features even mean, what you're
15  looking for. So why should we try to read your mind and
16  figure out what these limitations and features are when
17  you know exactly what you're looking for and we're going
18  to give you everything in our possession that we have
19  for you to make that analysis and determination.
20      MR. PEASE: Okay. Well, we don't think that's a
21  fair way to do it. We think it would be a simple matter
22  for you to simply check with your engineers. They could
23  check the sources that are available to them. And a lot
24  of these could be resolved, we think, in probably five
25  or ten minutes. I don't think a Vizio engineer is going
                                                    Page 17

1  to need to go through every single user manual and
2  service manual to answer these questions.
3      MR. MCCRUM: For over 100 products?
4      MR. PEASE: Yeah, that's right.
5      MR. MCCRUM: And you think --
6      MR. PEASE: No, it's not a matter of memorizing
7  them. A lot of them share the same chips. A lot of
8  chips fall within the same class of families. So all,
9  for example, media-type chips may be -- may allow the
10  processing of closed captioning information. I suspect
11  they do given that civil law requires TVs to be able to
12  display closed caption information.
13      MR. MCCRUM: Well, we have over 100 TVs and you're
14  asking us for each and every one of over 100 to
15  determine whether or not there are 11 features present?
16  And to think that that is just in the memory and
17  knowledge of our engineers and readily available is just
18  unreasonable. It requires a lot more work than that.
19  And I mean beyond that, you know, what you guys mean by
20  menu displays capable of displaying in more than one
21  color and more than one brightness, does that mean you
22  can have a menu displayed in more than one color, you
23  can have it red at one period in time and then you can
24  change the color to blue a day later, is that what that
25  means?
                                                    Page 18

1      MR. PEASE: We think it's clear on its face what it
2  means.
3      MR. MCCRUM: Well, it's not clear to me, Tom. Tell
4  me if it means that.
5      MR. PEASE: Well, I don't know whether it means
6  that or not. We'll talk amongst ourselves; and if we
7  can give you more information on that, we'll do it. But
8  to me, that's clear on its face.
9      MR. MCCRUM: Well, you can't give me -- you can't
10  even answer me that question. What about transparency,
11  menu display capable of displaying in more than one
12  level of transparencies? Okay?. So does that mean today
13  I can look at it and it displays with 60 percent
14  transparency and then tomorrow I have the ability to
15  change it to 80 percent transparency? Are you looking
16  for those TVs? Is that what that means?
17      MR. KENNEDY: Ryan, this is Todd. I mean, you can
18  try to pick apart this very simple language as much as
19  you would like. But a fair response to this
20  interrogatory would require you then to define what
21  Vizio believes the interrogatory to be asking for and
22  then provide some sort of response. And Vizio hasn't
23  even tried to do that. I'm not satisfied that there is
24  any way that we could define these terms in a way that
25  would satisfy Vizio enough to withdraw it's vague and
                                                    Page 19

1  ambiguous objections. I think that no matter how we
2  define these terms, Vizio is going to still point to
3  Rule 33(d) and refuse to provide us with a narrative
4  response and say that the terms are vague and ambiguous.
5      MR. MCCRUM: Well, I don't know, but I don't think
6  that it should be Vizio's burden to go through and
7  interpret -- try to interpret what Sony is meaning. I
8  have asked you some specific questions here and you guys
9  are not even willing to tell me whether or not these
10  interpretations are what you had in mind.
11      MR. PEASE: I mean -- this is Tom. You're asking
12  me for the first time in this phone call. We have
13  exchanged correspondence on this and you didn't present
14  those questions beforehand. I don't have the patent in
15  front of me, I'm not in the office right --
16      MR. MCCRUM: Well, apparently --
17      MR. PEASE: -- and I'm not going to answer that
18  without thinking about it. But the fact is we think the
19  terms we used in that interrogatory and the features we
20  defined are clear and unambiguous on their face. You
21  know, we're here and now you have these specific
22  questions. Why didn't you give us those questions
23  beforehand and we could have thought it out and given
24  you a response?
25      MR. MCCRUM: Well, I would have thought that having
                                                    Page 20

5 (Pages 17 to 20)

1 laid them out in my letter, you would have thought about
2 them before this meet and confer. These questions that
3 I'm asking you I'm reading from the letter sitting in
4 front of me that I sent you last Friday. And I'm not
5 going to try to read your minds about what these things
6 mean, only to have you hold them against me and say,
7 aha, they said they had a menu display capable of
8 displaying a submenu or subordinate menu, which is a
9 limitation, a feature of the 373 patent, they admitted
10 they infringed. And we're sitting here saying no, no,
11 no, that was something that we interpreted differently.
12 We're not going to have that happen. I'm sitting here
13 asking these specific questions that I already provided
14 to you in advance of this call and no one can tell me
15 whether or not these features mean what we think they
16 mean on their face or something else.
17     MR. KENNEDY: Ryan, this is Todd. Let's look at
18 one of these in particular, which is letter (d), and
19 that is the capability to superimpose captions on
20 another image or on a background. And in Vizio's
21 letter, Vizio complains that it's unclear what is meant
22 by the term captions. Captions is a simple term. It's
23 one that is not debatable in terms of its meaning. Can
24 you explain how the word captions is ambiguous?
25     MR. MCCRUM: Well, all I'm willing to say on this

Page 21

1 that's the answer. You could have answered this very
2 easily even in light of your expert's comment about his
3 view of the difference between caption and subtitles.
4 There's no reason not to answer the interrogatory.
5 Answer it in a way that lays out your concerns.
6     MR. MCCRUM: Well, that's part of the problem. I
7 don't want to be guessing about what you guys mean and
8 don't mean and take the risk that it is going to be
9 taken out of context and have all these disclaimers
10 that -- you know, captions in view means "X," "Y," and
11 "Z" and not to be interpreted to mean this. We are
12 giving you everything that we would have to look at to
13 determine if these features are available in our
14 products.
15     You know what you're looking for, we don't.
16 The burden is the same. You have been unable to tell me
17 for any of these features what -- these questions about
18 them, you have been unable to tell me what the meaning
19 is. I'm not, on behalf of the client, going to risk
20 going out and answering a vague and ambiguous
21 interrogatory that is going to be wholly held against us
22 when we've adequately given you the documents and the
23 products that you will need to answer this
24 interrogatory.
25     MR. KENNEDY: Does anyone else have anything else

Page 23

1 is that when we attempted to look into this
2 interrogatory, we had a question from someone at Vizio
3 who asked us what is the difference between captions and
4 subtitles. Some people might interpret these things to
5 mean the same thing and some people might interpret them
6 to mean different things. So that raised the question
7 in our mind if someone working in this industry can't
8 pinpoint a definition for these things, I'm certainly
9 not going to try to, and it was ambiguous to us.
10     MR. PEASE: Well, I'm just asking you how do you
11 think captions and subtitles are different?
12     MR. MCCRUM: I don't know, that's why I have it in
13 my letter. I'm not sure if they're different. Why
14 don't you tell us.
15     MR. KENNEDY: In letter (d), the feature that I
16 just read to you doesn't even mention subtitles.
17     MR. MCCRUM: Well, (e) does. How do they differ?
18 That is a define terms. Tell me what caption means and
19 tell me what subtitles mean.
20     MR. PEASE: This is Tom. All you had to do then
21 was answer based on what your experts said. You could
22 have said we -- it has -- our TVs allow caption and
23 subtitles to be displayed, unless of course subtitles
24 means "X," which it could mean according to our experts;
25 and therefore, if it means "X" and if it doesn't if

Page 22

1 to say about this one?
2     MR. PEASE: I just want to address the comment you
3 made earlier about our reliance on the user manuals in
4 our interrogatory response. I mean, we intend to rely
5 on that testimony. We will intend to rely on the
6 analysis of the chip, the force code as necessary, and a
7 lot of other stuff besides user manuals. So when you
8 say that our infringement position is entirely grounded
9 in the user manuals just -- that's not a fair
10 characterization at all.
11     We have given you infringement contentions
12 based on the user manuals because that is what you have
13 produced to date. And you asked us to supplement those
14 infringement contentions with specific focus on the user
15 manuals. We have done that and now we're going back and
16 looking at the service manuals and the other information
17 that's available to Sony. It may not be germane to the
18 ultimate question of this interrogatory, but I want to
19 state that for the record.
20     MR. MCCRUM: That's fine and you're free to go back
21 and look at our service manuals that we identified and
22 the products that we're making available for inspection
23 and determine whether these features that you have in
24 mind are in our products. We're giving it all to Sony.
25 We're not holding anything back.

Page 24

5 **(Pages 21 to 24)**

1 MR. PEASE: Well, that's not true because you're
2 not making your engineer available to us. I guarantee
3 if you ask the engineer, they'll be able to tell and
4 confirm that every one of your products allows closed
5 caption information to be displayed.
6 MR. MCCRUM: We did make him available on the 7th,
7 8th, and 9th and Sony indicated that those were not good
8 dates.
9 MR. PEASE: They were not good dates because we
10 have very few of your documents at this point. So far
11 we haven't seen any source code. There is a lot of the
12 documentation that we haven't seen yet.
13 MR. MCCRUM: We don't have any source code, Tom.
14 We have given you -- we're almost done with our document
15 production. We're going to give you everything that you
16 need that we have in our possession to answer this
17 interrogatory to the extent that it even can be answered
18 with knowledge in Vizio's possession.
19 MR. KENNEDY: Okay. Should we move onto No. 14?
20 Okay. No. 14 requested Vizio for each of its
21 televisions, identify all of the additional television
22 standards with which it complies. And the interrogatory
23 specifically lists a number of standards, including
24 EIA-708-B, which is the closed captioning standard and
25 it also lists the high-bandwidth digital content

1 protection system revision 1.3, which is the HDCP
2 standard. And Vizio again has pointed to Rule 33(d) and
3 has not given any sort of narrative response or listed
4 any of the digital television standards with respect to
5 any of its televisions.
6 And Sony's position, again, is that
7 Rule 33(d) is an improper way of responding to this
8 interrogatory because Vizio should have this information
9 easily within its possession.
10 MR. MCCRUM: This is Ryan. I disagree that we have
11 not identified any standards. We said that as shown in
12 the product literature that our products are operable to
13 receive and display television signals to be encoded
14 according to the following signal standards NTSC and/or.
15 We also said that certain of Vizio's televisions also
16 include -- we also note the DVI and HDMI interfaces as
17 well as circuitry capable of receiving QAM, DTVCC, an/or
18 HDCP signals.
19 So the first note I wanted to make is that we
20 did in fact identify standards in our response. So,
21 Todd, maybe you can explain specifically what the issue
22 is that you have with our answer so that we can discuss
23 whether or not there's anything we can do to alleviate
24 the concerns that you have.
25 MR. KENNEDY: Sure. Let's start with the response

1 that you just quoted. The response actually says that:
2 "Certain of Vizio's televisions
3 also include, among other things, DVI or
4 HDMI interfaces, as well as circuitry
5 capable of receiving QAM, DTVCC, and/or
6 HDCP signals."
7 That is not responsive to the
8 interrogatory which requires Vizio to actually identify
9 for each of its televisions which are the standards it
10 incorporates. And Vizio's answers that certain of its
11 televisions include some standards is simply not
12 responsive.
13 MR. MCCRUM: Well, we also refer to our Attachment
14 A which, again, lists all the included televisions as we
15 presently understand that term and the user manuals and
16 service manuals that we have in our possession on a
17 product-by-product basis. And our position is that you
18 can look at our user manuals and determine readily
19 whether they're the DVI or HDMI interfaces associated
20 with those.
21 MR. KENNEDY: This is Todd. Sony has done that and
22 Sony has been unable to determine whether or not Vizio's
23 televisions incorporate certain standards. And one is
24 the EIA-798-B, which is listed specifically in the
25 interrogatory. Vizio doesn't even mention that standard

1 in its response. And as far as we can tell, there are
2 absolutely no documents that mention that standard.
3 MR. MCCRUM: Well, my letter on that, Todd, told
4 you that with regard to the specific versions of these
5 standards and whether Vizio products comply with any,
6 some or all of the multiple of specific portions of
7 these various versions of the standards, that
8 information is not within the knowledge of Vizio. So if
9 you're trying to figure out which specific versions of
10 the standards that Vizio purportedly complies with,
11 that's information that we don't have. We have gone to
12 Vizio. We have asked for it. And they have told us
13 that they do not know.
14 MR. KENNEDY: This is Todd. I have a lot of
15 difficulty understanding how that could possibly be the
16 case because, as I pointed out in my last letter to you,
17 the 47 CFR 15.122-B requires that certain televisions
18 conform to EIA-708-B. So I'm having difficulty
19 understanding how Vizio would not know whether or not it
20 has complied with that regulation.
21 MR. MCCRUM: Well, like I said earlier, Vizio is
22 not making the chips that are used in these things and
23 cannot say under oath that their TVs do in fact comply
24 with any various versions. Again, that is something
25 that we would have to discuss with the chip suppliers

1 and ask that question directly to them. And, you know,
2 we haven't done that.
3     MR. KENNEDY: So what you're telling me then is
4 that Vizio does not know whether or not it complies with
5 47 CFR 15.122-B; is that correct?
6     MR. MCCRUM: Yeah. Does it intend to comply with
7 it? You know, that may be a different question. But
8 does it in fact comply with it? Has Vizio analyzed the
9 circuitry and the chips to determine whether or not they
10 do in fact comply with those standards? No, it has not.
11     MR. KENNEDY: Does Vizio employ anyone who is
12 responsible for ensuring that its televisions conform
13 with all the applicable laws and regulations?
14     MR. MCCRUM: I don't think they do.
15     Steve, I know we have asked this question of
16 Vizio and maybe you're in a better position to say. Is
17 that correct? We do not have someone specifically
18 employed to know whether or not we use specific versions
19 of standards?
20     MR. CORR: Yes, that's true, Ryan. But the point
21 from Todd that somehow implies that Vizio is supposed to
22 have someone who knows, I'm not sure is germane here.
23 We have done the research for this interrogatory. And
24 the fact that it complies with federal standards that
25 may supersede or be an umbrella standard to the specific

Page 29

1 standards that Todd is looking for doesn't necessarily
2 imply that Vizio doesn't have someone or doesn't have
3 knowledge related to the overarching standard. But the
4 fact that Todd is asking about a specific standard that
5 may be encompassed by an overarching standard, the
6 specific answer to that question is no, Vizio does not
7 have someone who would be knowledgeable with that
8 information.
9     MR. KENNEDY: This is Todd. I'm not asking about
10 any overarching standard. I'm just referring to the
11 exact same standards and the exact same version of the
12 standards that identifies specifically and the
13 regulations.
14     MR. MCCRUM: Well, that's a version of a larger
15 standard, right?
16     MR. KENNEDY: The standard is EIA-708-B. And
17 that's the document this lists all kinds of different
18 ways to perform closed captioning. I mean, that
19 document stands by itself as a standard. And in fact
20 the regulation specifically requires that standard and
21 that document to be practiced by television.
22     MR. MCCRUM: Well, our understanding is that that
23 is a version of a larger standard.
24     MR. KENNEDY: That may be true, but the regulation
25 requires that that version be practiced.

Page 30

1     MR. MCCRUM: Okay. Well, I understand -- as I
2 mentioned, Vizio does not design and develop the chips
3 to know exactly how they function and whether or not
4 they are in fact complying with that standard. No one
5 at Vizio is in a position to say that.
6     MR. KENNEDY: So you're representing that when
7 Vizio orders its televisions, it doesn't confirm that
8 these televisions, in fact, follow the law?
9     MR. MCCRUM: It does not analyze its products to
10 determine whether or not it practices any standards.
11     MR. KENNEDY: And you're representing that Vizio
12 doesn't employ anyone who is responsible for that?
13     MR. MCCRUM: Responsible for what?
14     MR. KENNEDY: For ensuring that Vizio televisions
15 comply with standards required by the law such as
16 EIA-708-B.
17     MR. MCCRUM: Say that again.
18     MR. KENNEDY: Are you representing that Vizio does
19 not employ anyone to ensure that its televisions comply
20 with the applicable regulations that require particular
21 standards to be practiced such as EIA-708-B?
22     MR. MCCRUM: I do not believe that they do and I
23 can go back and check with our client to make sure if
24 you would prefer me to do that and I would be happy to
25 do that. But my current understanding is that, no, they

Page 31

1 do not have someone specifically responsible for
2 ensuring that its products comply with certain
3 standards.
4     MR. KENNEDY: This is Todd. I don't understand
5 because at the last meet and confer on May 11, I asked
6 you this exact question and your answer was I don't
7 know. And now your answer seems to be, no, probably
8 not; but I can go back and check. So have you had any
9 communications with Vizio about this particular issue
10 since our last meet and confer?
11     MR. MCCRUM: Yes, I have. And I'm not willing to
12 get into the details because they are attorney/client
13 privilege, but we have been talking to our client in
14 detail about this interrogatory, I can assure you of
15 that. And I have already told you what we have since
16 found. And now you're asking me a very specific
17 question about whether or not we employ somebody
18 specifically responsible for ensuring that certain
19 versions of standards are met. And that was a question
20 I have not asked. Maybe Steve has asked it, actually.
21 I think we did ask that question, and the answer is no;
22 but that's what I need to confirm.
23     MR. KENNEDY: I don't know what else to say about
24 this one. Anyone else have anything to add?
25         (No response.)

Page 32

**(Pages 29 to 32)**

1   MR. MCCRUM: Well, I will go back and ask that
2   specific question for you, Todd, if that's something you
3   would like me to do.
4   MR. KENNEDY: I did want to discuss the other
5   standard that we're particularly concerned about which
6   is HDCP. And I believe it's Vizio's position that it
7   did not know which version of HDCP its televisions
8   practice; is that correct?
9   MR. MCCRUM: Right.
10  MR. KENNEDY: I'm curious about that one, as well,
11  because on Friday Vizio sent a letter to Sony alleging
12  that Vizio has a license to practice the HDCP standard,
13  which seems to me to be inconsistent with Vizio's
14  position here that it doesn't know whether it practices
15  the standard.
16  MR. MCCRUM: Well, I think having a license to do
17  something as opposed to actually knowing whether or not
18  you do it is two different questions, Todd. But I am
19  willing to revisit both of these issues with our client
20  and ask some of these specific questions that you're
21  raising. But I stand by what we have told you tonight
22  and in our letter that we do not know for certain
23  whether or not our products are practicing various
24  versions of standards. That's information that would
25  need to be obtained from our chip suppliers. And it
                                                    Page 33

1   seems as though you folks are taking steps to try to get
2   some of these questions answered.
3   MR. KENNEDY: This is Todd. In Sony's original
4   infringement contentions which were served well over a
5   month ago, Sony identified this version 1.3 as being
6   specifically relevant to Vizio's infringement of its
7   patent. And I don't understand how, having that much
8   time to review those infringement contentions, Vizio has
9   made no effort to determine whether its standards
10  actually -- whether its products actually practice that
11  standard and that particular revision of the standard.
12  MR. MCCRUM: Where do you get the idea that we have
13  made no effort to determine that? I just told you we
14  have had extensive conversations with our client about
15  this.
16  MR. KENNEDY: I believe in your letter you said
17  that the information is not in Vizio's possession with
18  regard to whether it practices the standard. Am I wrong
19  about that?
20  MR. MCCRUM: No, you're not; but that's a far cry
21  from saying we have made no effort to determine whether
22  or not we practice any of these standards that you have
23  identified.
24  MR. KENNEDY: Okay. I understand.
25  MR. MCCRUM: But like I said, I'm willing to go
                                                    Page 34

1   back and ask the specific questions of the client and I
2   can let you know if we find anything outside of that on
3   them.
4   MR. KENNEDY: Can you let us know that by Friday?
5   MR. MCCRUM: I can try, I don't know. There's
6   someone in mind that does a lot of traveling in Asia
7   that I need to talk to specifically; so whether or not
8   he's available this week, I can't say. I will endeavour
9   to do that, but I can't make any firm commitments on
10  this today.
11  MR. KENNEDY: Okay.
12  MR. PEASE: This is Tom. And just to clarify
13  something you said, you said we would have to ask the
14  chip suppliers for certain information. You've said
15  that at various points in this meet and confer and at
16  others. Is it your contention that Vizio does not have
17  access to that information? Because if Vizio has that
18  information and routinely calls up the chip suppliers
19  and tries to get that information, then from our view
20  that's information that's within the Vizio's possession,
21  custody, and control. I know, earlier you mentioned
22  information not being within Vizio's possession, but if
23  it's within its custody and control that's information
24  that ought to be disclosed to Sony. So let us know what
25  your position is on that.
                                                    Page 35

1   MR. MCCRUM: Well, our position is that if it's not
2   within the confines of Vizio, then it's not technically
3   within our possession, custody, and control. But I will
4   take that further and say, you know, these chip
5   manufacturers guard their information very closely and
6   are not very willing to share details about how their
7   products work.
8   MR. PEASE: Well, I know they give quite a bit of
9   information to the assemblers, the people that build
10  your TVs, the AmTran's of the world, for example. You
11  know, they'll have the software, they'll have the chips,
12  they'll have the reference boards.
13  MR. MCCRUM: You think that's true for AmTran of
14  like media sense chips?
15  MR. PEASE: If it has access to it, then that's the
16  sort of information that ought to be relied upon by
17  Vizio in its responses and it's the sort of information
18  that ought to be turned over to Sony in response to its
19  request.
20  MR. MCCRUM: Well, if you guys are -- well --
21  MR. PEASE: Do you disagree?
22  MR. MCCRUM: What I'll say on that is that we are
23  giving you -- we are working to obtain as much
24  information as we can about our products and we are
25  giving you everything that we have within our
                                                    Page 36

9  (Pages 33 to 36)

1 possession, custody, and control.
2     MR. KENNEDY: Okay. Unless anyone has any other
3 issues to raise or any comments, I think that that's all
4 that I have.
5     MR. MILLER: Okay. I don't know if you guys on the
6 line need to be on for this, but we want to just march
7 through a couple of the exhibits that we would like to
8 attach and Steve and I can handle that locally here.
9 I'm happy to let you go or you can stay on.
10     MR. KENNEDY: I'll stay on because I just want to
11 make sure that I got one of those e-mails out to you.
12     MR. MILLER: Okay. Now, as often is the case,
13 Steve, we've got the one copy, but I'll just hand them
14 to you and they're not stamped yet.
15     MR. CORR: I know what they are.
16     MR. MILLER: All right. Well, the first one
17 Exhibit 1, just for the record, is the first set of
18 interrogatories from Sony to Vizio.
19         Exhibit 2 is Vizio's First Supplemental
20 Responses. And attached to this are the various charts,
21 which I'm noticing now did not print correctly. We'll
22 replace those.
23     MR. CORR: Do you want to attach 1-A, as well?
24     MR. MILLER: Yeah, that should be there, but as I'm
25 saying, I notice that they're not printed right here; so

Page 37

1 we can swap that out.
2     MR. CORR: Here (indicating).
3     MR. MILLER: Okay. Let's replace that with that.
4         Exhibit 3 is the June 12 letter to Ryan McCrum
5 from Todd Kennedy.
6         Exhibit 4 is the June 4 letter from
7 Todd Kennedy to Steve Corr.
8         Exhibit 5 is the letter to Ryan McCrum from
9 Todd Kennedy dated May 26.
10         Exhibit 6 is the May 6 letter from Ryan McCrum
11 to Todd Kennedy.
12     MR. CORR: And don't we also have the letters we
13 discussed today?
14     MR. MILLER: Yeah, I believe that those are in
15 there, the June 12 letter.
16     MR. CORR: And did you have the June 19 response?
17     MR. MILLER: I do not, but if you would like to
18 mark that, let's mark that as Exhibit 7.
19     MR. CORR: Okay.
20     MR. MILLER: And the June 12 letter that we were
21 discussing is Exhibit 3.
22     MR. CORR: Okay.
23     MR. KENNEDY: I guess if we're going to do all the
24 letters, I mean, the one that started them all was the
25 April 24 letter, I believe that was the date.

Page 38

1     MR. CORR: Well, why would we leave out our latest
2 response, Todd, in the sequence of letters? I mean,
3 whatever letters you want to add and if you want to add
4 earlier ones, add them. But I think our June 19
5 response is certainly germane to today's conversation.
6     MR. MCCRUM: This is Ryan. Well, that was
7 specifically discussed, but why are we marking exhibits
8 on a transcript that were not discussed back to April
9 and early May?
10     MR. KENNEDY: You know, I think it's because
11 they're all these interrogatories. And, you know,
12 there's a rule that you're not supposed to -- you know,
13 in any motion to compel, you're not supposed to attach
14 any document, but you are supposed to attach the
15 transcript. And so, you know, the only way to talk
16 about the correspondence that the parties had earlier is
17 to actually attach it to the transcript.
18     MR. MILLER: And we believe that this is a more
19 efficient way to do it than having to call the
20 court reporter and sit down and read everyone's letter
21 to each other. But if that's Vizio position, then that
22 is what we will do going forward if we need to.
23     MR. MCCRUM: Well, if you want to go ahead and mark
24 all the correspondence relating to discovery issues,
25 let's march through it all. I'm not going to have all

Page 39

1 the Sony letters marked and not the Vizio ones. So why
2 don't we -- if you want to start back at April 29, then
3 we will move forward and we'll mark -- you know, there
4 are probably 30 or so letters here that we're talking
5 about.
6     MR. KENNEDY: I think we're only interested in ones
7 that discuss either of these Interrogatories 11 and 14,
8 right?
9     MR. CORR: Well, it didn't sound like it because
10 you were not interested in our June 19 letter that was
11 specific to these, so.
12     MR. KENNEDY: No, I am interested in them and I
13 think it should be attached.
14     MR. MCCRUM: All right. Well, what letters do you
15 have in mind that you want included?
16     MR. KENNEDY: The only other one that I have on my
17 list was the very first letter about these
18 interrogatories, and I believe that was April 24.
19     MR. MILLER: All right. So just so we can go
20 through these again, currently marked are the May 6
21 letter; the June 4 letter --
22     MR. MCCRUM: Which May 6 letter? You know,
23 sometimes we have several on a given day.
24     MR. MILLER: Okay. I'll read them, Ryan.
25         May 6 is a Jones Day letter to Todd Kennedy

Page 40

.0 (Pages 37 to 40)

1   from Ryan McCrum.
2       MR. MCCRUM: Okay.
3       MR. MILLER: The June 4 letter from Todd Kennedy to
4   Steve Corr.
5       MR. MCCRUM: Let me get that. Okay.
6       MR. MILLER: The next one is the May 26 letter from
7   Todd Kennedy to Ryan McCrum.
8       MR. MCCRUM: We're go backwards now?
9       MR. MILLER: Well, we're just going to get them
10  listed and then we'll figure them out. Okay? Because
11  they're just numbered accordingly. So May 26 Todd to
12  Ryan. The next one is the June 12 letter from
13  Todd Kennedy to Ryan McCrum. Again, we can reorder
14  these into chronological order at the end. We're just
15  attempting to get all of the ones that are currently
16  here out on the table.
17      MR. MCCRUM: When was that?
18      MR. CORR: June 12, the one that we discussed
19  today.
20      MR. MCCRUM: Okay. That one is fine.
21      MR. MILLER: The next one is the June 19 letter
22  from Ryan McCrum to Todd Kennedy.
23      MR. MCCRUM: Okay.
24      MR. MILLER: So that leaves my table at least --
25  and correct me if I'm missing any or added any in

1   here -- having the May 6 letter, a May 26 letter, a
2   June 4 letter, a June 12 letter, and a June 19 letter.
3       MR. MCCRUM: Okay. And why are we -- why is the
4   May 26 letter from Kennedy to me in here?
5       MR. MILLER: The May 26 letter from Todd Kennedy to
6   you is in here because on Page 1 it discusses Sony's
7   Interrogatory Number 11. And it says:
8           "Sony's Interrogatory No. 11
9       requires Vizio to identify for each
10      Vizio product which of the 11 enumerated
11      features it incorporates. Vizio
12      provided no substantive information in
13      response to that interrogatory.
14      Instead, Vizio invoked Rule 33(d)
15      without identifying a single Vizio
16      production document that allegedly
17      contains the information sought by this
18      Interrogatory."
19      MR. MCCRUM: I have three letters from May 26. I
20  was looking at the wrong one. Do we have my letter
21  from -- let's see. Okay.
22      MR. CORR: Any others to add, Ryan?
23      MR. MCCRUM: Well, not off the top of my head, but
24  I'm going to reserve the right to do so since the
25  correspondence on this is so lengthy and I don't want to

1   waste everyone's time sitting here going through the
2   entirety of it tonight. But if we're going to be going
3   through and selecting letters that were not specifically
4   discussed during the meet and confer tonight, I want to
5   reserve the right to add additional letters to the
6   exhibits as needed.
7       MR. KENNEDY: We're fine with that. You know, as
8   long as the letter discusses in some way the two
9   interrogatories that we discussed, I think it should be
10  attached.
11      Rory, I just sent you -- it was actually an
12  April 29 letter that --
13      MR. MILLER: Todd, if you want to e-mail it to our
14  word processing coordinator here in Los Angeles, I can
15  ask them to print it and we can add it to the stack
16  here.
17      MR. KENNEDY: So do you want me to send it to them?
18      MR. MILLER: That would probably get to them faster
19  than me forwarding it on.
20      MR. CORR: What is that letter, Todd?
21      MR. KENNEDY: That is from me to Ryan or it might
22  have been to Wamsley, I can't remember.
23      MR. MCCRUM: Jim Wamsley.
24      MR. KENNEDY: Okay.
25      MR. MCCRUM: And then we need to mark my May 28,

1   2009 letter to Todd Kennedy.
2       MR. CORR: Okay. To clarify this, can we exchange
3   what the exhibits are going to be on this tomorrow. And
4   then, Todd, I can send to you what I think we need to
5   add and then you can put in whatever you think you need
6   to add, but I think we are just kind of guessing right
7   now.
8       MR. MILLER: Yeah, I think that the housekeeping
9   can be done after this and submit it by agreement. I
10  don't think that we need to do it right now and possibly
11  end up in a situation where we want to go back. Let's
12  say by close of business tomorrow, we'll discuss and get
13  the exhibits put together?
14      MR. KENNEDY: Yeah, and sorry, I didn't mean to
15  blind side you guys with this, I should have sent around
16  the letters earlier so you could have had a chance to
17  look at it and add anything that you wanted. So I'll
18  try to do a better job next time.
19      MR. CORR: Ryan, I don't know if -- I mean, can we
20  get to this by the end of tomorrow or do we need until
21  Wednesday?
22      MR. MCCRUM: Why don't we take until Wednesday to
23  be sure.
24      MR. CORR: It's just I hadn't planned for this.
25  That's my issue.

**11 (Pages 41 to 44)**

1     MR. MILLER:  Wednesday should be fine.  If that
2  works for everyone else, that should be fine on our end.
3     MR. MCCRUM:  Fine.  All right, guys.  Thank you
4  all.
5     MR. MILLER:  Okay.  Thanks everyone.
6          (The meet and confer concluded at
7          7:07 p.m.)
8          (The exhibits were subsequently
9       sent electronically to the court
10      reporter and are attached hereto.)
11              -o0o-
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 45

1          DEPOSITION OFFICER'S CERTIFICATE
2            [C.C.P. 2025(q)(1),(r)]
3
   STATE OF CALIFORNIA      )
4                           ) ss
   COUNTY OF LOS ANGELES    )
5
6       I, JULIE SEYMOUR, Certified Shorthand
7  Reporter, Certificate No. 12341, State of California,
8  hereby certify:
9       I am the deposition officer that
10 stenographically recorded the foregoing meeting;
11      The foregoing transcript is a true record of
12 the statements given;
13
14 Dated:_____, Los Angeles, California.
15
16      _____
            JULIE SEYMOUR, CSR NO. 12341
17
18
19
20
21
22
23
24
25
                                        Page 46

12  (Pages 45 to 46)

DEPOSITION OFFICER'S CERTIFICATE

[C.C.P. 2025(q)(1),(r)]

STATE OF CALIFORNIA          )
                             ) ss
COUNTY OF LOS ANGELES        )

        I, JULIE SEYMOUR, Certified Shorthand

Reporter, Certificate No. 12341, State of California,

hereby certify:

        I am the deposition officer that

stenographically recorded the foregoing meeting;

        The foregoing transcript is a true record of

the statements given;

Dated: _____6-26-09_____, Los Angeles, California.


                        _____
                        JULIE SEYMOUR, CSR NO. 12341

46

# EXHIBIT 7

# High-bandwidth Digital Content Protection System

Revision 1.3

21 December, 2006

Digital Content Protection LLC

SONY0005632

## Notice

THIS DOCUMENT IS PROVIDED "AS IS" WITH NO WARRANTIES WHATSOEVER, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NONINFRINGEMENT, FITNESS FOR ANY PARTICULAR PURPOSE, OR ANY WARRANTY OTHERWISE ARISING OUT OF ANY PROPOSAL, SPECIFICATION OR SAMPLE. Intel Corporation disclaims all liability, including liability for infringement of any proprietary rights, relating to use of information in this specification. No license, express or implied, by estoppel or otherwise, to any intellectual property rights is granted herein.

The cryptographic functions described in this specification may be subject to export control by the United States, Japanese, and/or other governments.

Copyright © 1999-2006 by Intel Corporation. Third-party brands and names are the property of their respective owners.

## Acknowledgement

Silicon Image Inc. has contributed to the development of this specification.

## Intellectual Property

Implementation of this specification requires a license from the Digital Content Protection LLC.

### Contact Information

Digital Content Protection LLC
C/O VTM, Inc.
3855 SW 153rd Drive
Beaverton, OR 97006

Email: info@digital-cp.com

Web: www.digital-cp.com

## Revision History

1 September 99 – 0.80 Revision. Initial publication at Intel Developer Forum
13 October 99 – 0.89 Revision. Publication at Copy Protection Technical Working Group
11 November 99 – 0.90 Revision. Publication at Copy Protection Technical Working Group
11 January 00 – 0.95 Revision. Publication at Copy Protection Technical Working Group
17 February 00 – 1.00 Revision. Publication at Intel Developer Forum
9 June 03 – 1.1 Revision. Publication on DCP LLC web site
13 June 06 – 1.2 Revision. Publication on DCP LLC web site
21 December 06 – 1.3 Revision. Publication on DCP LLC web site

SONY0005633

1   Introduction.................................................................................................. 4
1.1     Scope ...................................................................................................4
1.2     Definitions ...........................................................................................5
1.3     Overview ..............................................................................................7
1.4     Terminology .........................................................................................8
1.5     References ...........................................................................................9

2   Authentication............................................................................................ 10
2.1     Overview ............................................................................................10
2.2     Protocol .............................................................................................10
    2.2.1   First Part of Authentication Protocol .............................................. 10
    2.2.2   Second Part of Authentication Protocol.......................................... 12
    2.2.3   Third Part of Authentication Protocol ............................................. 14
2.3     HDCP Transmitter State Diagram.........................................................15
2.4     HDCP Receiver State Diagram..............................................................20
2.5     HDCP Repeater State Diagrams ...........................................................21
2.6     HDCP Port ..........................................................................................28
2.7     Encryption Status Signaling .................................................................33

3   Data Encryption .......................................................................................... 36
3.1     Encryption/Decryption State Diagrams .................................................37
    3.1.1   OESS ............................................................................................ 37
    3.1.2   EESS............................................................................................. 40

4   HDCP Cipher ............................................................................................... 43
4.1     Overview ............................................................................................43
4.2     Linear Feedback Shift Register Module.................................................44
4.3     Block Module......................................................................................46
4.4     Output Function..................................................................................49
4.5     Operation ...........................................................................................50

5   Renewability ............................................................................................... 55
5.1     SRM Size and Scalability .....................................................................55
5.2     Updating SRMs ...................................................................................57

Appendix A.      Test Vectors ............................................................................ 58

Appendix B.      Confidentiality and Integrity of Values ...................................... 84

Appendix C.      Sample Algorithm for Ri Verification ......................................... 86

Appendix D.      Timing Diagram ........................................................................ 88

Appendix E.      Recommended Method for Synchronous Ri Checking.......... 89

SONY0005634

# 1  Introduction

## 1.1  Scope

This specification describes the High-bandwidth Digital Content Protection (HDCP) system, Revision 1.30, referred to as HDCP 1.3. HDCP 1.3 is a revision update to HDCP, Revision 1.20 and its errata, referred to collectively as HDCP 1.2.

HDCP 1.3 is designed for protecting Audiovisual content over certain high-bandwidth interfaces, referred to as HDCP-protected Interfaces, from being copied. In HDCP 1.3, the HDCP-protected Interfaces are Digital Visual Interface (DVI), High Definition Multimedia Interface (HDMI), Unified Display Interface (UDI), Giga-bit Video Interface (GVIF) and DisplayPort. This document explains in detail HDCP 1.3 applied to HDMI and DVI. Please refer to HDCP on DisplayPort Specification Rev 1_0 for the HDCP Amendment for DisplayPort. Use of HDCP 1.3 and the HDCP Amendment for DisplayPort are licensed under the terms of the HDCP Adopter Agreement available through DCP, LLC. No other use, right or license to HDCP 1.3 Specification or the HDCP Amendment for DisplayPort is granted by implication, estoppel or otherwise, under any patents, trade secrets or other intellectual property rights now or hereafter owned or controlled by DCP, LLC or its Adopters. In an HDCP System, two or more HDCP Devices are interconnected through an HDCP-protected Interface. The Audiovisual Content protected by HDCP, referred to as HDCP Content, flows from the Upstream Content Control Function into the HDCP System at the most upstream HDCP Transmitter. From there, the HDCP Content, encrypted by the HDCP System, flows through a tree-shaped topology of HDCP Receivers over HDCP-protected Interfaces. This specification describes a content protection mechanism for: (1) authentication of HDCP Receivers to their immediate upstream connection (to an HDCP Transmitter), (2) revocation of HDCP Receivers that are determined by the Digital Content Protection, LLC, to be invalid, and (3) HDCP Encryption of Audiovisual Content over the HDCP-protected Interfaces between HDCP Transmitters and their downstream HDCP Receivers. HDCP Receivers may render the HDCP Content in audio and visual form for human consumption. HDCP Receivers may be HDCP Repeaters that serve as downstream HDCP Transmitters emitting the HDCP Content further downstream to one or more additional HDCP Receivers.

Except when specified otherwise, HDCP 1.3-compliant HDMI Devices must interoperate with other HDCP 1.3, HDCP 1.2 and HDCP 1.1-compliant HDMI Devices attached to their HDCP-protected Interface Ports using the same protocol. Additionally, HDCP 1.3-compliant Devices of which one or more of their HDCP-protected Interface Ports are using the DVI protocol must interoperate with HDCP 1.3, HDCP 1.2, HDCP 1.1 and HDCP 1.0-compliant Devices attached to such HDCP-protected Interface Ports using the DVI protocol. HDCP Transmitters must support HDCP Repeaters.

The state machines in this specification define the required behavior of HDCP Devices. The link-visible behavior of HDCP Devices implementing the specified state machines must be identical, even if implementations differ from the descriptions. The behavior of HDCP Devices implementing the specified state machines must also be identical from the perspective of an entity outside of the HDCP System.

Implementations must include all elements of the content protection system described herein, unless the element is specifically identified as informative or optional. Adopters must also ensure that implementations satisfy the robustness and compliance rules described in the technology license. Additionally, HDCP Transmitters may be subject to additional robustness and compliance rules associated with other content protection technologies.

SONY0005635

## 1.2 Definitions

The following terminology, as used throughout this specification, is defined as herein:

**Audiovisual Content.** Audiovisual works (as defined in the United States Copyright Act as in effect on January 1, 1978), text and graphic images, are referred to as *AudioVisual Content*.

**Authorized Device.** An HDCP Device that is permitted access to HDCP Content is referred to as an *Authorized Device*. An HDCP Transmitter may test if an attached HDCP Receiver is an Authorized Device by successfully completing the first and, when applicable, second part of the authentication protocol. If the authentication protocol successfully results in establishing authentication, then the other device is considered by the HDCP Transmitter to be an Authorized Device.

**Device Key Set.** Each HDCP Device has a *Device Key Set*, which consists of a set of Device Private Keys along with the associated Key Selection Vector.

**Device Private Keys.** A set of Device Private Keys consists of 40 different 56-bit values. These keys are to be protected from exposure outside of the HDCP Device. A set of Device Private Keys is associated with a unique Key Selection Vector.

**downstream.** The term, *downstream*, is used as an adjective to refer to being towards the sink of the HDCP Content stream. For example, when an HDCP Transmitter and an HDCP Receiver are connected over an HDCP-protected Interface, the HDCP Receiver can be referred to as the *downstream* HDCP Device in this connection. For another example, on an HDCP Repeater, the HDCP-protected Interface Port(s) which can emit HDCP Content can be referred to as its *downstream* HDCP-protected Interface Port(s). See also, *upstream*.

**Enhanced Encryption Status Signaling (EESS).** *EESS*, further described in Section 2.7, is a protocol for signaling whether encryption is enabled or disabled for a frame. EESS is always used with the HDMI protocol, but is an optional feature with the DVI protocol. See also, *Original Encryption Status Signaling (OESS)*.

**frame.** For purposes of the HDCP specification, a frame consists of the pixel data between vertical synchronization signals. HDCP may be used with both progressive and interlaced video formats. For interlaced video, every field is an HDCP frame.

**HDCP.** *HDCP* is an acronym for High-bandwidth Digital Content Protection. This term refers to this content protection system as described by any revision of this specification and its errata.

**HDCP 1.0.** *HDCP 1.0* refers to, specifically, the variant of HDCP described by Revision 1.00 of this specification along with its associated errata.

**HDCP 1.1.** *HDCP 1.1* refers to, specifically, the variant of HDCP described by Revision 1.10 of this specification along with its associated errata, if applicable.

**HDCP 1.2.** *HDCP 1.2* refers to, specifically, the variant of HDCP described by Revision 1.20 of this specification along with its associated errata, if applicable.

**HDCP 1.3.** *HDCP 1.3* refers to, specifically, the variant of HDCP described by Revision 1.30 of this specification along with its associated errata, if applicable.

**HDCP 1.0-compliant Device.** An HDCP Device that is designed in adherence to HDCP 1.0 is referred to as an *HDCP 1.0-compliant Device*.

SONY0005636

**HDCP 1.1-compliant Device**. An HDCP Device that is designed in adherence to HDCP 1.1 is referred to as an *HDCP 1.1-compliant Device*.

**HDCP 1.2-compliant Device**. An HDCP Device that is designed in adherence to HDCP 1.2 is referred to as an *HDCP 1.2-compliant Device*.

**HDCP 1.3-compliant Device**. An HDCP Device that is designed in adherence to HDCP 1.3 is referred to as an *HDCP 1.3-compliant Device*.

**HDCP Content**. *HDCP Content* consists of Audiovisual Content that is protected by the HDCP System. *HDCP Content* includes the Audiovisual Content in encrypted form as it is transferred from an HDCP Transmitter to an HDCP Receiver over and HDCP-protected Interface, as well as any translations of the same content, or portions thereof. For avoidance of doubt, Audiovisual Content that is never encrypted by the HDCP System is not *HDCP Content*.

**HDCP Device**. Any device that contains one or more HDCP-protected Interface Ports and is designed in adherence to HDCP is referred to as an *HDCP Device*.

**HDCP Encryption**. *HDCP Encryption* is the encryption technology of HDCP when applied to the protection of HDCP Content in an HDCP System.

**HDCP-protected Interface**. An interface for which HDCP applies is described as an *HDCP-protected Interface*. For HDCP 1.0, the only *HDCP-protected Interface* is the Digital Visual Interface (DVI). For HDCP 1.1 and HDCP 1.2, in addition to DVI, the High Definition Multimedia Interface (HDMI) is also an *HDCP-protected Interface*. For HDCP 1.3, DVI, HDMI, Unified Display Interface (UDI), Giga-bit Video Interface (GVIF) and DisplayPort are all HDCP-protected Interfaces. See the References section for further information regarding these *HDCP-protected Interfaces*.

**HDCP-protected Interface Port**. A connection point on an HDCP Device that supports an HDCP-protected Interface is referred to as an *HDCP-protected Interface Port*.

**HDCP Receiver**. An HDCP Device that can receive and decrypt HDCP Content through one or more of its HDCP-protected Interface Ports is referred to as an *HDCP Receiver*.

**HDCP Repeater**. An HDCP Device that can receive and decrypt HDCP Content through one or more of its HDCP-protected Interface Ports, and can also re-encrypt and emit said HDCP Content through one or more of its HDCP-protected Interface Ports, is referred to as an *HDCP Repeater*. An *HDCP Repeater* may also be referred to as either an HDCP Receiver or an HDCP Transmitter when referring to either the upstream side or the downstream side, respectively.

**HDCP System**. An *HDCP System* consists of an HDCP Transmitter and one or more HDCP Receivers connected through their HDCP-protected interfaces in a tree topology; whereas the said HDCP Transmitter is the HDCP Device most upstream, and receives the HDCP Content from an Upstream Content Control Function. All HDCP Devices connected to other HDCP Devices in an *HDCP System* over HDCP-protected Interfaces are part of the *HDCP System*.

**HDCP Transmitter**. An HDCP Device that can encrypt and emit HDCP Content through one or more of its HDCP-protected Interface Ports is referred to as an *HDCP Transmitter*.

**I²C Bus**. A bus linking the HDCP Transmitter and HDCP Receiver compliant with the Video Electronics Standards Association (VESA) Digital Display Channel (DDC) specification subset DDC2B, as required by the Digital Display Working Group (DDWG) Digital Video Interface (DVI) specification.

SONY0005637

**Key Selection Vector (KSV)**. Each HDCP Device contains a set of Device Private Keys. A set of Device Private Keys is associated with a *Key Selection Vector (KSV)*. Each HDCP Transmitter has assigned to it a unique *KSV* from all other HDCP Transmitters. Also, each HDCP Receiver has assigned to it a unique *KSV* from all other HDCP Receivers.

**Original Encryption Status Signaling (OESS)**. *OESS*, further described in Section 2.7, is a protocol for signaling whether encryption is enabled or disabled for a frame. OESS is only used with the DVI protocol. See also, *Enhanced Encryption Status Signaling (EESS)*.

**upstream**. The term, *upstream*, is used as an adjective to refer to being towards the source of the HDCP Content stream. For example, when an HDCP Transmitter and an HDCP Receiver are connected over an HDCP-protected Interface, the HDCP Transmitter can be referred to as the *upstream* HDCP Device in this connection. For another example, on an HDCP Repeater, the HDCP-protected Interface Port(s) which can receive HDCP Content can be referred to as its *upstream* HDCP-protected Interface Port(s). See also, *downstream*. This term should not be confused as referring to the Upstream Specification.

**Upstream Content Control Function**. The HDCP Transmitter most upstream in the HDCP System receives HDCP Content from the *Upstream Content Control Function*. The *Upstream Content Control Function* is not part of the HDCP System, and the methods used, if any, by the *Upstream Content Control Function* to determine for itself the HDCP System is correctly authenticated or permitted to receive the Audiovisual Content, or to transfer the Audiovisual Content to the HDCP System, are beyond the scope of this specification. On a personal computer platform, an example of an *Upstream Content Control Function* may be software designed to emit Audiovisual Content to a display or other presentation device that requires HDCP.

In addition, terms such as *Data Island, Data Island Period, Guard Band, Leading Guard Band, Trailing Guard Band, Video Data, Video Data Period,* and *AVMUTE*, are further explained in the HDMI Specification (see references).

## 1.3 Overview

HDCP is designed to protect the transmission of Audiovisual Content between an HDCP Transmitter and an HDCP Receiver. The system also allows for HDCP Repeaters that support downstream HDCP-protected Interface Ports. Figure 1-1 illustrates an example connection topology for HDCP Devices. The HDCP System allows up to seven levels of HDCP Repeaters and as many as 128 total HDCP Devices, including HDCP Repeaters, to be attached to an HDCP-protected Interface Port.

SONY0005638



**Figure 1-1. Sample Connection Topology of an HDCP System**

There are three elements of the content protection system. Each element plays a specific role in the system. First, there is the authentication protocol, through which the HDCP Transmitter verifies that a given HDCP Receiver is licensed to receive HDCP Content. With the legitimacy of the HDCP Receiver determined, encrypted HDCP Content is transmitted between the two devices based on shared secrets established during the authentication protocol. This prevents eavesdropping devices from utilizing the content. Finally, in the event that legitimate devices are compromised to permit unauthorized use of HDCP Content, renewability allows a HDCP Transmitter to identify such compromised devices and prevent the transmission of HDCP Content.

This document contains chapters describing in detail the requirements of each of these elements. In addition, a chapter is devoted describing the cipher that is used in both the authentication protocol and in the encryption of the HDCP Content. All aspects of HDCP map easily onto the existing DVI and HDMI specifications.

## 1.4   Terminology

Throughout this specification, names that appear in italic refer to values that are exchanged during the HDCP cryptographic protocol. Names that appear in CAPS refer to status values from the video receiver. C-style notation is used throughout the state diagrams and protocol diagrams, although the logic functions AND, OR, and XOR are written out where a textual description would be more clear.

The concatenation operator '$\|$' combines two values into one. For eight-bit values $a$ and $b$, the result of ($a \| b$) is a 16-bit value, with the value $a$ in the most significant eight bits and $b$ in the least significant eight bits.

SONY0005639

**1.5    References**

Digital Display Working Group (DDWG), *Digital Visual Interface (DVI) Revision 1.0*, April 2, 1999.

Video Electronics Standards Association (VESA), Enhanced Display Data Channel (DDC) Standard, September 2, 1999.

HDMI, LLC., *High-Definition Multimedia Interfaces (HDMI) Revision 1.0*, December XX, 2002.

National Institute of Standards and Technology (NIST), *Digital Signature Standard (DSS)*, FIPS Publication 186-1, December 15, 1998.

National Institute of Standards and Technology (NIST), *Secure Hash Standard (SHS)*, FIPS Publication 180-1, April 17, 1995.

Philips Semiconductors, *The $I^2C$-Bus Specification*, Version 2.0, December 1998.

SONY0005640

## 2 Authentication

The HDCP Authentication protocol is an exchange between an HDCP Transmitter and an HDCP Receiver that affirms to the HDCP Transmitter that the HDCP Receiver is authorized to receive HDCP Content. This affirmation is in the form of the HDCP Receiver demonstrating knowledge of a set of secret device keys. Each HDCP Device is provided with a unique set of secret device keys, referred to as the Device Private Keys, from the Digital Content Protection LLC. The communication exchange, which allows for the receiver to demonstrate knowledge of such secret device keys, also provides for both HDCP Devices to generate a shared secret value that cannot be determined by eavesdroppers on this exchange. By having this shared secret formation melded into the demonstration of authorization, the shared secret can then be used as a symmetric key to encrypt HDCP Content intended only for the Authorized Device. Thus, a communication path is established between the HDCP Transmitter and HDCP Receiver that only Authorized Devices can access.

### 2.1 Overview

Each HDCP Device contains an array of 40, 56-bit secret device keys which make up its Device Private Keys, and a corresponding identifier, received from the Digital Content Protection LLC. This identifier is the Key Selection Vector (KSV) assigned to the device. The KSV is a 40-bit binary value.

The HDCP Authentication Protocol can be considered in three parts. The first part establishes shared values between the two HDCP Devices if both devices have a valid Device Key Set from the Digital Content Protection LLC. The second part allows an HDCP Repeater to report the KSVs of attached HDCP Receivers. The third part occurs during the vertical blanking interval preceding each frame for which encryption is enabled, and provides an initialization state for the HDCP Cipher for encrypting the HDCP Content within that frame.

### 2.2 Protocol

### 2.2.1 First Part of Authentication Protocol

Figure 2-1 illustrates the first part of the authentication exchange. The HDCP Transmitter (*Device A*) can initiate authentication at any time, even before a previous authentication exchange has completed. Authentication is initiated by the HDCP Transmitter by sending an initiation message containing its KSV (*Aksv*) and a 64-bit pseudo-random value (*An*) generated by the HDCP Cipher function hdcpRngCipher (Section 4.5) to the HDCP Receiver (*Device B*). The HDCP Receiver responds by sending a response message containing the receiver's KSV (*Bksv*) and the REPEATER bit, which indicates if the receiver is an HDCP Repeater. The HDCP Transmitter verifies that the HDCP Receiver's KSV has not been revoked (section 5), and that the received KSV contains 20 ones and 20 zeros.

SONY0005641



**Figure 2-1. First Part of Authentication Protocol**

At this point, if both HDCP Devices have a valid array of secret device keys and corresponding KSV from the Digital Content Protection LLC, then they can each calculate a 56-bit shared secret value, $Km$ (or $Km'$ in the video receiver). Each device calculates $Km$ (or $Km'$) by adding a selection of its private device keys described by the other device's KSV, using 56-bit binary addition (i.e. unsigned addition modulo $2^{56}$). The selection of secret device keys that are added together consists of those corresponding to the bit indexes of all of the 1-bits of the binary representation of the KSV.

For example, suppose $Bksv$ equals 0x5A3. For the binary representation of 0x5A3, bit positions 0, 1, 5, 7, 8, and 10 are ones and all other bit positions are zeros. Therefore, *Device A* will add it's own secret device keys at array indexes 0, 1, 5, 7, 8, and 10 together to calculate the shared secret value, $Km$. *Device B* will perform an analogous calculation using its own private key array and *Device A*'s KSV to get $Km'$.

If either device has an invalid set of secret device keys or corresponding KSV, then $Km$ will not be equal to $Km'$.

The HDCP Cipher function hdcpBlockCipher (Section 4.5) is then used to calculate three values, $Ks$, $M_0$, and $R_0$. The cipher initialization values for this calculation are $Km$ (or $Km'$), and the 65-bit concatenation of REPEATER with $An$. The HDCP Receiver's status bit REPEATER indicates that the HDCP Receiver supports retransmission of HDCP Content to additional HDCP Receivers. The session key $Ks$ is a 56-bit secret key for the HDCP Cipher. $M_0$ is a 64-bit secret value used in the second part of the authentication protocol, and as a supplemental HDCP Cipher initialization value. $R_0$ is a 16-bit response value that the video receiver returns to the HDCP Transmitter to provide an indication as to the success of the authentication exchange. $R_0'$ must be available for the HDCP Transmitter to read within 100 milliseconds from the time that the HDCP Transmitter finishes writing $Aksv$ to the video receiver. The HDCP Transmitter must not read the $R_0'$ value sooner than 100ms after writing $Aksv$.

If authentication was successful, then $R_0'$ will be equal to $R_0$. If authentication was unsuccessful, then $R_0'$ and $R_0$ will, in most cases, differ. Future $R_i'$ values, produced during the third part of the authentication protocol, will reveal that authentication has failed in the event that the $R_0$ values erroneously indicate that authentication was successful.

The HDCP Transmitter enables HDCP Encryption when the first part of the authentication protocol successfully completes.

SONY0005642



**Figure 2-2. Second Part of Authentication Protocol**

### 2.2.2 Second Part of Authentication Protocol

The second part of the authentication protocol (Figure 2-2) is required if the HDCP Receiver is an HDCP Repeater. The HDCP Transmitter executes the second part of the protocol only when the REPEATER bit is set, indicating that the attached HDCP Receiver is an HDCP Repeater. This part of the protocol assembles a list of all downstream KSVs attached to the HDCP Repeater through a permitted connection tree, enabling revocation support upstream.

HDCP Repeaters assemble the list of all attached downstream HDCP Receivers as the downstream HDCP-protected Interface Ports of the HDCP Repeater complete the authentication protocol with attached HDCP Receivers. The list is represented by a contiguous set of bytes, with each KSV occupying five bytes stored in little-endian order. The total length of the KSV list is five bytes times the total number of attached and active downstream HDCP Devices, including downstream HDCP Repeaters. An HDCP-protected Interface Port with no active device attached adds nothing to the list. Also, the KSV of the HDCP Repeater itself at any level is not included in its own KSV list. An HDCP-protected Interface Port connected to an HDCP Receiver that is not an HDCP Repeater adds the *Bksv* of the attached HDCP Receiver to the list. HDCP-protected Interface Ports that have an HDCP Repeater attached add the KSV list read from the attached downstream HDCP Repeater, plus the *Bksv* of the attached downstream HDCP Repeater itself. In order to add the KSV list of the attached HDCP Repeater, it is necessary for the HDCP Repeater to verify the integrity of the list by computing $V$ and checking this value against $V'$ received from the attached HDCP Repeater. If $V$ does not equal $V'$, the downstream KSV list integrity check fails, and the upstream HDCP Repeater must not assert its READY status. Upstream HDCP Transmitters will detect this failure by the expiration of a watchdog timer set in the HDCP Transmitter.

When the HDCP Repeater has assembled the complete list of attached HDCP Devices' KSVs, it computes and appends to the list the verification value $V$. This value is the SHA–1 hash of the concatenation of the KSV list, *Bstatus*, and the secret value $M_0$. When constructing the byte stream for SHA-1 input, the KSV list is in the same little-endian byte order in which it is transmitted over the link, Bstatus is appended in little-endian order, and M0 is also appended in little-endian order. (See tables A-24 and A-25.) When both the KSV list and $V$ are available, the HDCP Repeater asserts its READY status indicator.

The HDCP Transmitter, having determined that the REPEATER bit read earlier in the protocol is set, sets a five-second watchdog timer and polls the HDCP Repeater's READY status bit. When READY is set, the HDCP Transmitter reads the KSV list and $V$ from the HDCP Repeater. If the size of the KSV list exceeds the capacity of the HDCP transmitter, the authentication protocol is aborted. The HDCP Transmitter verifies the integrity of the KSV list by computing the SHA–1 hash value $V$ and comparing this value to $V'$. If $V$ is not equal to $V'$, then the authentication protocol is aborted.

SONY0005643

If the asserted READY status is not received within a maximum-permitted time of five seconds, authentication of the HDCP Repeater fails. With this failure, the HDCP Transmitter abandons the authentication protocol with the HDCP Repeater. Authentication can be reattempted with the transmission of a new value *An* and the *Aksv*.

In addition to assembling the KSV list, an HDCP Repeater propagates topology information upward the connection tree to the HDCP Transmitter. An HDCP Repeater reports the topology status variables DEVICE_COUNT and DEPTH. The DEVICE_COUNT for an HDCP Repeater is equal to the total number of attached downstream HDCP Receivers and HDCP Repeaters. The value is calculated as the sum of the number of attached downstream HDCP Receivers and HDCP Repeaters plus the sum of the DEVICE_COUNT read from all attached HDCP Repeaters. The DEPTH status for an HDCP Repeater is equal to the maximum number of connection levels below any of the downstream HDCP-protected Interface Ports. The value is calculated as the maximum DEPTH reported from downstream HDCP Repeaters plus one (accounting for the attached downstream HDCP Repeater). For example, an HDCP Repeater with zero downstream HDCP Devices reports a value of zero for both the DEPTH and the DEVICE_COUNT. An HDCP Repeater with four downstream HDCP Receivers that are not HDCP Repeaters reports a DEPTH of one and a DEVICE_COUNT of four. If the computed DEVICE_COUNT for an HDCP Repeater exceeds 127 or the maximum number of devices supported by the size of the KSV FIFO, the HDCP Repeater must assert the MAX_DEVS_EXCEEDED status bit. If the computed DEPTH for an HDCP Repeater exceeds seven, the HDCP Repeater must assert the MAX_CASCADE_EXCEEDED status bit. When an HDCP Repeater receives a MAX_DEVS_EXCEEDED or a MAX_CASCADE_EXCEEDED status from a downstream HDCP Repeater, it is required to assert the corresponding status bits to the upstream HDCP Transmitter. If either MAX_CASCADE_EXCEEDED or MAX_DEVS_EXCEEDED status bits are set, the READY bit may be set by the repeater, or it may not set the READY bit and simply let the timeout occur in the HDCP transmitter.

For dual link repeaters, the repeater combines the topology information for both links into a single KSV list that is read from the primary link KSV FIFO. It may at it discretion remove duplicate KSV information in the list. Duplicate KSV values may result from downstream dual link HDCP devices having the same KSV on both links.

Authentication fails if the topology maximums are exceeded. The top-level HDCP Transmitter checks to see if the KSV of any attached device is found in the current revocation list, and, if present, the authentication fails. The HDCP Transmitter verifies the integrity of the current revocation list by checking the signature of the system renewability message (SRM) using the Digital Content Protection LLC public key. Failure of this integrity check constitutes an authentication failure.



**Figure 2-3. Multi-level Repeater Protocol Signals.**

| From | To | Max Delay | Conditions and Comments |
|------|-----|-----------|------------------------|
| AKSV1<br><br>Upstream HDCP Transmitter *Aksv* received | AKSV2<br><br>HDCP Repeater's *Aksv* transmitted downstream | 100 ms | Downstream propagation time. To latest *Aksv* transmission when more than one HDCP Receiver is attached. |

SONY0005644

| AKSV3 *Aksv* transmitted to all downstream HDCP-protected Interface Ports | RDY1 Upstream READY asserted | 500 ms | Upstream propagation time when no downstream HDCP Repeaters are attached. (no downstream KSV lists to process) |
|---|---|---|---|
| RDY1 Downstream READY asserted | RDY2 Upstream READY asserted | 500 ms | Upstream propagation time when one or more HDCP Repeaters are attached. From latest downstream READY. (downstream KSV lists must be processed) |
| AKSV1 Upstream HDCP Transmitter transmits *Aksv* | RDY2 Upstream HDCP Transmitter polls asserted READY | 4.2 seconds | For the Maximum of seven repeater levels, 7 * (100 ms + 500 ms) |

**Table 2–1. HDCP Repeater Protocol Timing Requirements**

Table 2–1 specifies HDCP Repeater timing requirements that bound the worst-case propagation time for the KSV list. Note that because each HDCP Repeater does not know the number of downstream HDCP Repeaters, it must use the same five-second timeout used by the upstream HDCP Transmitter when polling for downstream READY.



**Figure 2-4. Third Part of Authentication Protocol** **

## 2.2.3 Third Part of Authentication Protocol

The third part of the authentication protocol, illustrated in Fig. 2-4, occurs during the vertical blanking interval preceding the frame for which it applies. Each of the two HDCP Devices calculates new cipher initialization values, $K_i$ and $M_i$, and a third value $R_i$. The index, $i$, represents the frame number, starting with the value of one for the first video frame for which encryption is enabled after the completion of the first part of the authentication protocol, and incrementing either on encrypted frames or on every frame,

---

** Reading $Ri$ synchronously every 128th frame is also acceptable in lieu of asynchronous polling every 2 seconds

SONY0005645

depending upon whether ADVANCE_CIPHER mode is enabled (see below). However, the frame counter does not advance while the HDCP device is in the HDMI AVMUTE state, and does not resume advancing after HDMI AVMUTE state until the first encrypted frame. $K_s$ is a 56-bit key used to initialize the HDCP cipher for encryption or decryption of the HDCP Content. $M_i$ is a new 64-bit initialization value for the HDCP cipher. $R_i$ is a 16-bit value used for link integrity verification, and is updated for every 128th frame counter increment, starting with the 128th. The HDCP Transmitter verifies $R_i'$ against its own calculations to insure that the video receiver is still able to correctly decrypt the information. This verification is made at a minimum rate of once every two seconds. Synchronous reading of Ri every time it changes (every 128th frame) is also acceptable in lieu of asynchronous polling. (Synchronous reading in the frame prior to Ri update and shortly after 1 millisecond of the Ri update also provides a method of detecting frame counter mismatch between HDCP transmitter and HDCP receiver when either device does not support Enhanced Link Verification). It is required that the $R_i'$ read operation complete within 1 milliseconds from the time that it is initiated by the HDCP Transmitter. Failure for any reason causes the HDCP Transmitter to consider the HDCP Receiver to be unauthenticated.

In order to enhance the detection of the loss of encryption synchronization, the HDCP Transmitter and Receiver may optionally support Enhanced Link Verification, in which a computation to aid verification of cipher synchronization is performed when a specific video pixel is processed. For every 16th frame counter increment, the decrypted value of channel zero of the first pixel is combined with the least significant byte Rj using the XOR operation, and the result is made available on the Pj port. If this feature is supported by an HDCP Receiver, the Bcaps bit 1.1_FEATURES is set and the Pj' port is always updated. The HDCP Transmitter may optionally support reading and verifying the Pj' value against an internally generated Pj value. However, unless a minimum of three successive mismatches of stable values occur, this is considered to be a pixel transmission error and not an authentication or synchronization error. In addition, the mismatched Pj values must be sampled more than once in the same manner as the Ri value. (see Appendix C). Note that the frame counter may advance on unencrypted frames if ADVANCE_CIPHER mode (see below) is enabled, in which case the least significant byte Rj and the pixel data is captured every 16th frame. However, if ADVANCE_CIPHER is not enabled, these values are updated on every 16th encrypted frame.

ADVANCE_CIPHER mode is an optional mode in which the cipher state and frame counter is advanced for *every* frame in DVI mode, or for every frame when not in AVMUTE state for HDMI mode, regardless of whether encryption is enabled or disabled. The HDCP Receiver indicates this capability by setting the 1.1_FEATURES *Bcaps* bit, and the HDCP Transmitters enables it by setting the ENABLE_1.1_FEATURES bit in the *Ainfo* byte. The frame counter is first updated to a value of 1 when the first ENC_EN is sent or received after authentication, and thereafter incremented every frame, until SET_AVMUTE is set (in HDMI mode). The cipher state is not advanced if HDMI mode AV_MUTE is active, and resumes advancing with the first ENC_EN frame after HDMI CLEAR_AVMUTE.

Note: An HDMI-capable HDCP Transmitter that has enabled AC (by writing 1 to ENABLE_1.1_FEATURES bit of AInfo) may need to re-authenticate after sending an AVMUTE to the HDCP Receiver, since the HDCP Receiver may have ignored the HDMI General Control Packet that contained the Set_AVMUTE command, causing the loss of HDCP cipher synchronization.

## 2.3 HDCP Transmitter State Diagram

The HDCP Transmitter Link State Diagram and HDCP Transmitter Authentication Protocol State Diagram (Figures 2-5 and 2-6) illustrate the operation states of the authentication protocol for an HDCP Transmitter that is not an HDCP Repeater. For HDCP Repeaters, the downstream (HDCP Transmitter) side is covered in Section 2.5.

A variety of events are involved in the transmitter's decision to begin authentication or to transmit video. Some examples of such events may include hot plug detection of an attached HDCP Receiver, completion of certain phases of the operating system, a software request, and mode settings. HDCP receivers are not required to authenticate until presented with a video signal. When an HDCP Receiver acknowledges an I²C register read, it must be ready to

SONY0005646

authenticate, and, in the event of authentication failure, must be prepared to process subsequent authentication attempts. The HDCP transmitter should not attempt to authenticate until it has successfully obtained an acknowledged read of an HDCP I²C register. Should the I²C register read or the authentication fail, the HDCP Transmitter must retry periodically, with a period of no more than 2 seconds (preferably much more often). It may cease to attempt authentication only if the HDCP Receiver is clearly disconnected, as with a hot-plug detach.



Note: Transition arrows with no connected source state (e.g. Reset) indicate transitions that can occur from multiple states

**Fig. 2-5 HDCP Transmitter Link State Diagram**

SONY0005647



**Figure 2-6. HDCP Transmitter Authentication Protocol State Diagram**

**Transition Any State:H0.** Reset conditions at the HDCP Transmitter or loss of Hot Plug Detect (HPD) cause the HDCP Transmitter to enter the No Receiver Attached state. Some TMDS transmitters have the ability to directly sense the presence of a TMDS receiver (Receiver Sense). If this signal is present and indicates the absence of an HDCP Receiver, it should cause a transition to State H0.

**Transition H0:H1.** The detection of Hot Plug Detect indicates that a sink device is attached and that the EDID ROM is available for reading.

**State H1: Read EDID.** Whenever HPD is active, the HDCP Transmitter must assume that the receiver is available and displaying an image to the user. Consequently, the transmitter should transmit an image to the screen as soon as feasible. Upon detection of HPD, the HDCP Transmitter reads the EDID to determine the capabilities of the sink device, including whether it is HDMI capable (refer to the HDMI Specification 1.0 for details). If both transmitter and receiver are HDMI-capable, then the TMDS transmitter enters HDMI mode, otherwise, it enters DVI mode.

SONY0005648